1         **IN THE UNITED STATES DISTRICT COURT**
                   **FOR**
2        **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6  THE UNITED STATES
     OF AMERICA
7                         CRIMINAL ACTION NO.
      vs.            3:07-cr-313-MHT
8
  PIERRE MARCELLO GUNNINGS
9

10

11

12

13                   VOLUME I OF II
                    1ST DAY OF
14             JURY TRIAL PROCEEDINGS

15

16

17

18             * * * * * * * * * *

19

20

21  HEARD BEFORE:     The Hon. Myron H. Thompson

22  HEARD AT:         Opelika, Alabama

23  HEARD ON:         May 12, 2008

24  APPEARANCES:      Kent Brunson, Esq.
                      Danielle Mason, Esq.
25                   Donnie W. Bethel, Esq.

1          **T A B L E   O F   C O N T E N T S**

2

3     <u>ITEM DESCRIPTION</u>                        <u>PAGE NO.</u>

4
      Table of Contents .........................   1
5
      Title Page ................................   2
6
      Preliminary Discussion
7          (The jury is not present) ............   5

8     Will Panoke - Direct Voir Dire Examination
           by Mr. Bethel
9          (The jury is not present) ............   8

10    Will Panoke - Cross Voir Dire Examination
           by Mr. Brunson
11         (The jury is not present) ............   11

12    Pretrial Jury Charge
           by the Court .........................   18
13
      Opening Statements
14         by Mr. Brunson .......................   22

15    Opening Statements
           by Mr. Bethel ........................   27
16
      Will Panoke - Direct Examination
17         by Mr. Brunson .......................   32

18    Motion for Mistrial In Open Court ..........   43

19    Will Panoke - Cross Examination
           by Mr. Bethel ........................   50
20
      Bonnie Derrer - Direct Examination
21         by Mr. Brunson .......................   54

22    Bonnie Derrer - Cross Examination
           by Mr. Bethel ........................   55
23
      Bonnie Derrer - Redirect Examination
24         by Mr. Brunson .......................   57

25

# **T A B L E   O F   C O N T E N T S**

**ITEM DESCRIPTION**                                    **PAGE NO.**


Bonnie Derrer - Recross Examination
        by Mr. Bethel ........................... 58

Doug Johnson - Direct Examination
        by Mr. Brunson .......................... 59

Doug Johnson - Cross Examination
        by Mr. Bethel ........................... 64

Steve Wingo - Direct Examination
        by Mr. Brunson .......................... 67

Steve Wingo - Cross Examinatin
        by Mr. Bethel ........................... 75

Scott Fowler - Direct Examination
        by Mr. Bethel ........................... 84

Scott Fowler - Cross Examination
        by Mr. Brunson .......................... 92

Scott Fowler - Redirect Examinatin
        by Mr. Bethel ........................... 100

Devereau Racossi - Direct Examinatin
        by Mr. Bethel ........................... 101

Devereau Racossi - Cross Examination
        by Mr. Bunson ........................... 103

Devereau Racossi - Redirect Examination
        by Mr. Bethel ........................... 106

Priscilla Butler - Direct Examination
        by Ms. Mason ............................ 107

Priscilla Butler - Cross Examination
        by Mr. Brunson .......................... 109

Anthony Davis - Direct Examination
        by Ms. Mason ............................ 111

**T A B L E   O F   C O N T E N T S**

**ITEM DESCRIPTION**                                              **PAGE NO.**


Anthony Davis - Cross Examination
     by Mr. Brunson ........................... 113

Anthony Davis - Redirect Examination
     by Ms. Mason ............................. 114

William Gunnings - Direct Examination
     by Ms. Mason ............................. 116

William Gunnings - Cross Examination
     by Mr. Brunson ........................... 120

William Gunnings - Redirect Examination
     by Ms. Mason ............................. 123

Tequila Griffin - Direct Examination
     by Mr. Bethel ............................ 124

Tequila Griffin - Cross Examination
     by Mr. Brunson ........................... 127

Tequila Griffin - Redirect Examination
     by Mr. Bethel ............................ 128

Patsy Thomas - Direct Examination
     by Ms. Mason ............................. 131

Patsy Thomas - Cross Examination
     by Mr. Brunson ........................... 141

Patsy Thomas - Redirect Examination
     by Ms. Mason ............................. 143


Court Reporter's Certificate .................. 145

-o0o-

MITCHELL P. REISNER, CM, CRR
Official U. S. Court Reporter
Middle District of Alabama
(334) 265-2500

1  WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE
   HON. MYRON H. THOMPSON ON MAY 12, 2008 AT THE UNITED STATES
2  COURTHOUSE IN MONTGOMERY, Alabama:

3

4                     PRELIMINARY DISCUSSION

5                 (THE JURY IS NOT PRESENT):

6            THE COURT:  How long do you need for your opening

7  statements?

8            MR. BRUNSON:  Ten minutes, Your Honor.

9            MR. BETHEL:  That will be sufficient, Your Honor.

10           THE COURT:  Ten minutes it is for each side.

11           Are your witnesses here, Mr. Brunson?

12           MR. BRUNSON:  Your Honor, I haven't had a chance to

13  check.  I know during jury selection your law clerk had told

14  me one had arrived. I don't know -- There were two who were

15  supposed be here at eleven.

16           THE COURT:  Have your witnesses here at one-ten and

17  we'll swear in all witnesses.

18           Any witnesses you have, Mr. Bethel, have them here

19  at one-ten.

20           I considered your notice of intent to use four oh

21  four B evidence.  I'll sustain the objection at this time.

22  I'll reconsider it when you're ready to use that evidence and

23  I'll hear argument at that time.  In other words, you're not

24  to mention it during your opening statement.

25           Anything else?

1          MR. BETHEL:  Yes, Your Honor.  I believe there are

2   a couple of preliminary matters we could take up at this

3   time.

4          THE COURT:  What are they?

5          MR. BETHEL:  Number one, Mr. Brunson and I had an

6   oral stipulation as to the fact that Mr. Gunnings was, in

7   fact, under a felony indictment, had been arraigned under a

8   felony indictment as of the date alleged, that is December

9   sixteenth, two thousand and six.

10         THE COURT:  You need to present that stipulation to

11  the jury later.

12         MR. BETHEL:  What I'm saying is an *Old Chief*

13  stipulation, a felon in possession.

14         THE COURT:  Very good.

15         MR. BRUNSON:  Your Honor, I was not asked about

16  this until this morning.  Generally, when we have a *Old Chief*

17  objection there is a written stipulation that is presented

18  that the jurors can have, and I don't have the ability

19  without a computer, or even a typewriter here, to prepare a

20  stipulation at this time.

21         THE COURT:  So what are you telling me?

22         MR. BRUNSON:  I'm telling you Mr. Bethel asked me

23  about this this morning, and I have agreed but I'm not able

24  to give him a written stipulation.

25         THE COURT:  Do you wish to prepare one?

1          MR. BETHEL:  If he'd like to prepare one this

2    evening and bring it back to court tomorrow, that's fine with

3    us, Your Honor.

4          MR. BRUNSON:  I would ask Mr. Bethel, since he

5    brought this up, if he has the ability to prepare one.

6    Because I'm not going back to Montgomery.  I don't have

7    access to a computer.

8          MR. BETHEL:  I'll be happy to do that, Your Honor.

9          THE COURT:  Very good.

10          Anything else?

11          MR. BETHEL:  One other issue, Your Honor.  I would

12    like to voir dire Agent Panoke before he testifies.  I may

13    have an objection to some of his testimony that I would like

14    to keep from the jury, depending upon what his answers to a

15    few questions may be.

16          THE COURT:  Is he your first witness?

17          MR. BRUNSON:  Yes, Your Honor.

18          THE COURT:  Okay.  What else?

19          MR. BETHEL:  That's it, Your Honor.

20          THE COURT:  Okay.  What in particular do you wish

21    to ask him about?

22          MR. BETHEL:  There's a couple of statements, two

23    lines in the narrative that we were provided about his

24    telephone conversation with Mr. Gunnings.  He makes a couple

25    of statements Mr. Gunnings has made, and it's not clear

1    whether it was a spontaneous declaration, whether it was in

2    response to questions by Agent Pinoke.  And that's the

3    substance of my voir dire.

4            MR. BRUNSON:  Your Honor, my position would be that

5    he was not in custody in any event.  This was a telephone

6    situation.  It was not a custodial situation.

7            THE COURT:  Okay, then.  Why don't we take this up

8    at this time right now.

9            Swear in the agent.

10                   W I L L    P A N O K E,

11      the witness herein, having first been duly sworn or

12    affirmed to tell the truth, was examined and testified as

13    follows:

14                   DIRECT VOIR DIRE EXAMINATION

15                   BY MR. BETHEL OF WILL PANOKE.

16                   (THE JURY IS NOT PRESENT):

17            THE COURT:  Go ahead.

18    Q.  Agent Panoke, I wanted to ask you about a telephone

19    conversation that you had with Mr. Gunnings on the thirtieth

20    of March.

21    A.  Yes, sir?

22    Q.  According to the notes in the narrative that you provided

23    to Mr. Brunson, you called Mr. Gunnings and identified

24    yourself?

25    A.  That's correct, yes, sir.

1  Q.   It says that you advised Mr. Gunnings that the A. T. F.

2  was conducting a federal firearms investigation involving his

3  attempted firearms purchase.

4  A.   Correct.

5  Q.   Let me just start with a couple of predicates.  Was this

6  conversation recorded?

7  A.   It was not.

8  Q.   Was there anybody else on another line who was listening

9  in to this conversation?

10  A.   No, sir.

11  Q.   So this would have been just between you and Mr.

12  Gunnings?

13  A.   That's correct.

14  Q.   Now it says that you explained that the A. T. F. would

15  like to arrange an in-person interview with Mr. Gunnings as

16  to be able to advise him of his constitutional rights.

17  A.   Yes, sir.

18  Q.   Did you explain to him why you wanted to advise him of

19  his constitutional rights?

20  A.   I did not.  I merely stated that I wanted to arrange an

21  in-person interview and to advise him of his constitutional

22  rights.

23  Q.   But you told him you wanted to advise him of his

24  constitutional rights, but you didn't tell him why?

25  A.   I felt that we were conducting a federal investigation

1    and I assumed that he would have understood.

2    Q.  Why would you assume that he would understand what he was

3    being investigated for if you didn't advise him of it?

4    A.  I don't know.

5    Q.  All right.  And the next thing it says is simply,

6    "Gunnings stated he did not receive the weapon because he was

7    denied."

8    A.  That's correct.

9    Q.  What was your response to that statement?

10   A.  Well I told him before he made any statements or before

11   we discussed anything further, again, I wanted to talk with

12   him in person and just have a consensual interview with

13   him.

14   Q.  The next thing that you note in your narrative is this:

15   "Gunnings also stated that he did not know he was under

16   indictment for his charges in Georgia and he could not

17   purchase any firearms."

18   A.  That's correct.

19   Q.  How is it that he made that statement?

20   A.  Well I told him that the reason why we were conducting an

21   investigation, he answered one of the questions on the form

22   to know that question being eleven B where it asked him

23   whether he was under indictment or information for any felony

24   charges anywhere.  And he said he didn't know he was under

25   indictment.

1  Q.  And it's that is why you wanted to have a face-to-face

2  interview and advise him of his constitutional rights?

3  A.  Correct.

4  Q.  Because you were investigating him for that particular

5  violation of federal law?

6  A.  That's correct.

7         MR. BETHEL:  No further questions, Your Honor.

8                    CROSS VOIR DIRE EXAMINATION

9                   BY MR. BRUNSON OF WILL PANOKE

10                  (THE JURY IS NOT PRESENT):

11  Q.  What was Mr. Gunnings' response to you having an in-face

12  meeting?

13  A.  He told me to contact his attorney and arrange a

14  meeting.

15  Q.  At this time had you ever met Gunnings?

16  A.  I had not.

17  Q.  Have you told the Court the substance in total of this

18  conversation?

19  A.  Yes, sir.  The conversation was very brief.  It sounded

20  like he was driving or something.  Probably preoccupied, so

21  it was a really short interaction.

22  Q.  Did you call him, or did he call you?

23  A.  I called him.

24  Q.  On a cell phone, I take it, if he was driving?

25  A.  I think so.  I assumed so.

```
 1   Q.  Did you tell him that he was subject to arrest?

 2   A.  I did not.

 3   Q.  Was he under arrest?

 4   A.  He was not.

 5            THE COURT:  When he made these statements to you,

 6   were they in response to any questions from you?

 7            THE WITNESS:  No, sir.

 8            THE COURT:  He volunteered them?

 9            THE WITNESS:  That's correct, sir.

10   Q.  Did you follow up?  Did you ask him if he knew that he

11   was under indictment?

12   A.  I did not.  I didn't ask him any questions.

13            MR. BRUNSON:  No further questions.

14            THE COURT:  Mr. Bethel?

15            MR. BETHEL:  No further questions, Your Honor.

16            THE COURT:  Thank you.

17            (Whereupon the witness, Will Panoke, stepped down

18   from the stand.)

19            THE COURT:  Mr. Bethel?

20            MR. BETHEL:  Your Honor, I would first object to

21   any testimony from this witness concerning Mr. Gunnings'

22   invocation of his right to counsel.

23            THE COURT:  You mean the statement that he wished

24   to speak with counsel?

25            MR. BETHEL:  Yes, Your Honor.
```

```
 1            THE COURT:  Just that statement itself?

 2            MR. BETHEL:  Yes.

 3            THE COURT:  Mr. Brunson?

 4            MR. BRUNSON:  Your Honor, I have the agent here.

 5  He understands he is not under -- he is not to answer even if

 6  he understands a question I asked.

 7            THE COURT:  He's not to mention that Mr. Gunnings

 8  asked to speak to counsel.

 9            MR. BRUNSON:  Yes, sir.

10            THE COURT:  What else?

11            MR. BETHEL:  Your Honor, I further object to any

12  testimony from this witness concerning Mr. Gunnings'

13  statement that he did not know he was under indictment.  That

14  statement was made, number one, after Agent Panoke had told

15  already him that the reason he wanted to see him was to

16  advise him of his constitutional rights and there was an

17  ongoing federal firearms investigation.  So clearly there's

18  no dispute that Mr. Gunnings was a suspect at the time, and

19  that he was, in fact, a suspect of the investigation that was

20  ongoing.

21            As to whether or not there was a question, the fact

22  is that the statement that Agent Panoke made is what prompted

23  Mr. Gunnings --

24            THE COURT:  What statement?

25            MR. BETHEL:  That statement being that he had
```

```
1   filled out the form checking "no" on the box that said he was

2   indictment.  That statement alone is going to prompt a

3   response.  It may not be definite after an interrogative, but

4   that statement alone after he has notified Mr. Gunnings that

5   he's under investigation and he wants to advise him of his

6   constitutional rights, i.e., Miranda rights, to make that

7   statement clearly is going to evoke a response.  And that's

8   exactly what happened.  And that response should have been --

9   That statement should not have been made until such time as

10  Agent Panoke did, in fact, advise Mr. Gunnings of his Miranda

11  rights.

12          THE COURT:  Was Mr. Gunnings in custody?

13          MR. BETHEL:  He was not in custody, Your Honor.

14          THE COURT:  If he wasn't in custody, then what's

15  the basis for the suppression?

16          MR. BETHEL:  The basis for the suppression is that

17  he was a suspect in a criminal investigation, Agent Panoke

18  knew that he was a suspect in a criminal investigation --

19          THE COURT:  Do you have any law that the supports

20  that?

21          MR. BETHEL:  Not one bit, Your Honor.

22          THE COURT:  Okay.  Thank you very much.

23          MR. BETHEL:  You're welcome, Your Honor.

24          THE COURT:  Mr. Brunson?

25          MR. BRUNSON:  Nothing further, Your Honor.
```

```
 1           THE COURT:  Okay.  I'll let you know about that
 2   after lunch.
 3           Is that the only statement we're talking about, by
 4   the way?
 5           MR. BETHEL:  Yes, other than the one we've already
 6   discussed.
 7           THE COURT:  The one we've already discussed, that
 8   objection is sustained.
 9           MR. BETHEL:  That's it, Your Honor.
10           THE COURT:  Very good.  I'll let you know after
11   come back at one-ten.
12           (Whereupon, the luncheon recess was taken.)
13                   DISCUSSION IN OPEN COURT
14                   (THE JURY NOT PRESENT):
15           THE COURT:  Anything else, Counsel, before we get
16   started and I rule on this evidentiary matter?
17           MR. BETHEL:  No, Your Honor.
18           THE COURT:  Mr. Brunson, anything?
19           MR. BRUNSON:  No, Your Honor.
20           THE COURT:  The Court considers the defendant's
21   challenge to the testimony of the officer to be a motion to
22   suppress a statement, and the motion is denied.  The law is
23   clear that *Miranda* is required only if the defendant was both
24   in custody and being interrogated.  And the Court would cite
25   for that proposition *United States vs. Grimes*, one forty-two
```

1    F. Third, thirteen forty-two at -- I think it's at page

2    thirteen forty-eight but I'm not sure.

3            But anyway, it's clear here that the defendant was

4    not in custody under any circumstances.  The mere fact that

5    he was being informed of the reasons that the officer wanted

6    to see him did not convert the conversation to one which the

7    defendant was in custody.

8            Secondly, the defendant was not being interrogated.

9    While it is true that the term "interrogation" refers not

10   only to express questioning but also to words or actions on

11   the part of the police, that the police should know or

12   reasonably likely to elicit an interrogating response from

13   the suspect.  Here the officer was merely explaining why he

14   wished to meet with the defendant later, and while some

15   people might want to answer that informative statement with

16   the statement, the informant statement itself was not

17   reasonably likely to elicit in particular an incriminating

18   response, which is what the Supreme Court has stated

19   constitutes interrogation.

20           In that regard, I refer to the case of *Rhode Island*

21   *versus Inis*, I-n-i-s, four forty-six U. S. two ninety-one at

22   page three oh one, a nineteen eighty Supreme Court case.

23           Anything else?

24           MR. BRUNSON:  No.  Thank you, Your Honor.

25           MR. BETHEL:  Just one other thing, Your Honor.

```
 1   Since we have agreed with the Government concerning a
 2   stipulation involving Mr. Gunnings, that that is that he was
 3   under indictment in December of two thousand and six.  As a
 4   matter of a motion in limine, I would object to his
 5   discussion of any of the particulars of the indictment
 6   itself.
 7             MR. BRUNSON:  Your Honor, here is the stipulation
 8   that I prepared.  Mr. Bethel has agreed with this language.
 9   "The parties agree and stipulate that the defendant Pierre
10   Marcello Gunnings had been invited for a felony offense prior
11   to December sixteenth, two thousand six when he completed A.
12   T. F. form forty-four seventy-three at Pawn Central
13   Incorporated when he attempted to purchase a firearm.
14             MR. BETHEL:  Yes, we stipulate to that, Your Honor.
15             THE COURT:  Very good.
16             Bring in the jury.
17             How long do you need -- oh, we said ten minutes to
18   a side.
19             MR. BRUNSON:  Yes, Your Honor.
20             MR. BETHEL:  Your Honor, it appears the
21   Government's witnesses are in the courtroom, and we would
22   invoke the rule.
23             THE COURT:  Bring your witnesses forward and we'll
24   swear in all witness.
25             Does Mr. Gunnings right now think he might testify?
```

1          MR. BETHEL:  We will reserve the right to make that

2     decision.

3          THE COURT:  Let's just swear him in right now just

4     in case he does.

5          MR. BETHEL:  All right, Your Honor.

6          (Whereupon, all prospective witnesses currently

7     present were duly sworn.)

8          THE COURT:  All right.  Bring in the jury.

9          COURT OFFICER:  Jury entering.

10          (Whereupon, the jury was escorted into the

11     courtroom.)

12          THE COURT:  As I said earlier, you are the jury

13     that will try the case of *United States of America vs. Pierre*

14     *Marcello Gunnings*.

15          At this time I'm going to ask that you stand again.

16     Please stand, and the clerk will swear you in.

17          (Whereupon, the petit jury was duly sworn by the

18     courtroom deputy clerk.)

19          THE COURT:  Be seated.

20                    PRETRIAL JURY CHARGE:

21          THE COURT:  Members of the jury, you have now been

22     sworn as the jury to try this case.  By your verdict, you

23     will decide disputed issues of fact.  I will decide all

24     questions of law that arise during the trial, and before you

25     retire to deliberate at the close of the case I will instruct

1  you on the rules of law that you must follow and apply in

2  reaching your decision in this case -- that is, your verdict.

3          Now because you will be called upon to decide the

4  facts of the case, you should give careful attention to the

5  testimony and evidence presented for your consideration

6  during the trial.  But you should keep an open mind and

7  should not form or state any opinion about the case one way

8  or the other until you have heard all of the evidence and

9  until you've have had the benefit of the closing arguments of

10 the attorneys as well as my instructions to you on the

11 applicable law.

12         Now during the trial you must not discuss the case

13 in any manner among yourselves or with anyone else.  Nor

14 should you permit anyone to discuss the case in your

15 presence.  And insofar as the attorneys are concerned, as

16 well as others whom you may come to recognize as having some

17 connection with this case, in order to avoid even the

18 appearance of impropriety, as I said before you should have

19 no contact with these persons while you are serving on this

20 jury.

21         Now the reasons for these cautions lie in the fact

22 that it will be your duty to decide this case only on the

23 basis of the testimony and evidence presented during the

24 trial without consideration of any other matters whatsoever.

25         Now a question sometimes arises as to whether

1    individual members of the jury will be permitted to take

2    notes during the trial.  If you would like to take notes you

3    may do so.  Indeed, we have furnished you with pads and

4    pencils.  On the other hand, you are not required to take

5    notes if you do not want to.  That is left up to you

6    individually.  If you do decide to take notes, be careful not

7    to get so involved in note-taking that you become distracted

8    from the ongoing proceedings.  Also, your notes should be

9    used only as your aids to your memory, and if your memory

10   should later differ from your notes you should rely upon your

11   memory and not necessarily your notes.

12          If you do not take notes you should rely upon your

13   own independent recollection or memory of what the testimony

14   was, and you should not be unduly influenced by the notes of

15   other jurors.  Notes are not entitled to any greater weight

16   or believability than the recollection or impression of each

17   juror as to what the testimony was.

18          Now from time to time during the trial I may be

19   called upon to make rulings of law on objections or motions

20   made by the attorneys.  You should not infer or conclude from

21   any ruling that I may make, that I have any opinion on the

22   merits of this case favoring one side or the other.  And if I

23   should sustain an objection to a question that goes

24   unanswered by a witness, you should not speculate on what the

25   answer might have been if given, nor should you draw any

1    inferences or conclusions from the unanswered question

2    itself.

3          Now during the trial it may be necessary for me to

4    confer with the attorneys from time to time out of your

5    hearing with regard to matters of law or procedure that

6    require consideration by the Court alone -- that is by me

7    alone.  On some occasions you may even be excused from the

8    courtroom for this purpose.  Now I will try to limit these

9    interruptions as much as possible, but I ask that you be

10   patient even though the case may seem to go slowly at times.

11   I'll further ask that you remember at all times the

12   importance of the matter that you are here to decide.

13         Now we will begin by affording the attorneys for

14   each side an opportunity to make openings statements to you

15   in which they may explain the issues in the case and

16   summarize the facts that they expect the evidence will show.

17         Now after all of the testimony and evidence has

18   been presented, the lawyers, that is the attorneys, will be

19   given another opportunity to address you at the end of the

20   trial and make their summations, or final arguments.  The

21   statements that the attorneys make now, as well as the

22   arguments that they present at the end of the trial, are not

23   to be considered by you either as evidence, which will come

24   only from witnesses and exhibits, or as your instructions on

25   the law, which will come only from me.  Nevertheless, these

1    statements and arguments are intended to help you understand

2    the issues and the evidence as it comes in, as well as the

3    positions taken by both sides.

4         Now at this time I'm going to the ask that you give

5    your close attention to the attorneys as they make their

6    opening statements.

7         Mr. Brunson.

8                        OPENING STATEMENTS:

9         MR. BRUNSON:  May it please the court, ladies and

10   gentlemen of the jury.

11        I know it hasn't been too long since we were

12   introduced, but I'll very briefly tell you that I am Kent

13   Brunson from the United States' Attorney's Office, assisted

14   by Will Panoke with the Bureau of Alcohol, Tobacco, Firearms

15   and Explosives.  And here for the defendant in this case is

16   Donnie Bethel and Danielle Mason.

17        As the judge has just told you, you are here, you

18   have been selected from a large number people who were here

19   this morning to hear a very important case for both sides.

20        This case that brought to you Opelika today started

21   with an indictment that was returned charging Mr. Gunnings

22   with two counts.  Both of these counts are a violation of

23   Title Eighteen of the United States Code.  Count one charges

24   A violation of Title Eighteen, Section nine twenty-two A six.

25   The other one is a violation of Title Eighteen, Section nine

1    twenty-four A one A.

2          The nine twenty-two A six violation makes it a

3    federal crime or an offense for anyone to possess or buy a

4    firearm, to make a false statement to a licensed firearms

5    dealer.  To prove that case you must believe and agree beyond

6    a reasonable doubt, all of you unanimously, that first the

7    defendant acquired or attempted to acquire a firearm from a

8    federally licensed firearm dealer; two, that in doing so the

9    defendant knowingly made a false or fictitious statement

10   orally or in writing -- in this case it would be in writing

11   -- that was likely to deceive, and that the subject matter of

12   the false statement was material to the lawfulness of the

13   sale.

14         Now I read that because that's an element, but the

15   materiality part will be decided by the judge.  He will

16   determine after the evidence is in if this was a material

17   false statement.

18         The nine twenty-four A one A offense was made a

19   federal crime for anyone to knowingly make a false statement

20   or representation with respect to the information that's

21   required to be kept in the records of a personal licensed to

22   sell firearms.  That's an F. F. L., federal firearms

23   licensee.

24         The elements in this case are that the defendant

25   knowingly made a false statement or representation, the

1    defendant made the statement or representation to a licensed

2    dealer or manufacturer or collector of firearms, and that the

3    statement pertained to the information that the law requires

4    the dealer or manufacturer or collector to keep.

5           I expect the evidence to show, ladies and

6    gentlemen, that on December the sixteenth, the date charged

7    in the indictment, that's December the sixteenth, two

8    thousand and six, that Mr. Gunnings went to a pawnshop in

9    Opelika, Alabama for the purpose of purchasing a firearm.

10   You'll hear two witnesses for that pawnshop testify that they

11   are federally -- or that pawnshop is a federally firearms

12   licensee.  They are required to keep records and documents,

13   and they did so in this case.

14          One of the questions, and a form will be introduced

15   to you, one of the questions on this form is, "Are you under

16   indictment or any information in any court for a felony or

17   any other crime for which the judge could imprison you for

18   more than one year?"  I expect the evidence to show that in

19   September -- this happened in December of two thousand six --

20   in September of two thousand six Mr. Gunnings was indicted in

21   Georgia.  Then in October, on October thirteenth, he was

22   brought into court and told that he was charged in a felony

23   offense.

24          Now the offense to you is not material.  It's what

25   is important is his knowledge that he was under indictment

1   when he falsely filled out that form.

2          As the judge has already told you, only consider

3   the evidence that comes from the witness stand from the

4   witnesses and the documents that are introduced from the

5   witnesses.  Now in this case there is one important

6   exception, and that is the parties have agreed, stipulated,

7   and a written stipulation will go to you when you go to

8   deliberate this verdict, that Mr. Gunnings admits that prior

9   to December the sixteenth, two thousand six, that he had been

10  indicted for a felony offense.

11         That is a written stipulation, so when that comes

12  as one of the elements you can skip over that because the

13  parties agree to that.  And it's not important for you to

14  consider what the offenses are.  It's just that he was

15  indicted, under indictment when he applied for this firearm

16  on December the sixteenth two thousand six.

17         Another thing that's very important that you're

18  going to carry into that jury room with you is your common

19  sense.  Again, you were narrowed down for your own particular

20  importance in this case to consider the facts of this case,

21  and part of that is your common sense.  You're not expected

22  to leave that out.  You're not to communicate with each other

23  and discuss this case until you have been given the case by

24  the judge after you have been charged.

25         When you go to deliberate, take the evidence with

1   you seriously, like both parties are entitled, like your oath

2   requires.  And use your common sense and reach a fair verdict

3   beyond a reasonable doubt.  And it has to be unanimous.

4          None of the witnesses in this case are going to

5   tell you all of the elements, that everything you need to

6   know about this case.  Agent Panoke is going to give you a

7   small piece of the puzzle.  An Assistant District Attorney

8   from Georgia is going to give you a small piece of the

9   puzzle.  The two people from the pawnshop are going to come

10  and testify and give you their evidence in this case.  You

11  will have as evidence the form that was filled out that

12  contains the false statement.

13         This case will proceed through my brief

14  introductory remarks, Mr. Bethel's, and then we'll begin to

15  call witnesses, first for the Government and then for the

16  defendant.

17         Once that is done, the attorneys get to conclude,

18  as Judge Thompson has already told you, by stating to you the

19  facts that they want you to consider in reaching your

20  verdict.  After that is completed, he will then charge you on

21  the law.  You are bound to follow his charge on the law.

22  That's the one thing that you need to listen to and follow

23  his instructions carefully.  After that, it's your case.  You

24  go back to deliberate and you reach a fair and impartial

25  verdict.  That's what you're here to do.

```
 1              I thank you for your attention.
 2                        OPENING STATEMENTS:
 3         THE COURT:  Mr. Bethel?
 4         MR. BETHEL:  Thank you, Your Honor.
 5              May it please the Court, ladies and gentlemen of
 6  the jury.
 7              Pierre Gunnings can't read.  You're going to hear
 8  from Mr. Scott Fowler.  Mr. Fowler currently works in the
 9  construction industry, but some years ago when Mr. Gunnings
10  was in high school, Mr. Fowler was a Special Education
11  teacher at Auburn High School.  He has a master's degree in
12  Special Education.  He is going to testify.  He's going to
13  take the witness stand.  He is going to tell you that he
14  taught Pierre for a year while Pierre was in high school, and
15  he is going to tell you that Pierre cannot read.  He is going
16  to tell you that Mr. Gunnings certainly can't read words like
17  "felony" and "indictment," the key words that the prosecutor
18  was talking about that got to appear on that form that he
19  filled out.
20              We have a number of witnesses who are going to
21  testify, and they're all going to tell you that Pierre
22  Gunnings can't read.  We have several family members who will
23  tell you that it was well known in the family that Pierre
24  Gunnings can't read.  We have army buddy of Mr. Gunnings who
25  will tell you that he served with Mr. Gunnings, and that Mr.
```

1    Gunnings, it was well known in the unit that Mr. Gunnings
2    cannot not read.
3             We have his girlfriend approximately two years ago
4    prior to the time that this indictment was filed in December,
5    prior to the time that Mr. Gunnings went into the pawnshop
6    and filled out that form, and she will tell you that Mr.
7    can't read.  That she filled out forms for him.  That she
8    read things to him.  One of the most important witness you're
9    going to hear from is Ms. Patsy Thomas.
10            Miss Thomas is going to tell you that she also has
11   a Master's degree in education, that she's been working as a
12   volunteer in literacy programs for well on thirty years.  And
13   that for the last two years, including the period of time
14   when Mr. Gunnings filled out that form at the pawnshop, that
15   Mr. Gunnings can't read, and she's been tutoring him that
16   very period of time.  She will tell you that Mr. Gunnings
17   can't read words like "felony" and "indictment".  That's what
18   you're going to hear.  And what's key in this case is that
19   word that Mr. Brunson used, "knowingly".
20            The question is when Mr. Gunnings filled out that
21   form, if he knowingly and intentionally falsified that
22   question.  If he couldn't read the question and didn't know
23   what the question asked, then he didn't knowingly falsify
24   that form.  It's that simple.
25            So the question you're going to have to ask

```
1    yourself during the course of this trial is did Mr. Gunnings
2    knowingly falsify that form.
3            And as far as indictment goes, we'll concede a
4    number of things.  There is no doubt that in September of two
5    thousand six, Mr. Gunnings was indicted, a felony indictment
6    in the state of Georgia.  There's no doubt he was arraigned
7    on that charge prior to the time that he went to that
8    pawnshop in Alabama in December.  That's not in dispute.  We
9    don't dispute that whatsoever.
10           We don't dispute that he filled out that form.  And
11   Mr. Fowler and Ms. Thomas will tell you that it's common for
12   someone, the term I will use is "functionally illiterate,"
13   Mr. Flower will tell you, for instance, that Pierre Gunnings
14   is not dumb.  He's right.  He is very, very good verbally,
15   but he will tell you that he can't make the connection with
16   letters to be able to read.
17           So Mr. Fowler will explain when he testifies that,
18   simply put, Pierre Gunnings can't read and couldn't have
19   filled out that form knowingly.  Ms. Thomas is going to tell
20   you exactly the same thing.  And as I said, you'll hear from
21   a number of other witnesses who will all tell you that Pierre
22   Gunnings can't read.
23           Now one other question that has to be answered is
24   how in the world did someone get into the Army, taking a test
25   if that person can't read?  And there is a simple explanation
```

1    for that.  It's not particularly flattering.  The explanation

2    is this:  You're going to hear from Mr. Gunnings' brother and

3    Pierre wanted to get into the army, but he knew he wouldn't

4    be able to pass the test.  So what happened was his brother

5    will tell you that -- his name is William Gunnings -- that

6    Mr. William Gunnings took Pierre's Social Security card and

7    went down to the army recruiter and he went down and took the

8    test in the name of Pierre Gunnings.

9             Is it something he should have done?  Absolutely

10   not.  But those are the facts, and that's what you're going

11   to hear the testimony from the witness stand about how Mr.

12   Gunnings got into the army.

13            It's going to be interesting when we look at that

14   form.  There are a number of things I'm going to ask you to

15   take a very close look at on that form that was filled out.

16   What I was saying earlier was Mr. Fowler and Ms. Thomas will

17   both tell you that when you have someone who is functionally

18   illiterate, it is not uncommon for them to be able to write

19   simple words that they have to use repeatedly.  Things like

20   their name, their address, their phone number.  Identifying

21   information.  They learn how to write those because they

22   learn how to get by.

23            They will also tell you that not being able to read

24   is something that many of the people they work with are

25   reluctant to admit because, quite simply, it's humiliating

1   and embarrassing for a grown man who is twenty-six years old
2   to have to admit in public, in court, for instance, that he
3   doesn't read.  And to have to listen to a parade of witnesses
4   who are going to come in and tell you that they all know that
5   Pierre Gunnings can't read.
6           That's the question in this case.  If you look at
7   those two charges in the indictment, those charges are very
8   similar.  They happen to be violations of two different laws
9   that there is a slight variation, but I will tell you this,
10  either Mr. Gunnings is guilty of both or he's not guilty of
11  both.  There is no way, based on the elements of those
12  offenses the way it's been charged that you could find him
13  guilty of count one and not guilty of count two or the other
14  way around.  Either he's guilty or he's not guilty of both
15  those counts.
16          What you're going to find out is, he's not guilty
17  because he didn't knowingly and intentionally falsify that
18  form.  And the reason you're going to hear that he didn't
19  knowingly falsify that form is very simply that Pierre
20  Gunnings can't read.
21          THE COURT:  First witness.
22          MR. BRUNSON:  Will Panoke.
23                   W I L L   P A N O K E,
24      the witness herein, having first been duly sworn or
25  affirmed to tell the truth, was examined and testified as

```
 1   follows:

 2                        DIRECT EXAMINATION

 3                   BY MR. BRUNSON OF WIL PANOKE:

 4   Q.   Would you please state your name and how you're employed.

 5   A.   Sure.  My name is Will Panoke, and I'm a special agent

 6   with the Bureau of Alcohol, Tobacco and Firearms and

 7   Explosives.  A. T. F.

 8   Q.   What are your duties and assignments with A. T. F.?

 9   A.   I investigate violations against the federal firearms

10   laws, explosive laws, as well as assist local law enforcement

11   on curtailing violent crimes in communities.

12   Q.   As far as this particular case goes, did you investigate

13   this case?

14   A.   That's correct.

15   Q.   What was the complaint, the purpose of your investigating

16   the case?

17   A.   We were notified, "we" being the A. T. F. in the

18   Montgomery field office, was notified I'd say somewhere

19   around February of two thousand seven by the U. S. Attorney's

20   Office where they in fact requested us to investigate four

21   separate cases, one of them being or involving Mr. Gunnings

22   who had actually attempted to purchase a firearm and

23   falsified information on the A. T. F. form forty-four

24   seventy-three, which is the form that anyone who wants to

25   purchase a firearm has to complete.
```

1          Those cases, again, the individual falsified

2  information, so I initiated an investigation to find out the

3  details of the case.

4          MR. BRUNSON:  Your Honor, may I approach?

5          THE COURT:  Yes.

6  Q.  I'm handing you two documents.  One has been marked for

7  identification as Government's exhibit one, and the other one

8  is marked Government's exhibit one A, again for

9  identification.  Starting with Government's exhibit one, what

10  is that, please?

11  A.  This is an actual A. T. F. form forty-four seventy-three

12  that individuals who want to purchase a firearm from a

13  federal firearms licensee, or F. F. L., have to complete to

14  be able to purchase the firearm.  And it's a three-page --

15  it's sectioned off in three pages.

16  Q.  And those three pages make up the exhibit, all three

17  pages comprise exhibit one?

18  A.  Yes.

19  Q.  Agent Panoke, in looking at that, can you read anything

20  that has been or may have been written on that page?

21  A.  Barely.  It appears that there were some writings or

22  notations on this form, but it's not visible anymore.

23  Q.  Can you explain to the jury briefly why it's not visible

24  on that form?

25  A.  Absolutely.  This is the actual form that I took

1    possession of from the F. F. L. here in Opelika, Alabama.  I

2    sent this actual form to the Alabama state crime lab to have

3    it analyzed for fingerprints and the chemicals that the

4    latent print examiners use, it causes the ink to disappear.

5    Q.  Once you received the form -- well, let me ask, where did

6    you get it?

7    A.  I took possession of this form from Pawn Central in

8    Opelika, Alabama.

9    Q.  Once you got that, knowing that you were going to send it

10   to the crime lab, did you make a copy?

11   A.  Yes, sir, I made several copies of this form.

12   Q.  Did you observe the form in its original state prior to

13   it being copied?

14   A.  I did.

15   Q.  Did you observe -- You said you made a copy.  Would you

16   look at one A and see if that is a copy.

17   A.  This is in fact an exact photocopy of exhibit one.

18   Q.  Did you make that?

19   A.  I did.

20   Q.  Did you review it after you made it?

21   A.  I did.

22   Q.  And as you have testified, is it an exact copy?

23   A.  Yes, it is.

24   Q.  What is the purpose of that form?

25   A.  The purpose of the form is by law, federal law, federal

1  firearms licensees are required to take information from the

2  potential customer or the potential gun purchasers to conduct

3  a background investigation.  It has a section for them to put

4  their personal information like name, address, date of birth

5  and so forth, as well as it asks a list of questions to

6  determine whether the individual is prohibited or not to

7  purchase a firearm.

8  Q.  What would prohibit a person under the law from

9  purchasing a firearm?

10  A.  If someone has been convicted of a felony, if someone is

11  under indictment or information of a felony charge, if

12  someone who is an illegal alien, someone who is a fugitive or

13  someone who has renounced their U. S. citizenship, those

14  types of questions are asked on this form.

15  Q.  Is one of those questions determined to have an answer

16  untruthfully on that form?

17  A.  Yes, sir.

18  Q.  And which one is that?

19  A.  That would be question eleven B.

20  Q.  Would you read that question for the jury.

21  A.  Sure.

22          MR. BETHEL:  Your Honor, excuse me.  What

23  Mr. Brunson is asking this witness to do is to read from a

24  document that has not as yet been admitted in evidence.  That

25  would not be proper, since this evidence is not properly

1    before the Court yet.

2            MR. BRUNSON:  I would agree, Your Honor, and I

3    would now move to introduce the exhibits as Government's

4    exhibits one and one A.

5            THE COURT:  Okay.

6            MR. BETHEL:  Your Honor, I do have an objection.

7    That document is hearsay.  It can be properly admitted under

8    the business exception to the hearsay rule, but this is not

9    the proper way to lay that that foundation.  That would have

10   to come form someone who either reported the information or

11   could say it had been reported contemporaneously with the act

12   that took place, and someone from the business itself.  So

13   while it may be properly admitted, it's not properly admitted

14   through this witness, Honor, so I object.

15           MR. BRUNSON:  Your Honor, I will tie this up.  I

16   have two witnesses from the store and they would testify to

17   that form.  If you would like me to excuse Agent Panoke and

18   recall him after I bring those two witnesses forward.

19           THE COURT:  I'll allow it conditionally, subject to

20   you showing the business records, and so forth.

21   Q.  Tell the jury, if you would, what exactly a federal

22   firearms licensee is.

23   A.  Again, a federal firearms licensee, stands for in short

24   an F. F. L.  They are required by law and through A. T. F. to

25   follow a list of rules and regulations that have been set

1    forth by the A. T. F.  Some of the rules and regulations that

2    are required to be maintained is simply to make sure that all

3    potential gun purchasers or firearms purchasers complete the

4    format of the forty-four seventy-three truthfully, as well as

5    maintain these forms for at least seven years.

6           They're required -- If someone is interested in

7    purchasing a firearm, they have to the call in to the N. I.

8    C. S., which stands for the National Instant Check System,

9    and that branch is comprised of F. B. I. and A. T. F.

10   employees where they conduct background investigations.

11   Basically they run a criminal history on the potential gun

12   purchaser to see if they're actually prohibited or not.

13          They have to keep accurate log books.  All the guns

14   or firearms that come into their store, as well as go out of

15   the store.  Again, they have to maintain that information for

16   seven years.  It's a whole list of rules and regulations that

17   the A. T. F. requires for someone who the wants to be a

18   federal firearms licensee to maintain.

19   Q.  Can you look at that form forty-four seventy-three,

20   Government's exhibit one and one A, and tell who completed

21   that form.

22   A.  The section with the personal information, it looks like

23   the defendant's, Pierre Gunnings', handwriting.  It's

24   separate or different from the Handwriting that's required

25   for the F. F. L. --

1          MR. BETHEL:  I'm sorry, Your Honor.  I have an

2   objection.  It's a conclusionary statement made by this

3   witness that this is Mr. Gunnings' handwriting.  That is

4   exactly conclusory.  There's been no evidence to establish

5   that this witness is a trained document examiner.  He's not a

6   handwriting expert or that he has any independent recognition

7   of Pierre Gunnings' handwriting.

8          MR. BRUNSON:  I agree, Your Honor.

9   Q.  What name is on that application?

10  A.  The name on the application is Pierre Marcello

11  Gunnings.

12  Q.  Do you know the requirements of filling out this form

13  forty-four seventy-three?

14  A.  I do.

15  Q.  What are the requirements?

16  A.  The requirements are that the gun purchaser, potential

17  purchaser, completes the first page of the form, and then

18  signs it on the second page under section number sixteen.

19  And then starting on section number eighteen throughout the

20  rest of the form, the F. F. L., or an employee of the F. F.

21  L. completes that section.

22  Q.  What date was that form filled out?

23  A.  It was signed by, or someone who signed Gunnings' name on

24  December sixteenth, two thousand six.

25  Q.  In fact, was this firearm purchased from that pawnshop?

```
 1   A.   It was not.   The firearm purchase was denied.

 2   Q.   And why was it denied?

 3   A.   The N. I. X. (ph.) branch notified the F. F. L. and

 4   advised them that there was a prohibiter showing on the

 5   criminal history of the person that was attempting to

 6   purchase the firearm, so they denied the firearm sale.

 7              MR. BETHEL:   Your Honor, may we approach, a side

 8   bar, please?   I have an objection.

 9              THE COURT:   Why don't we just let the jury step out

10   for a minute.

11                  Members of the jury, do not discuss the case.

12                  However, before you step out I'm going to ask

13   you to put your names on your pads even if you've written

14   nothing, and turn your pads over in your chairs so that no

15   one can see even if you've written nothing.

16              If you'll step out for just a minute.

17              (Whereupon, the jury was escorted out of the

18   courtroom, and the following colloquy ensued):

19              THE COURT:   Yes, Mr. Bethel?

20              MR. BETHEL:   Your Honor, I object to this witness's

21   response to Mr. Brunson's question.   Mr. Brunson asked was

22   the gun purchased, it was denied because, I expect the next

23   words out of Agent Panoke's mouth to be because Mr. Gunnings

24   was under indictment.   That's not what he said.   What he said

25   was, because of his criminal history.   That sounds far more
```

```
 1   damning and far more expansive than the mere fact it's
 2   already been stipulated to here in this courtroom, and that
 3   is that Mr. Gunnings was merely under indictment.  In fact,
 4   there has been no evidence that Mr. Gunnings has any criminal
 5   history at all other than that case for which he was under
 6   indictment of December two thousand six.  I request that that
 7   answer be stricken from the record as nonresponsive, and for
 8   the jury to be instructed that there is no evidence of
 9   criminal history for Pierre Gunnings, other than the fact
10   that he was under indictment in Georgia at the time the form
11   was filled out in December two thousand six.
12           THE COURT:  Before we do that let me just get an
13   understanding.  What was reason for which he was denied the
14   gun?  Because of his criminal history, or because he was
15   under indictment?
16           THE WITNESS:  Your Honor, the way how I interpret
17   "criminal history" is if anything shows up, whether it's an
18   arrest or indictment or conviction, that that starts his
19   history of criminal history.  So he was denied for his
20   indictment.
21           THE COURT:  For the indictment.
22           THE WITNESS:  Yes, sir.
23           THE COURT:  I'll instruct the jury that when he
24   said "criminal history," he merely meant his indictment and
25   nothing else.  There is no evidence of anything else.
```

```
 1              MR. BETHEL:  Thank you, Your Honor.

 2              THE COURT:  Very good.  Bring the jury back in.

 3              MR. BETHEL:  Your Honor, Mr. Gunnings needs a

 4   comfort break.

 5              THE COURT:  A what?

 6              MR. BETHEL:  A comfort break.

 7              THE COURT:  I just never heard it called that

 8   before.

 9              MR. BETHEL:  He needs to see a man about a horse.

10              THE COURT:  All right.  We'll take just a couple of

11   minutes while he has his break.

12              (Whereupon, a recess was taken.)

13              THE COURT:  Proceed.

14              Now you want to clarify that last answer?

15   Q.  Agent Panoke, I believe my last question to you had to do

16   with did he get the gun, you said no, and then I asked why

17   not, is that correct?

18   A.  Yes, sir.

19   Q.  What was your intended answer for that question?

20   A.  That he was under indictment in the state of Georgia.

21              THE COURT:  He had no other history.  When you said

22   he had a criminal history, you didn't you just mean he was

23   indicted, or any criminal history.

24              THE WITNESS:  That's right.

25              THE COURT:  Any other criminal history.
```

1           THE WITNESS:  That's right.

2   Q.  Is that a fact, that he was under indictment that would

3   make him a prohibited person for purchasing a firearm?

4   A.  That's correct.

5   Q.  Is there any notice on that form forty-four seventy-three

6   that advises a person that there is a penalty for not making

7   an accurate statement or for making a false statement?

8   A.  There is.

9   Q.  And what is that?

10  A.  In the section just above where the gun purchaser would

11  sign their name, there's a question or list of questions that

12  ask -- or informs the gun purchaser about falsifying

13  information.  And one sentence in here reads, "I also

14  understand that making any false oral or written statement or

15  exhibiting any false or misrepresented identification with

16  respect to this transaction is a crime punishable as a

17  felony."

18  Q.  After December sixteenth, two thousand and six did you

19  have any opportunity to talk to Mr. Gunnings?

20  A.  I did briefly, yes.

21  Q.  Tell the jury the nature and purpose of that

22  conversation.

23  A.  Well, I obtained a cell phone number from the gun store,

24  or from Pawn Central.  They explained that was a phone number

25  left by Gunnings if he was approved to purchase a firearm.

1   So I called him, explained to him who I was, explained to him

2   that I was conducting a federal investigation in reference to

3   him attempting to purchase a firearm while he was under

4   indictment from the state of Georgia, and he explained to me

5   that he didn't get the gun, as well as he didn't know he was

6   under indictment.

7         I told him, I said, "Before I ask you any questions

8   or before we go into any other information," I wanted to meet

9   with him in person to have a sit-down interview.  And he told

10   me to contact his attorney to make arrangements --

11         MR. BRUNSON:  Well stop --

12         MR. BETHEL:  Your Honor, mistrial.  I move for a

13   mistrial.

14         THE COURT:  Just a minute.  No, no, no.  Not now.

15         I'll excuse the jury for just a minute.

16         (Whereupon, the jury was escorted out of the

17   courtroom, and the following colloquy ensued):

18                 MOTION FOR MISTRIAL IN OPEN COURT

19                   (THE JURY IS NOT PRESENT):

20         THE COURT:  Now, yes?  What were you going to say?

21         THE WITNESS:  I apologize Your Honor.  I realized

22   after I said it I shouldn't have mentioned in addition about

23   his attorney.  I completely forgot.

24         THE COURT:  What was your answer to the question?

25         THE WITNESS:  My answer was that he instructed me

1    to contact his attorney to schedule the interview.

2            THE COURT:  And then what happened?

3            THE WITNESS:  That was the end of the conversation.

4            THE COURT:  Yes?

5            MR. BRUNSON:  Your Honor, it's Mr. Bethel's motion

6    for mistrial.  I would ask him to state his grounds.

7            MR. BETHEL:  This is exactly what we covered

8    earlier during the voir dire of this witness, Your Honor.

9    There was never any issue of that -- Everybody in this

10   courtroom, and I'm not sure how it had been forgotten

11   considering that was the point before the jury came in.

12   Everybody in this courtroom knew that he was specifically

13   told not to mention the fact that Mr. Gunnings invoked his

14   right to counsel.  And he clearly stated that he told me to

15   contact his attorney when I was ready to jump out of my skin.

16           I'm amazed that we are at this point.  We worked

17   very hard to seat a jury in this case, and I would at least

18   like a recess so I can decide whether I want to move for a

19   mistrial or whether I simply want to go forward with this

20   jury and have an instruction from the Court given to the

21   members of the jury.

22           THE COURT:  I think you're entitled to have a

23   recess to make that decision.  It's an important decision.

24           Is there anything you would like to say, Mr.

25   Brunson?

1          MR. BRUNSON:  Yes, Your Honor.  I did understand

2    the Court's admonition and the agreement, and I did not know,

3    and I want the record to reflect, that question was not

4    intended to go there.  So I do think that this is a matter,

5    because of the brief nature and Mr. Bethel's quick response,

6    that can be cured by a jury instruction and this jury is not

7    tainted to require a mistrial.

8          THE COURT:  Now my understanding is that he said he

9    wanted to talk to his attorney to schedule an appointment.

10         He told you he wanted to talk to his attorney to

11   schedule an appointment?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  I'll have to decide whether that

14   warrants a mistrial.  But I'll first give Mr. Bethel a few

15   minutes to make the decision as to whether he wants a

16   mistrial.

17         MR. BETHEL:  Thank you, Your Honor.

18         (Whereupon, a recess was taken.)

19                    DISCUSSION IN OPEN COURT

20                    (THE JURY IS NOT PRESENT):

21         THE COURT:  Mr. Bethel?

22         MR. BETHEL:  Your Honor, after consulting with Mr.

23   Gunnings, we have decided not to move for a mistrial at this

24   time.  Mr. Gunnings has already been locked up for several

25   months.  It's his position that he's not guilty of this

1    offense, and he's looking to be released from custody at the

2    soonest possible moment.

3              THE COURT:  How would you like to take this up?

4              MR. BETHEL:  Well, Your Honor, there is no doubt

5    that this witness was instructed by the Court not to mention

6    that.  It was the subject of a motion.  I request number one,

7    that the jury be instructed to disregard any statement that

8    this witness made about Mr. Gunnings stating that he needed

9    to talk -- that this agent should talk to his lawyer.

10             Further, I think they should be instructed that

11   this witness knew he wasn't supposed to make that statement

12   before he made it in open court.

13             THE COURT:  Now he actually said the statement was

14   he was to talk to his lawyer about setting up a conference.

15   You want the jury just to understand that he was to talk to

16   the lawyer, or do you want it also to be clear that your

17   client says he was not to talk to his lawyer about setting up

18   a conference?

19             MR. BETHEL:  I'm not sure what distinction you're

20   making, Your Honor.

21             THE COURT:  It's one thing to say, you know, you're

22   to talk to my lawyer, which is sort of saying I'm not going

23   to talk to you any more.

24             MR. BETHEL:  Exactly.

25             THE COURT:  It's another thing to say you can talk

1  to my lawyer about setting up a conference, which is merely

2  like talking to my secretary, talking to anyone, and then

3  we'll have a conference.  Just get with my lawyer and we'll

4  set up a conference.  One of them is clearly invoking a right

5  not to say anything further and to say from now on everything

6  has to go through my lawyer.  This latter statement could

7  just merely be saying, you know, like if you want to talk to

8  me, talk to my lawyer about setting it up.  It's not

9  necessarily saying I don't walk to you any more.

10          But I'll leave that up to you.  Do you want any

11  clarification right now?  I think all he got out was talk "to

12  my lawyer".  He didn't get out set up the conference.  I

13  don't know if you want the jury to hear the conference part,

14  or whether you just want them --

15          MR. BETHEL:  Your Honor, what I would request is

16  that first Mr. Gunnings' actual statement was that he

17  suggested to the agent that he should talk to his lawyer to

18  set up a conference.

19          THE COURT:  Right.

20          MR. BETHEL:  Furthermore, I would like the jury

21  instructed that this was not to be discussed.  That this

22  witness knew this issue was not to be discussed.

23          THE COURT:  Right.  So you would like the full

24  statement to come in, is all I'm saying.

25          MR. BETHEL:  Yes, Your Honor.

```
 1              THE COURT:  I think the full statement has less
 2    damage --
 3              MR. BETHEL:  I understand, Your Honor.
 4              THE COURT:  I'll do that.
 5              Bring in the jury.
 6              (Whereupon, the jury was escorted into the
 7    courtroom.)
 8              THE COURT:  Members of the jury, you just heard
 9    this witness state in response to a question that the
10    defendant said "talk to my lawyer".  The full statement was
11    talk to my lawyer so that a conference can be set up.
12    Nonetheless, that statement of this witness was improper.
13    Prior to these proceedings I told this witness never to
14    mention that statement.  He was cautioned not to do so and
15    yet he did.  He violated the Court order, the witness did,
16    and you are not to consider that answer at any time during
17    your deliberations.
18              Go ahead, Mr. Brunson.
19              MR. BRUNSON:  Thank you, Your Honor.
20              THE COURT:  So disregard that last answer, is the
21    bottom line.
22    Q.  Agent Panoke, very carefully, where did you get the
23    number that you called for Mr. Gunnings?
24    A.  First of all, I apologize to the jury for their
25    inconvenience.
```

```
 1            I received a phone number from employees at Pawn
 2   Central in Opelika, Alabama.
 3   Q.  Where did they have a phone number?
 4   A.  They instructed me that they received that phone number
 5   from Gunnings.
 6   Q.  Who did you reach when you called that number?
 7   A.  An individual who identified himself as Gunnings.
 8   Q.  What did you say to him when you got him on the phone?
 9   A.  I explained to him -- or I introduced myself, explained
10   to him that I was an agent with A. T. F., I was conducting a
11   federal investigation concerning his attempted purchase of a
12   firearm, and that I wanted to conduct a sit-down interview
13   with him.
14   Q.  Did he say anything to you at all about his attempted
15   purchase of the firearm?
16   A.  Did he make any statements to me?  Is that what you're
17   asking?
18            MR. BETHEL:  Your Honor, I object for the mere fact
19   that these questions have already been asked and answered.
20   We're plowing the same ground that we've already plowed.
21   It's cumulative.
22            THE COURT:  I'll let him state it again.
23   Overruled.
24            Go ahead.
25   Q.  Let me ask you this.  How long did this conversation
```

1  last?

2  A.  Approximately two to three minutes at the most.  Not long

3  at all.

4  Q.  A short conversation?

5  A.  Very short, yes.

6  Q.  What did Mr. Gunnings say to you in reference to his

7  attempted purchase of that firearm?

8  A.  He told me that he did not get the gun, and that he did

9  not know he was under indictment.

10 Q.  Is that it?

11 A.  That was it.

12 Q.  Did he say anything to you about not having filled out

13 the form?

14 A.  He did not.

15 Q.  Did he say anything to you at all about not being able to

16 read what was on the form?

17 A.  He did not.

18            MR. BRUNSON:  No further questions.

19                         CROSS EXAMINATION

20                    BY MR. BETHEL OF WIL PANOKE:

21 Q.  Good afternoon, Agent Panoke.

22 A.  Good afternoon, sir.

23 Q.  At the time you called Mr. Gunnings, it was your

24 impression he was driving at the time.

25 A.  That's what it sounded like to me.

```
 1   Q.  And it was also your impression that he was preoccupied
 2   with what he was doing while he was on the phone with you?
 3   A.  Possibly.
 4   Q.  Well you had testified earlier in this courtroom when the
 5   jury wasn't present and that was your word, was it not?
 6   A.  Yes.
 7   Q.  And the word you used was, you thought he was
 8   preoccupied.
 9   A.  In my opinion it appeared he was preoccupied.
10   Q.  So it's more than possible that he appeared to be
11   preoccupied?
12   A.  I don't know for sure, but that's my interpretation,
13   yes.
14   Q.  Now, do you still have the form that you were looking
15   at?
16   A.  Yes, sir, I have both forms.
17   Q.  You were not present when someone, Mr. Gunnings, filled
18   out that form.
19   A.  That's correct.
20   Q.  You were not there to see or hear any conversation
21   between Mr. Gunnings and the pawnshop employee who helped him
22   fill out this form.
23   A.  That's correct.
24   Q.  So you have no personal knowledge whatsoever about how
25   this form became filled out.
```

```
1   A.   No firsthand knowledge, no, sir.

2   Q.   So no personal knowledge.  You weren't there?

3   A.   That's correct.

4   Q.   If you look at block three on that form where it says

5   "place of birth" under "foreign country," it says "Lee".

6   A.   Yes, sir.

7   Q.   Are you aware of another country on the planet called

8   "Lee"?

9   A.   No, sir.

10  Q.   But it was filled out in Lee County.

11  A.   Correct.

12  Q.   Now down at the bottom of the form at block thirteen --

13  A.   I'm sorry, what number?

14  Q.   Thirteen.

15          Do you see there where it says "What is your state

16  of residence if any," and then that must be handwritten in.

17  A.   I do.

18  Q.   Do you still where it was -- the first word that was

19  written was Albama, A-l-b-a-m-a?

20  A.   Yes.

21  Q.   And that was crossed out?

22  A.   Correct.

23  Q.   And then Alabama was written in.

24  A.   Yes, sir.

25  Q.   Now you said that whoever is applying to buy the gun is
```

1    supposed to fill out this page, correct?

2    A.   That's correct.

3    Q.   In fact, the employee at the federal firearms licensee,

4    in this case the pawnshop, is not supposed to give them

5    information as to filling out this form.

6    A.   That is correct.

7    Q.   In fact, if in fact that's what happened, that that

8    pawnshop employee simply told someone how to fill out the

9    form, that is what question went in each box, that federal

10   firearms licensee employee would be in big trouble.

11   A.   They would be in violation, yes.

12   Q.   They would be in violation of the law.  So if that

13   employee were to come into this courtroom and admit under

14   oath that that's in fact what he had done, he would be in

15   violation of federal law himself.

16   A.   Yes, sir, that's correct.

17           MR. BETHEL:  No further questions, Your Honor.

18           MR. BRUNSON:  May this witness be excused?

19           THE COURT:  Yes.  You may step down.

20           (Whereupon the witness, Will Panoke, stepped down

21   from the stand.)

22           MR. BRUNSON:  We'd call Bonnie.

23                    B O N N I E    D E R R E R,

24       the witness herein, having first been duly sworn or

25   affirmed to tell the truth, was examined and testified as

```
 1   follows:

 2                          DIRECT EXAMINATION

 3                BY MR. BRUNSON OF BONNIE DERRER:

 4   Q.  State your name and how you're employed, please.

 5   A.  My name is Bonnie Derrer.  I'm the Assistant District

 6   Attorney in Cobb County, Georgia.

 7   Q.  And you have previously been sworn and are under oath, is

 8   that correct?

 9   A.  Yes, sir.

10   Q.  Do you know Pierre Gunnings?

11   A.  By having him as a defendant in the courtroom I was

12   working, yes.

13   Q.  Do you recognize him in court?

14   A.  Yes, he's in court.

15   Q.  Very briefly, I want to ask you if prior to December the

16   sixteenth, two thousand six if Mr. Gunnings was indicted in

17   Georgia.

18   A.  Yes, sir, that's correct.  He was --

19   Q.  That's all right.  Just he was indicted?

20   A.  Yes.

21   Q.  When was that?

22   A.  That was on September twenty-first, two thousand six.

23   Q.  Had -- Prior to December the sixteenth, two thousand six,

24   had he made a court appearance?

25   A.  Yes.  In fact, he made two court appearances.  He was in
```

1   court on November sixth of two thousand six, and that was the

2   first jury trial calendar call.  The defendant was present in

3   the courtroom.  He was wearing a military uniform, and the

4   judge that I was working for at the time, Judge Dorothy

5   Robinson, does require defendants to be present at all court

6   dates.

7          And then the second time he was called back to

8   report back.  The report back date was on December fourth, of

9   two thousand six.  And that was for a pretrial.  So it was an

10  attempt for the state to tell the defendant and the defense

11  attorney what its offer would be for a plea.  And he was

12  present on that date.

13  Q.  Okay.  I'm going to try to ask this for a yes or no

14  answer.  Was his court appearance in connection with having

15  been indicted for a felony?

16  A.  Yes.

17          MR. BRUNSON:  No further questions, Your Honor.

18                  CROSS EXAMINATION

19              BY MR. BETHEL OF BONNIE DERRER:

20  Q.  Good afternoon.

21  A.  Good afternoon.

22  Q.  You were not present at the Central Pawnshop in Auburn,

23  Alabama on the sixteenth of December of two thousand six?

24  A.  I was not.

25  Q.  So you were not there when Pierre Gunnings filled out a

1  form forty-four seventy-three in an attempt to purchase a
2  gun?
3  A.  No.
4  Q.  So you have no idea about what the circumstances were
5  surrounding Mr. Gunnings filling out that form?
6  A.  Right.
7  Q.  Because weren't there?
8  A.  Right.
9  Q.  So you also don't have any knowledge as to whether or not
10 Mr. Gunnings can read?
11 A.  Well, I know that he can read and write because he filled
12 out several forms and I have copies of those with his
13 signature and his address that he wrote.
14 Q.  So he filled out some personal information, name?
15 Address?
16 A.  Yes.  I have a change of address form that he filled out
17 on May twenty-third, two thousand six in Cobb County, and he
18 signed that form.  He wrote his address and telephone number.
19 I also have --
20 Q.  But you've never seen him read.  He's never read out loud
21 to you?
22 A.  Has he ever read out loud to me?
23 Q.  Right.
24 A.  No.
25 Q.  Now, you say he was wearing a military uniform?

```
 1   A.   That's correct.

 2   Q.   Army uniform?

 3   A.   I don't know all the different branches.  I assume it was

 4   army.

 5   Q.   Was it green?

 6   A.   I think so, yes.

 7              MR. BETHEL:  No further questions, Your Honor.

 8                       REDIRECT EXAMINATION

 9                  BY MR. BRUNSON OF BONNIE DERRER:

10   Q.   Ms. Derrer, the forms you have referred to, did he fill

11   them out accurately?

12   A.   Yes.  The address that he wrote on that form was the same

13   address that the clerk mailed a notice of his court dates

14   that I talked about previously, and that notice included a

15   description of the charges against him.

16   Q.   Did he have any questions about information on those

17   forms that he filled out?

18   A.   I don't know whether he had any questions about them, but

19   he did put the correct information in the form.  The form

20   asked for a name, he put his name.  The form asked for an

21   address and he listed his address.  The city is there, state,

22   zip code, telephone number.  He listed his telephone number.

23   Then it says "Person requested by," and he signed his name.

24   It asked for a date, and he put the date out there.

25              MR. BRUNSON:  No further questions.
```

```
 1                        RECROSS EXAMINATION

 2                 BY MR. BETHEL OF BONNIE DERRER:

 3   Q.  You were not standing there when he filled out these

 4   forms.

 5   A.  No, I wasn't.

 6   Q.  So when you say that he put that information down there,

 7   that simply is what -- you're simply going by what's on the

 8   form.

 9   A.  That's correct.

10   Q.  So the question is this, then:  You had no idea when he

11   filled out those forms whether someone was standing there and

12   pointing out to him what information was that he needed to

13   put on the form?

14   A.  He was obviously literal, or he couldn't have filled them

15   out.

16   Q.  Well, you weren't there when he filled out the forms.

17   A.  Correct.

18   Q.  So it don't know whether or not he read it and filled it

19   out, or someone was there and explained it to him and filled

20   out the information.

21   A.  I just know that he can write.

22   Q.  Well, what you know is he put those letters on that page,

23   correct?  You don't know if he read and filled it out, or if

24   someone explained it to him and he filled out the

25   information.  That's what happened, because you weren't there
```

```
 1   when he filled it out, right?
 2   A.  Right.
 3           MR. BETHEL:  No further questions, Your Honor.
 4           MR. BRUNSON:  Your Honor, may this witness be
 5   excused?
 6           THE COURT:  Yes.  Thank you.
 7        (Whereupon the witness, Bonnie Derrer, stepped down from
 8   the stand.
 9           THE COURT:  Yes.
10           Next witness.
11           MR. BRUNSON:  Doug Johnson.
12                     D O U G    J O H N S O N,
13        the witness herein, having first been duly sworn or
14   affirmed to tell the truth, was examined and testified as
15   follows:
16                       DIRECT EXAMINATION
17               BY MR. BRUNSON OF DOUG JOHNSON:
18   Q.  State your name and how you're employed, please.
19   A.  My name is Doug Johnson.  I'm the manager at Pawn Central
20   here in Opelika.
21   Q.  Were you acting in that capacity in December of two
22   thousand six?
23   A.  Yes, sir.
24   Q.  Is Pawn Central licensed to sell firearms?
25   A.  Yes, sir.
```

```
 1   Q.   What does that exactly mean?
 2   A.   It means that the business is federally licensed through
 3   the A. T. F. to carry an N. F. L. license to buy and sell
 4   ammunition.
 5   Q.   What is required to become an F. F. L. licensee?
 6   A.   It's A long application process and so forthThis is a
 7   form that has to be filled out in order to start the
 8   purchasing of a firearm.
 9   Q.   Are you required to keep records?
10   A.   Yes, sir.
11   Q.   Let me ask you what's been introduced conditionally as
12   Government's exhibit one and one A, and can you identify
13   these?
14         MR. BRUNSON:   And may I approach, Your Honor?
15         THE COURT:   Yes.
16   A.   Yes, sir.   The Government exhibit one appears to be a
17   forty-four seventy-three form that the purchaser of the gun
18   fills out in order to get through the background check to
19   purchase the gun.
20   Q.   On that application who was the purchaser?
21   A.   The purchaser was Pierre Marcello Gunnings.
22   Q.   Is that a record that was kept at your office?
23   A.   Yes, sir.
24   Q.   At your store?
25   A.   Yes, sir.
```

1    Q.  Do you recall when that was filled out?

2    A.  I know it was around December of oh six just in staying

3    current with the case, but I couldn't tell you the exact date

4    without looking.  It appears it was called in on December

5    sixteenth.

6    Q.  Did Mr. Gunnings in fact purchase a firearm with that

7    application?

8    A.  No, sir.  There was no transfer of the gun because the N.

9    I. C. S. office called back on twelve nineteen with a denial.

10   Q.  Did Mr. Gunnings purchase anything?

11   A.  I believe the day he was in and initially filled out this

12   forty-four seventy-three, I believe on that day he purchased

13   a magazine for a handgun that.  I had given Mr. Panoke a copy

14   of the receipt on the purchase for the magazine.

15   Q.  What did he -- What type of gun was he attempting to

16   purchase with that application?

17   A.  Well, I'm not exactly sure here because we did not list

18   the gun on this application because it was not transferred.

19   The guy that worked under my management was the one that

20   handled the transaction.  I know the magazine he purchased

21   went to the Beretta twenty-two caliber pistol, but I'm not

22   sure if that was the one he was attempting to purchase with

23   this.

24   Q.  Does that form within its contents show descriptions of

25   guns that are being purchased or attempted to be purchased?

1    A.   The actual transfer from the F. F. L. dealer to the

2    individual takes place.   When the individual receives the gun

3    from the dealer, then we fill out the form with manufacturer

4    number, model number, serial number, type of gun and caliber.

5    Yes, sir.

6    Q.   Okay.   Without knowing because the sale was not completed

7    and that isn't filled out, is there another place on there

8    that says what category of gun is being purchased?

9    A.   Yes, sir.   It appears here that he had applied for the

10   purchase of a handgun.

11   Q.   But that's all you know, just a handgun?

12   A.   Just a handgun.   That's all I can tell you.

13   Q.   But you also know he did purchase a Beretta clip?

14   A.   Yes, sir.

15   Q.   And that's for a twenty-two caliber pistol, you said?

16   A.   Yes, sir.

17   Q.   Did you actually assist Mr. Gunnings with his

18   transaction?

19   A.   I don't believe I had anything to do with it.   It's been

20   two years.   I may have, you know, stepped away and handed him

21   to one of the other employees.   It's been a long time but I

22   don't recall.   I don't think I did.

23        MR. BRUNSON:   Your Honor, at this time I'm

24   attempting to tie up the introduction of these two exhibits,

25   and I move that one and one A be admitted unconditionally.

1          THE COURT:   Admitted.

2    Q.   Do you know who actually took part in that application?

3    A.   Steve Wingo is a guy that was working in my employ at

4    that time, and he was the one that did the actual call-in for

5    this particular transaction.

6    Q.   If you would, please, walk the jury through making an

7    application.   How many pages are included in that form?

8    A.   The customer fills out the complete front side, answers

9    the questions that are applicable, and then before we

10   actually transform this paper to the customer for him to fill

11   out the information, we take his I D, write in the I D type,

12   the I D number, the expiration date on that I D and what type

13   of gun is attempted to be purchased.   And then we'll turn it

14   over to the customer to fill out his portion, and then we'll

15   take it back, make sure everything is complete then do the

16   call-in to the N. I. C. S. program officer.

17   Q.   Do you ever assist the customer to in filling out the

18   front of that card?

19   A.   No, sir, we do not do any of the writing on the portion

20   for where the customer is supposed to, because that would

21   kind of be a conflict of interest with us being on the dealer

22   side.   When on the purchaser side, that has to be filled out

23   by himself.   Occasionally, a customer who can't read or write

24   will normally bring a member of his family or a

25   representative, an acquaintance or friend to fill out that

1    portion of it for them because we can't fill it out.

2    Q.  So as you suggested, that is permissible, it's just the

3    licensee can't fill it out.

4    A.  Right.

5    Q.  But they can request and obtain assistance?

6    A.  That is correct.

7    Q.  Do you know whether or not Mr. Gunnings requested any

8    assistance?

9    A.  Not to my knowledge, no, sir.

10   Q.  Is the form filled out completely?

11   A.  Yes, sir, it appears to have everything on here that's

12   supposed to be down to the point where we did not transfer

13   because we couldn't proceed any further at that time.  We

14   filled it out as far as we could until it was denied.

15            MR. BRUNSON:  No further questions, Your Honor.

16                       CROSS EXAMINATION

17            BY MR. BETHEL OF DOUG JOHNSON:

18   Q.  Mr. Johnson, let's be clear.  You don't know Mr.

19   Gunnings.

20   A.  I do not.

21   Q.  You do not remember him?

22   A.  No, sir.

23   Q.  You don't remember helping him?

24   A.  I do not.

25   Q.  You couldn't identify him if you had to.  In other words,

1    before today you couldn't have picked him out of a lineup.

2    A.  I could tell you that I probably could not have picked

3    him out because so many customers come through on any given

4    day.

5    Q.  And this happened a couple of years ago?

6    A.  Yes, sir.

7    Q.  So you weren't there.  At least you have no recollection

8    of how this form got filled occupant?

9    A.  That's correct.

10   Q.  So you weren't there when I believe it's Mr. Wingo, an

11   employee of yours, was the person who actually helped Mr.

12   Gunnings that day.

13   A.  I probably was there but I may not have been standing

14   right with the two of them during this transaction.  I spend

15   a lot of time -- Chances are I was at the business but not

16   involved in this.

17   Q.  That's my point.  You were not involved in this form

18   being filled out in any way?

19   A.  That's right.

20   Q.  So you certainly have no recollection of being present at

21   the time that Mr. Wingo and Mr. Gunnings were filling out

22   this form?

23   A.  No, sir.

24   Q.  Now you said it's a policy.  You don't fill it out for

25   the customers and you don't answer any questions.

```
 1   A.  We'll answer a question if they need clarification.  If a
 2   customer is unable to read but can do all the writing,
 3   occasionally I'll read off the questions and let ask them
 4   answer in the appropriate block.  We cannot write into any of
 5   the customer fields.
 6   Q.  Take look at that form, block thirteen.
 7   A.  Yes, sir.
 8   Q.  You can see that somebody had misspelled Alabama and had
 9   written A-L-B-A-M-A, is what it looks like.
10   A.  Yes, sir.
11   Q.  So obviously whoever was helping him at your store, Mr.
12   Wingo was apparently helping him, he must have looked at that
13   and explained to Mr. Gunnings that he misspelled it and made
14   him cross it out and spell it again?
15   A.  I don't know.
16   Q.  Well obviously somebody had to tell Mr. Gunnings he
17   misspelled Alabama.
18           MR. BRUNSON:  Object, Your Honor.  He could have
19   noticed it himself.
20           THE COURT:  Actually, you're both just
21   speculating.
22   Q.  Again, you didn't participate in filling this form out in
23   any way?
24   A.  As far as I know I was not involved in this particular
25   transaction.
```

1         MR. BETHEL:  No further questions, Your Honor.

2         MR. BRUNSON:  Your Honor, may this witness be

3    excused?

4         THE COURT:  Yes.

5         (Whereupon the witness, Doug Johnson, stepped down

6    from the stand.)

7         THE COURT:  Next witness.

8         MR. BRUNSON:  Steve Wingo.

9                   S T E V E    W I N G O,

10      the witness herein, having first been duly sworn or

11   affirmed to tell the truth, was examined and testified as

12   follows:

13                  DIRECT EXAMINATION

14              BY MR. BRUNSON OF STEVE WINGO:

15   Q.  Would you state your full name and how you're employed.

16   A.  Joseph Steven Wingo.  Pawn City.

17   Q.  Let me ask you to keep your voice up so the last juror in

18   the box can hear you very clearly.

19   A.  Steven Wingo, Pawn City.

20   Q.  Mr. Wingo, have you previously been sworn and recognize

21   that you are under oath?

22   A.  Yes.

23   Q.  Where do you work?

24   A.  Pawn City in Lanett.

25   Q.  Where did you work in December?  Specifically, December

```
 1   the sixteenth of two thousand six?
 2   A.   Pawn Central in Opelika.
 3   Q.   Do you know Doug Johnson?
 4   A.   Yes, sir.
 5   Q.   How do you know him?
 6   A.   He's my manager -- or was my manager.
 7   Q.   When was he your manager?
 8   A.   Oh six to -- for about a year.  About eleven months.
 9             MR. BRUNSON:  May I approach, Your Honor?
10             THE COURT:  Yes.
11   Q.   Let me ask you to look at what's been introduced as
12   Government's exhibit one and one A.  Can you identify those,
13   please.
14   A.   Forty-four seventy-threes.
15   Q.   What are forty-four seventy-threes?
16   A.   They are -- To get a gun, you have to -- it's a federal
17   -- to purchase a gun it's a background check.
18   Q.   And with that form, who was attempting to purchase a
19   firearm?
20   A.   Gunnings, Pierre.
21   Q.   And when was that being done?
22   A.   I guess twelve sixteen oh six.
23   Q.   Did you assist Mr. Gunnings?
24   A.   What do you mean by "assist"?
25   Q.   Well, were you the person in the store who was waiting on
```

1    him when he completed this form out?

2    A.  Yes, sir.

3    Q.  Do you remember that?

4    A.  No, sir.

5    Q.  Do you remember Mr. Gunnings?

6    A.  No, sir.

7    Q.  How do you know that you were the one that was assisting

8    him when he attempted to purchase that firearm?

9    A.  My handwriting.

10   Q.  What part of the form is your handwriting on?

11   A.  It's on the back.  I took the driver's license number

12   down and wrote it down.  I had to have a picture I D, state

13   I D.

14   Q.  Is that something you're required to do with every form

15   forty-four seventy-three?

16   A.  Yes, sir.

17   Q.  Did you do that in this case?

18   A.  Yes, sir.

19   Q.  Did a person give you a driver's license?

20   A.  Yes.

21   Q.  And whose driver's license was that?

22   A.  It had to be Pierre Gunnings.

23   Q.  Did you look at the driver's license -- Was it a picture

24   I D?

25   A.  Yes, it has to be.

1    Q.  Did you look at that and see if that was the person who
2    was standing before you filling out the form?
3    A.  Yes, sir.
4    Q.  What information is included on the portion that you
5    filled out?
6    A.  Trying to buy a handgun and then whether or not --
7    Q.  It says "handgun"?
8    A.  Right.
9    Q.  Okay.
10   A.  And then I put "Alabama" and a "D" for driver's license,
11   and his driver's license number and expiration date and the
12   date that he tried to purchase the gun.
13   Q.  Okay.  And, again, what was the date he was trying to
14   purchase?
15   A.  Twelve sixteen oh six.
16   Q.  And did you copy from the document handed to you, that is
17   the driver's license, the number that is included in that
18   form?
19   A.  From this driver's license?
20   Q.  Yes, sir.
21   A.  Yes.
22   Q.  What else did you put on that form?
23   A.  I called it in, and I got the N. I. C. S. number and it
24   was delayed.  It was delayed until Thursday the
25   twenty-first.

1    Q.   What does that mean?

2    A.   We couldn't -- We cannot give the gun to the person

3    trying to buy until we get an answer from the F. B. I.

4    Q.   Is that a system that you are required to work under

5    being employed by the federal firearms licensee?

6    A.   Yes.

7    Q.   Look at the front page.  What, if anything, did you write

8    on that front page?

9    A.   Nothing.

10   Q.   Are you allowed to write anything on that front page?

11   A.   No, sir.

12   Q.   Nothing at all?

13   A.   No, sir.

14   Q.   Who is required to fill out the form on the front page?

15   A.   The person trying to buy the firearm.

16   Q.   Is that done in every occasion in a situation where

17   you're selling, or a person is attempting to buy a firearm?

18   A.   Yes.  If they don't have a state I D or driver's license,

19   I can't sell them a gun.

20   Q.   And you didn't write down any of the answers on that

21   form?

22   A.   No, sir.

23   Q.   If a person tells you that they don't understand or they

24   can't read the form, what can you do then?

25   A.   If they have any questions, you know, I can try to

1   explain to it them, but I cannot answer or I cannot provide a

2   yes or no answer or write anything on that form.

3   Q.  Is there a yes on that form?

4   A.  The first question.

5   Q.  And what is that question?

6   A.  "Are you the actual buyer of the firearm?"

7   Q.  And that is answered how?

8   A.  "Yes."

9   Q.  How many other questions are there to be answered?

10  A.  There were a total of fourteen.

11  Q.  Is every one answered?

12  A.  Yes, except the last one.  That says, "If you are not a

13  citizen".

14  Q.  And that didn't apply in this case, did it?

15  A.  No, sir.

16  Q.  So every other question was answered?

17  A.  Yes, sir.

18  Q.  What about not being a citizen was appropriately not

19  answered?

20  A.  Right.

21  Q.  How were they all answered?

22  A.  The first question was actually "yes," and two through

23  eleven were "no," and then twelve was N. A.  So it doesn't

24  have anything in it.

25  Q.  Let me ask you to look at eleven B.  Read that question,

1    please.  Read it out loud for the jury.

2    A.  Eleven -- "Are you a non-immigrant alien?"

3    Q.  No, eleven B.

4    A.  Oh, eleven B.  I'm sorry.

5            "Are you under any indictment or information in any

6    court for a felony or any other crime for which the judge

7    could imprison you for more than one year?"

8    Q.  And how is that answered?

9    A.  It's answered, "No."

10   Q.  Again, I'm going to ask you.  Did you complete any part

11   of this front page?

12   A.  No, sir.

13           MR. BRUNSON:  May I approach, Your Honor?

14           THE COURT:  Yes.

15   Q.  I want to direct your attention to question number

16   thirteen.  And what is written there at the beginning?

17   A.  It looks like he tried to spell Alabama.

18   Q.  And did you mark through that?

19   A.  No, sir.

20   Q.  Did you suggest that it should be marked through?

21   A.  It's spelled correctly.

22   Q.  Did you?

23   A.  Yes, sir.

24   Q.  Okay.  And is it spelled correctly?

25   A.  It is on the second part.

```
1   Q.  And is number twelve, was an answer given there?
2   A.  The answer, "No," and then it really doesn't have
3   anything to do with it so it's an N. A. question.  But that's
4   his initials right there by it.
5   Q.  What is the initials?
6   A.  "P. G."
7   Q.  And he did that?
8   A.  Yes, sir.
9   Q.  What was your purpose in getting this front page
10  completed?
11  A.  So we could do the background check.
12  Q.  Did he ever say anything to you that led you to believe
13  that he was having difficulty reading or understanding what
14  was on that form?
15  A.  I really don't remember that.
16  Q.  Well, if he had asked you for assistance, what would you
17  have done?
18  A.  I can't answer the question for him.  I can try to
19  explain the question for him, but I can't answer for him.
20  Q.  Is there anything that makes this stick out, makes it you
21  remember this that he didn't understand the form?
22  A.  No, sir.
23  Q.  Did he furnish any contact information?
24  A.  I don't remember.
25  Q.  How would he have been notified to come pick up his
```

1   firearm?

2   A.  We would have taken his cell number and put a sticky note

3   on the front of it.

4   Q.  But that's not on that form?

5   A.  No.

6               MR. BRUNSON:  No further questions.

7                            CROSS EXAMINATION

8                  BY MR. BETHEL OF STEVE WINGO:

9   Q.  Mr. Wingo, that form was filled out, it appears it was

10  filled out on the sixteenth day of December of two thousand

11  six.

12  A.  Yes, sir.

13  Q.  Now you were working at Central Pawnshop in December of

14  two thousand six.

15  A.  Correct.

16  Q.  You were still working there three months later on the

17  sixteenth of March, two thousand six?

18  A.  Yes, sir.

19  Q.  You see quite a few customers at the pawnshop?

20  A.  Yes, sir.

21  Q.  So you would have seen a lot of customers in three months

22  between the sixteenth of December and the sixteenth of March

23  two thousand seven?

24  A.  Right.

25  Q.  And you already said you don't really have any specific

1    recollection of Pierre Gunnings.

2    A.   No, sir.

3    Q.   You really can't say exactly what happened while you were

4    there, while he was there, and what didn't happen.

5    A.   Right.

6    Q.   Now the first time anybody asked you about what happened

7    that day was when Special Agent Panoke talked to you.

8    A.   Right.

9    Q.   And that was on the sixteenth of March of two thousand

10   and seven.

11   A.   Okay.

12   Q.   Well if Agent Panoke's notes were to reflect that he

13   talked to you on the sixteenth of March, two thousand seven,

14   you wouldn't have any reason to dispute that?

15   A.   I mean -- I don't remember what day or anything like

16   that.  I remember meeting with him.

17   Q.   But it was several months.  You recall it was several

18   months later?

19   A.   Yes, sir.

20   Q.   And didn't you in fact tell him at the time he talked to

21   you that you didn't really recall Pierre Gunnings?

22   A.   Correct.

23   Q.   So you can't specifically remember if you had told him to

24   correct that misspelled Alabama.

25   A.   Correct.

1   Q.  You can see that's down here at the bottom of the form

2   where obviously somebody had misspelled Alabama, and that was

3   crossed out and then the correct spelling was written in.

4   A.   Right.

5   Q.  But it's likely you looked at the form and you told him

6   that needed to be spelled correctly?

7   A.   Right.

8   Q.  And you also talked about that last block.  You said that

9   wasn't filled out.  And in fact what had happened was, he had

10  written "No" in that block.

11  A.   Right.

12  Q.  Even though you're only supposed to write something in

13  that block --

14  A.  N. A. -- If he didn't answer it yes to eleven, then --

15  Q.  Well if we look at question twelve it says specifically

16  "If you answered yes to eleven point L, do you fall within

17  any of the exceptions set forth in notice for, exception to,

18  for example, a valid state hunting license?  If yes, the

19  licensee must complete question twenty-six."

20         So someone who is reading that, clearly that tells

21  them that they only filled this block in if they answered yes

22  to this question.

23  A.   Right.

24  Q.  But when Mr. Gunnings filled out the form he answered,

25  "No."  Now that "No" is crossed through and "N. A." is

1   written in next to it, and then his initials are written next

2   to that.  Now he wouldn't have known to do that on his own,

3   would he?

4   A.  If they answer no, we just ask if they would or

5   whatever.

6   Q.  So you must have told him to cross that out, write in the

7   N. A. and put his initial there.

8   A.  Right.

9   Q.  Because he wouldn't have any idea that he was supposed to

10  do that unless you told him.

11  A.  Right.

12  Q.  So just to be clear, you don't have any specific memory

13  of Pierre Gunnings?

14  A.  No, sir.

15  Q.  You don't have any specific memory of what the

16  conversation was that transpired in the store that day?

17  A.  Correct.

18  Q.  And it was three months later before you talked to

19  anybody about that particular transaction?

20  A.  Correct.

21          MR. BETHEL:  No further questions, Your Honor.

22          MR. BRUNSON:  Your Honor, may this witness be

23  excused?

24          THE COURT:  Yes.

25          (Whereupon the witness, Steve Wingo, stepped down

```
 1   from the stand.)

 2            MR. BRUNSON:  Your Honor, is now the appropriate

 3   time for the afternoon recess?

 4            THE COURT:  How many more witnesses do you have?

 5            MR. BRUNSON:  At this point, Your Honor, I have

 6   one.

 7            THE COURT:  One more witness?

 8            MR. BRUNSON:  Yes, Your Honor.

 9            THE COURT:  How long will this witness take?

10            MR. BRUNSON:  Your Honor, the witness would not be

11   a long witness, but I'm not prepared to go forward right now.

12            THE COURT:  You should have told me.  Why isn't

13   your witness ready?

14            MR. BRUNSON:  May I approach?

15            (Whereupon, an off-the-record bench conference was

16   held between both counsel and the Court.)

17            THE COURT:  I'll excuse the jury.  We have to take

18   something up outside the presence of the jury.  This will be

19   at least a ten minute recess.

20            (Whereupon, the jury was escorted out of the

21   courtroom and the following colloquy ensued):

22            THE COURT:  The question now is whether the four oh

23   four B evidence comes in?

24            MR. BRUNSON:  Yes, Your Honor.

25            THE COURT:  I'll hear you.
```

1          MR. BRUNSON:  Your Honor, the last witness would be

2    Auburn Police Officer Michael Roberson.  He has been here.

3    He has been sworn.  The case has moved more quickly than I

4    thought, but he told me he could be here within a matter of

5    minutes after a phone call.

6          The purported evidence would be that on March the

7    first of this year, he, acting as an Auburn police officer,

8    arrested Mr. Gunnings for possession of a firearm.  And this

9    was obviously after he had been indicted in this Court on

10   this charge, then apprised of the nature and been informed

11   that he could not have a firearm.  And it goes strictly to

12   his intent to possess a firearm knowing he was not able to

13   have a firearm.

14         THE COURT:  Is that intent at issue in this case?

15         MR. BRUNSON:  Your Honor, I submit that it is

16   because he's saying that he didn't know what he was doing,

17   that he couldn't read the form.  That certainly shows that he

18   did --

19         THE COURT:  He says he couldn't read the form.

20   Arguably his defense is that he didn't understand what was on

21   the form.  But I don't think, at least so far, that there is

22   any question that he was intending to purchase a firearm.

23         MR. BRUNSON:  Well he was intending to purchase a

24   firearm unlawfully, which is a requirement.  That's the

25   reason for the forty-four seventy-three.  And he possessed a

```
 1   firearm unlawfully after he knew he was under indictment in
 2   the Middle District of Alabama.
 3            THE COURT:  The charge here is not intending to
 4   possess a firearm unlawfully, the charge here is giving false
 5   information to get a firearm.  It's not quite that broad.
 6   The four oh four B evidence doesn't come in yet.  I have yet
 7   to hear, however, what his defense will be, so it may come in
 8   as rebuttal.
 9            MR. BRUNSON:  At this time, Your Honor, the
10   Government rests.
11            THE COURT:  Very good.  When he puts on his
12   defense, your four oh four B evidence may become relevant.
13   So far, no.
14            MR. BRUNSON:  May my agent be excused to tell the
15   witness not to come at this time?
16            THE COURT:  Yes.
17            THE COURT:  Are you ready to proceed with your
18   case?
19            MR. BETHEL:  We would move for a judgment of
20   acquittal at this time.
21            THE COURT:  The motion for judgment of acquittal is
22   denied.
23            Now how many witnesses do you have?
24            MR. BETHEL:  We anticipate nine witnesses, Your
25   Honor.
```

1    THE COURT:  Will you be calling the defendant at
2    this time?

3    MR. BETHEL:  Your Honor, we haven't yet decided at
4    this time.

5    THE COURT:  Let me know, because I do need to put
6    it on the record with regard to whether he testifies.
7    Especially if he doesn't testify, I will need to inform him
8    of his rights.

9    MR. BETHEL:  Your Honor, I will say at this time
10   that we do not expect Mr. Gunnings to testify.  That could
11   change, but at the present we do not expect Mr. Gunnings to
12   testify.

13   THE COURT:  Why don't we go ahead then and make the
14   inquiry.

15   Mr. Gunnings, if you would stand.

16   Mr. Gunnings, you understand that you have a right
17   to testify?

18   THE DEFENDANT:  Yes, Your Honor.

19   THE COURT:  And however you can make that decision
20   as to whether you want to testify after conferring with your
21   lawyer.

22   THE DEFENDANT:  Yes, sir.

23   THE COURT:  But the decision as to whether you
24   should testify is your decision, do you understand that?

25   THE DEFENDANT:  Yes.

```
 1              THE COURT:  And I understand at this time you do
 2    not wish to testify, is that correct?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Has anyone forced you or coerced you or
 5    said anything to you that would make you give up your right
 6    to testify?
 7              THE DEFENDANT:  No, Your Honor.
 8              THE COURT:  Do you have any questions for me or
 9    from your lawyer with regard to whether you should testify?
10              THE DEFENDANT:  No.
11              THE COURT:  So are you voluntarily giving up your
12    right to testify?
13              THE DEFENDANT:  Yes, Your Honor.
14              THE COURT:  Do you have any questions for him, Mr.
15    Bethel?
16              MR. BETHEL:  No, Your Honor.
17              THE COURT:  Do you have anything, Mr. Brunson, on
18    this issue?
19              MR. BRUNSON:  No, Your Honor.
20              THE COURT:  We'll take a ten minute recess and
21    we'll come back with the defendant's case.
22              (Whereupon, a recess was taken.)
23              THE COURT:  Members of the jury, the Government has
24    rested, and we are now in the defendant's case.
25              Mr. Bethel?
```

1     MR. BETHEL:  Your Honor, the defense witnesses have

2  not yet been sworn.  Would you like us to --

3     THE COURT:  Yes.  Bring them all in and we'll swear

4  them all in at one time.

5     (Whereupon, all prospective defense witnesses were

6  duly sworn by the courtroom deputy clerk.)

7                    S C O T T    F O W L E R,

8     the witness herein, having first been duly sworn or

9  affirmed to tell the truth, was examined and testified as

10  follows:

11                    DIRECT EXAMINATION

12              BY MR. BETHEL OF SCOTT FOWLER:

13     MR. BETHEL:  Your Honor, I'd like to move for the

14  admission of defendant's exhibit one into evidence.

15     THE COURT:  Admitted.

16  Q.  Good afternoon, Mr. Fowler.

17  A.  Good afternoon.

18  Q.  Sir, do you know Pierre Gunnings?

19  A.  I do.

20  Q.  If he's in the courtroom, could you point to him and

21  describe where he's sitting, please.

22  A.  Right here next to the lady, your helper.

23  Q.  And you'll have to speak into the microphone.  The court

24  reporter needs to record everything that you say.

25  A.  Seated right here with the striped tie.

```
 1   Q.   Sir, in what city and state do you live?

 2   A.   Auburn, Alabama.

 3   Q.   How long have you been a resident of Auburn, Alabama?

 4   A.   Twenty-five years.

 5   Q.   Sir, what do you do for a living?

 6   A.   I'm a building contractor.

 7   Q.   Please describe for the Court your educational

 8   background.

 9   A.   I have a Bachelor's degree from Auburn University with a

10   major in technology, and a minor in building science.  I have

11   a Master's degree the in Special Education.

12   Q.   What kind of training did you receive as part of your

13   Master's degree in Special Education?

14   A.   I worked with children of all ages.  All different

15   disabilities.  Grades K through twelve.  Training in behavior

16   management.  Teaching children with reading disabilities.

17   Behavioral problems.  Autism.  How to do psychometric testing

18   to determine disabilities.  Some Special Education law, et

19   cetera.

20   Q.   How long did it take you to obtain that Master's

21   degree?

22   A.   It was an intense program of one year, or four

23   quarters.

24   Q.   Prior to the time that you were running your own

25   construction company, what did you do, sir?
```

1  A.  I taught at Auburn High School for seven years.

2  Q.  And during what time frame did you teach at Auburn High

3  School?

4  A.  From the fall of ninety-nine to the spring of oh six.

5  Q.  How do you know Pierre Gunnings?

6  A.  He was in one of my classes the first year I taught at

7  Auburn High School.

8  Q.  And what year was that?

9  A.  Ninety-nine to two thousand.

10  Q.  Would he have been your student for the entire school

11  year?

12  A.  Yes.

13  Q.  How well did you get to know Pierre during that period of

14  time?

15  A.  We spent an hour and-a-half together every day of the

16  week.  Very well.

17  Q.  What opportunity did you have to observe Pierre and his

18  ability to learn?

19  A.  As good an opportunity as anybody could hope to have.  He

20  was in a small class of seven to eight students, and I worked

21  hands-on with these kids every day.

22  Q.  And how would you describe Pierre's intelligence?

23  A.  He's a sharp guy, as far as talking with you.  You can't

24  win an argument with him, I'll tell you that.  But he's sharp

25  when it comes to just talking or picking up things verbally.

1  He's a pretty sharp guy that way.

2  Q.  What is your opinion of Pierre Gunnings' ability to

3  read?

4  A.  His ability to read is very limited.  I would estimate he

5  made reading at the second grade level at that time.

6  Q.  How about words such as "felony" or "indictment," would

7  he be able to read those kinds of words?

8  A.  I wouldn't think so.  No.

9  Q.  Now you said that you taught Special Education at Auburn

10  High School.  Are you familiar with the diploma that gets

11  issued to Auburn High School graduates?

12  A.  Yes.

13        MR. BETHEL:  Your Honor, may I approach the

14  witness?

15        THE COURT:  Yes.

16  Q.  Mr. Fowler, I'm going to hand you what's been marked as

17  defendant's exhibit two.  The top of this form it says

18  "Auburn City Secondary School Record".  I'm handing up

19  defendant's exhibit two, Mr. Fowler.  Sir, if you would,

20  please, just take a look at that form.

21  A.  Okay.

22  Q.  Do you recognize it?

23  A.  It's a copy of Pierre's transcript from Auburn high

24  school.

25  Q.  Have you seen those kinds of transcripts previously?

1    A.  Yes.

2    Q.  Is that the type of transcript that's issued by Auburn

3    High School?

4    A.  Yes.

5    Q.  If you look in the upper right-hand part of that form,

6    can you tell me what kind of diploma that Mr. Gunnings has

7    received?

8    A.  It's called the Alabama Occupational Diploma.

9    Q.  Would you please explain to the ladies and gentlemen of

10    the jury what an occupational diploma is.

11    A.  It's a program designed by the Alabama State Department

12    of Education for students with disabilities who were unable

13    to pass the graduation exam.  It was done in an effort to

14    give students some classes and training so they could at

15    least go out of school and be good employees.

16    Q.  Based on what you observed of Mr. Gunnings, during the

17    time that you spent with him at Auburn High School, would it

18    have been at all possible for Mr. Gunnings to have earned a

19    regular diploma?

20    A.  No.

21    Q.  Take a look at that form.  I have some specific questions

22    about some of the entries there.  If you see under "grade

23    ten," for instance, it says "prealgebra."  Would that be a

24    course that Mr. Gunnings would have been able to take?

25    A.  Yes.

```
1   Q.  Explain for the Court if you would the difference between
2   being able to do math and being able to read.
3   A.  It's a huge difference.  It's not at all uncommon for
4   someone to have good math skills and be unable to read.  It's
5   quite common, actually.
6   Q.  I'd also like for you to explain a term that we've heard
7   used in the news, for instance, "functionally illiterate".
8   What would that mean?
9   A.  Just basically a person is unable to read, to decode or
10  decipher words and understanding the meaning of what those
11  words are.
12  Q.  Would a person who is unable to read be able to fill out
13  basic personal information?  For instance, a name and
14  address, a phone number?
15  A.  If the form or the terms were familiar to them, even if a
16  person cannot read sometimes if they see the word enough
17  times, they would learn by repetitiously seeing it.  Which is
18  basically what learning, is anyway.  If you see a form enough
19  times where it asks for a name and phone number, you might be
20  able to fill it out.
21  Q.  I'll give you answer for instance.  If someone had filled
22  out personal information on a number of occasions, they might
23  recognize the word like "county" for instance?
24  A.  Sure.
25  Q.  So whenever they saw that word, even though they can't
```

1    read it the same way a normal person would know to put Lee,

2    for instance, if they were from Lee County, is that an

3    accurate description?

4    A.   Right.  But you need to take it on a case-by-case basis.

5    But it's very possible.

6    Q.   Well let me ask you that based on what you know about

7    Pierre, based on his verbal abilities, for instance, and what

8    you know of his reading abilities, is he the kind of person

9    that even though he can't read, he might be able to fill in

10   some of that simple, basic information?

11   A.   Yes.

12   Q.   Mr. Fowler, I'm going to show you what's been marked as

13   defendant's exhibit one.  I want to move this up closely

14   enough so that you can see it.  This is simply a blown up

15   copy of a federal firearms form that someone would have to

16   fill out before they could purchase a firearm.

17   A.   Okay.

18   Q.   If you take a look, sir, specifically at question eleven

19   B -- or let's just back and talk about question A.  Take a

20   look at some of the words there in question eleven A.

21   A.   Okay.

22   Q.   Is that the kind of question that Pierre Gunnings could

23   understand without someone explaining it to him?

24   A.   He could not.

25   Q.   How about question eleven B?  Do you see that?  The

```
 1   question that talks about "indictment," "information,"
 2   "felony," "imprisonment," is that the kind of question that
 3   Pierre Gunnings could read without someone explaining it to
 4   him?
 5   A.  He could not.
 6            MR. BRUNSON:  Your Honor, I feel like this is
 7   inappropriate for Mr. Fowler to answer when he has testified
 8   that he had him as a student in ninety-nine and two thousand.
 9   And unless it's established what his knowledge of what his
10   abilities were in two thousand and six --
11            MR. BETHEL:  Your Honor, we are going to call a
12   witness who will testify as to Mr. Gunnings' abilities in two
13   thousand and six.  I'm simply trying to paint an entire
14   picture of Mr. Gunnings as many years as possible so they can
15   be sure that Mr. Gunnings cannot read now and never has been
16   able to read.
17            MR. BRUNSON:  And, Your Honor, I think things have
18   changed since Mr. Fowler had him as a student, and he is not
19   an appropriate witness to testify about this.
20            THE COURT:  You can bring that out on cross.
21   Overruled.
22            Go ahead.
23   Q.  I'm talking about based on your knowledge, your
24   experience with Mr. Gunnings, based on what you know Mr.
25   Gunnings, are those the kinds of questions that he would be
```

```
 1   able to read on his own without help?
 2   A.  At that time he could not have read those questions.
 3              MR. BETHEL:  No further questions, Your Honor.
 4              THE COURT:  Cross?
 5                       CROSS EXAMINATION
 6              BY MR. BRUNSON OF SCOTT FOWLER:
 7   Q.  Mr. Fowler, I'm from Montgomery, but I understand that
 8   Auburn High School has a very, very good reputation
 9   throughout the state.  Is that accurate?
10   A.  Yes, sir.
11   Q.  And they don't give diplomas for just as a graduation
12   gift, do they?
13   A.  That's correct.
14   Q.  What does E. M. P. E. N. G. three mean?
15   A.  Employment English three.
16   Q.  Is there any reading required with employment English
17   three?
18   A.  There can be, however from the occupational program we
19   can make any number of accommodations, which includes reading
20   tests to students.  We can prompt them when they're trying to
21   read.  They can have additional time.  Additional days to
22   complete the assignments.  We cannot modify the changes the
23   curriculum requires, but any number of accommodations can be
24   made in order to help a student succeed.
25   Q.  What I'm referring to is the year nineteen ninety-nine to
```

1  two thousand, and he in fact was one of your students back

2  then, is that correct?

3  A.  Yes, sir.

4  Q.  And he got a full one credit for that.

5  A.  Yes, sir.  I had him for life skill science and career

6  prep that year.

7  Q.  Was any reading required on those courses?

8  A.  I required the students to read out loud every day, and

9  that's why I'm so familiar with Pierre's inability to read.

10  I ask them to specifically read out loud so I can correct

11  them as they went along.  So I saw it on a daily basis, and

12  that's why I am so familiar with his inability to read.  When

13  we had written tests, I would sit with him and read the

14  questions to him.

15  Q.  And that was during the school year nineteen ninety-nine,

16  two thousand?

17  A.  Yes, sir.

18  Q.  Are you aware that what we're talking about is an

19  application that was filled out in two thousand and six?

20  A.  Yes, sir.

21  Q.  Are you aware that Mr. Gunnings had the ability, being a

22  bright person, that he could make great improvement between

23  two thousand and two thousand and six?

24  A.  In his reading?

25  Q.  Yes, sir.

```
 1    A.   Yes.   If he had continuing education, if he had someone
 2    to work with him one-on-one and he had the time to devote to
 3    it, he could make improvement.
 4    Q.   Are you aware that during this period of time, that's
 5    between two thousand and two thousand six, that he in fact
 6    served in the army?
 7    A.   Yes, sir.
 8    Q.   And don't you know that some reading is required to take
 9    -- to be admitted into the army and to succeed in the army?
10    A.   I've never been in the army.
11    Q.   You looked at that form that was completed, is that
12    correct?
13    A.   I think so.
14    Q.   Going back to nineteen ninety-nine and two thousand, and
15    if you'd like to look at this form I'll give you this copy,
16    are any of those questions questions that you would at that
17    time have expected Mr. Gunnings to have answered?
18    A.   Can I see the questions again?
19              MR. BRUNSON:   May I approach, Your Honor?
20              THE COURT:   Yes.
21    A.   Is your question if he read this on his own, could he
22    have answered it?
23    Q.   Yes.   Between nineteen ninety-nine and two thousand, are
24    those questions that he would have been able to answer?
25    A.   Number fourteen says, "What is your country and
```

 1   citizenship?"  And I think he probably could have gotten

 2   that.

 3            THE COURT:  Is this reading, or comprehending or

 4   both?

 5            THE WITNESS:  Are you asking to decode and

 6   understand, or what is your question?

 7            THE COURT:  I don't know, I'm asking for a

 8   clarification.

 9   Q.  I'm asking if he would have understood the written words

10   and be able to appropriately answer those.

11   A.  I think "country citizenship" he would have gotten that.

12   And like "What is your state of residence?"  He probably

13   could have gotten that.

14   Q.  How about eleven B, "Are you under indictment or

15   information in any court for a felony or any other crime for

16   which the judge could imprison you for more than one year?"

17   A.  No, sir.  He could certainly read words like "are you,"

18   one more, but polysyllabics like multi-indictment or

19   information, words like that could be very challenging for

20   somebody who has a hard time reading.

21   Q.  Okay.  And that was in nineteen ninety-nine, two

22   thousand?

23   A.  Yes, sir.

24   Q.  And it's certainly that he made improvement in the

25   intervening six years?

```
1   A.   It's possible.
2   Q.   Now going back to nineteen ninety-nine two thousand with
3   Mr. Gunnings that you knew, would he have attempted to answer
4   those questions or would he have honestly said I can't read
5   it or I can't understand it?
6              MR. BETHEL:   Your Honor, I think that question
7   calls for pure speculation.
8              THE COURT:   I don't understand what you are asking.
9              MR. BRUNSON:   I'm asking him when he was teaching
10  him, if there were questions of this nature on the form,
11  would he have attempted to answer?  What would he have done
12  in nineteen ninety-nine two thousand, would he throw up his
13  hands and say I can't read it, I can't understand it.
14  A.   For one thing, I would never put a question like this in
15  front of a student with reading disabilities.  But if I did,
16  it could be very embarrassing that he couldn't read, and
17  that's understandable.
18  Q.   Okay.  When it says eleven A, "Are you the actual buyer
19  of the firearm listed on the form?"  And then it gives some
20  warning under there.  "Are you aware that certain questions
21  not answered appropriately would prohibit a person from being
22  able to buy a firearm?"
23  A.   You're asking me if I'm aware of that?
24  Q.   Yes, sir.
25  A.   I guess so.
```

```
1    Q.  And the answer to that is yes, isn't it?
2    A.  I'm not sure I understand your question.
3           THE COURT:  I don't understand it either.
4    Q.  The question is, are you the actual buyer, and the answer
5    to that is yes.
6    A.  Okay.
7    Q.  Are you aware that if he had put no he was not the actual
8    buyer he couldn't have purchased a firearm?
9    A.  You say if I were to?
10   Q.  Yes, sir.
11          THE COURT:  Is he aware about Mr. Gunnings, or
12   about himself?
13          MR. BRUNSON:  No, sir.  He is aware about himself.
14   I'm trying to get to the appropriateness of the answers, Your
15   Honor.
16          THE COURT:  About himself or about somebody else?
17   I'm confused, too.  I don't quite know for whom he's
18   answering.
19          MR. BRUNSON:  I'm asking if he knows the
20   appropriate answer to these questions.
21          THE COURT:  For him?
22          MR. BETHEL:  Your Honor, I object because I fail to
23   see that that's relevant in the any way whatsoever.  I really
24   can't quite understand either what Mr. Brunson is trying to
25   get at with this, Your Honor.
```

1         THE COURT:  You're asking him how he would have

2    filled out the application?

3         MR. BRUNSON:  Yes, Your Honor.

4         THE COURT:  And what point are you trying to make

5    with that?

6         MR. BRUNSON:  I'm trying to show that on this form

7    every question is answered appropriately to successfully

8    purchase a firearm.  He didn't miss a one.

9         MR. BETHEL:  Well, Your Honor, we've already had

10   testimony about that from the A. T. F. agent.

11        THE COURT:  I'm not quite sure what you're trying

12   to show with this particular witness.

13        MR. BRUNSON:  I'm trying to ask if he knew him in

14   nineteen ninety-nine or two thousand, would he have even

15   attempted to answer those questions.  A great deal of time

16   changed up until two thousand six, and he doesn't know what

17   those changes were.

18        THE COURT:  In two thousand -- in the year nineteen

19   ninety-nine, the year two thousand, could he have answered

20   those questions?

21        THE WITNESS:  No.  He could not have answered those

22   questions accurately.

23   Q.  Okay.  Would that tell you that some significant change

24   took place between two thousand and two thousand six?

25   A.  Would tell me what?

```
 1   Q.  The fact that he answered these questions in an attempt
 2   to purchase a firearm.  You just said he couldn't have
 3   answered them in two thousand.
 4             MR. BETHEL:  Well again, Your Honor, I object
 5   because it assumes facts not in evidence.  All we know is
 6   that that was Mr. Gunnings' handwrighting.  We already
 7   established that nobody has testified here as to what the
 8   circumstances were as to how those questions were answered,
 9   whether he guessed, whether the person who was helping him
10   read the questions to him.  There is no evidence about what
11   the predicate was as to how those letters ended up in those
12   blocks.  So Mr. Brunson's question assumes facts not in
13   evidence.
14             THE COURT:  You're just saying that -- I guess your
15   question is, if he filled out the form, he would have been
16   able to fill out the form?
17             MR. BRUNSON:  Yes, Your Honor.
18             THE COURT:  I still don't understand what this
19   witness can say.  It sounds to me you just want to make an
20   argument to the jury, which is appropriate, but that has to
21   be made at the end of the case.
22   Q.  But your testimony is that he wouldn't even have
23   attempted it in two thousand?
24   A.  He was prone to guessing.  On this it looks like he had a
25   fifty/fifty shot, yes or no, so in answer to your question,
```

1  guessing on numerous occasions, that's a possibility.

2  Q.  And you also agree that things could have changed with

3  his reading ability and comprehension between two thousand

4  and two thousand six?

5  A.  That is a possibility.

6                  REDIRECT EXAMINATION

7            BY MR. BETHEL OF SCOTT FOWLER:

8  Q.  Mr. Fowler, over the course of your career as a Special

9  Education teacher, did you know any people who were unable to

10 read?

11 A.  Several, yes.

12 Q.  Is it something that as a rule they would readily

13 admit?

14 A.  No.

15 Q.  Why not?

16 A.  Embarrassment.  Shame.

17 Q.  Did you find that they would go to great lengths to hide

18 that fact?

19 A.  Absolutely.  Yes.  Especially with male students.  It

20 seems to be more of an issue of pride with the male students

21 than female students.

22            MR. BETHEL:  No questions, Your Honor.

23            MR. BRUNSON:  No questions.

24            THE COURT:  Thank you.  You may step down.

25            MR. BETHEL:  Your Honor, we call Devereau Racossi.

1           Your Honor, also at this time I'd move the

2    admission into evidence of defendant's exhibit two.

3           THE COURT:  What is two?  May I see it?

4           MR. BETHEL:  Yes, that is the Occupation and

5    Employment Act.

6           THE COURT:  Admitted.

7                D E V E R E A U    R A C O S S I,

8        the witness herein, having first been duly sworn or

9    affirmed to tell the truth, was examined and testified as

10   follows:

11                    DIRECT EXAMINATION

12                BY MR. BETHEL OF DEVEREAU RACOSSI:

13   Q.  Ma'am, you'll have to lean into the microphone so the

14   court reporter can hear and record everything we say.

15           Mr. Racossi, in what city and state do you live?

16   A.  Auburn, Alabama.

17   Q.  How long have you lived in Auburn?

18   A.  Since August of two thousand two.

19   Q.  Ma'am, do you know Pierre Gunnings?

20   A.  Yes.

21   Q.  How do you know Pierre?

22   A.  He is my nephew.

23   Q.  How long have you known him?

24   A.  All of his life.

25   Q.  Since he was born?

```
1   A.   Yes.

2   Q.   How long have you lived in Auburn?

3   A.   August will be six years.

4   Q.   And where did you live before that?

5   A.   I'm prior military.  I was born and raised in Detroit,

6   Michigan.  I had lived in Michigan, Alabama, North Carolina,

7   Mississippi, California.  I think that's it.

8   Q.   Pierre is twenty-six years old.  Do you remember where he

9   would have been living when he was born?

10  A.   I believe Pierre was born in New York, and I would have

11  been living in Michigan.

12  Q.   How much have you gotten to see your nephew over his

13  twenty-six years?

14  A.   Well, when Pierre was probably between -- he was a little

15  boy and I would see him periodically with my sister, his

16  mother, would come to Alabama.  Now at some point my sister

17  moved to Alabama, and Pierre moved to Alabama, and I think

18  that either I was living up here or here on leave from the

19  military at the time.  But most of my -- I guess more of the

20  time that he and I have been together have been more recent,

21  like in his adulthood than when he was growing up.

22  Q.   Do you know if Pierre has ever served in the Army?

23  A.   He has.

24  Q.   Did he serve in Iraq?

25  A.   He did.
```

```
1   Q.  During the time that you have been here in Alabama, you
2   said where you spent the most time with him when he was an
3   adult, do you know if your nephew can read?
4   A.  To my knowledge Pierre cannot read.
5   Q.  Is this something that is well-known within the family?
6   A.  Yes.
7   Q.  Do you know how Pierre managed to get into the army if he
8   can't read?
9   A.  My other nephew, Pierre's brother, took the A. S. B. A.
10  B. for him. It's a written test that you have to take and
11  pass to get into the army.
12  Q.  What's his the brother's name?
13  A.  William Gunnings.
14  Q.  Do you know why his brother took the test for him?
15  A.  Yes, because Pierre couldn't have passed the test.
16  Q.  And the reason he couldn't have passed the test?
17  A.  Because he couldn't read.
18          MR. BETHEL:  No further questions, Your Honor.
19                     CROSS EXAMINATION
20          BY MR. BRUNSON OF DEVEREAU RACOSSI:
21  Q.  Ms. Racossi, how long were you in the service?
22  A.  Four years and two years served, and then eleven years
23  later two years in the Reserves.
24  Q.  Lengthy military service?
25  A.  Somewhat.  Not really compared to the twenty years no.
```

```
 1    Q.   How long was your nephew Pierre in the army?
 2    A.   I don't really know exactly how many years Pierre did in
 3    the army, but I do know he was active duty, and I do know
 4    that he served active duty during war.
 5    Q.   What kind of discharge did he receive?
 6    A.   I've never viewed his D. E. Two-fourteen, but on his
 7    vehicle he has a tag that says "Disabled veteran".
 8    Q.   Do you know what his disability is for?
 9    A.   I don't think it's physical, but I can't be sure because
10    I have not read any documentation.
11    Q.   Do you know how long he served in the army?
12    A.   I don't know.
13    Q.   Do you know whether it was in excess of one year?
14    A.   It was, yes.
15    Q.   In your experience in the army, even after you had taken
16    the entrance test and then admitted, don't you then go to
17    basic training?
18    A.   Yes.
19    Q.   Isn't reading required while you're at basic training?
20    A.   Yes.
21    Q.   And for a person, anybody, your nephew or anybody else,
22    they would have to satisfactorily complete basic training in
23    order to get a discharge, wouldn't they?
24    A.   I'm sorry, repeat the question.
25    Q.   You've just acknowledged that reading is required in the
```

1  military.

2  A.  Yes.

3  Q.  And in if a person is not able to complete those

4  requirements, those assignments in the military, they would

5  be discharged, wouldn't they?

6  A.  I'm not in a position to answer that.

7  Q.  You served in the military.

8  A.  I did, but I'm able to read.  I couldn't answer that.

9        MR. BETHEL:  Your Honor, this witness has not

10 testified that she's a member of the judge advocate's corps

11 or that she's a paralegal or if she worked in administrative

12 discharges.  She said she doesn't know.  She was asked and

13 answered that question, Your Honor, so I object to repeating

14 the question because she has no personal knowledge.

15        THE COURT:  If she doesn't know, then let's move

16 on.

17 Q.  To your knowledge, your nephew was not discharged because

18 he could not read, was he?

19 A.  I don't know why he was discharged.

20 Q.  When did he serve?

21 A.  When you say "when," do you mean year-to-year?

22 Q.  Yes, ma'am.

23 A.  I don't know.  I only know for sure that he served during

24 wartime.  I don't know how many years.

25        MR. BRUNSON:  No further questions.

1              THE COURT:  Redirect.

2                          REDIRECT EXAMINATION

3                    BY MR. BETHEL OF DEVEREAU RACOSSI:

4    Q.  Ms. Racossi, are soldiers who serve in a unit together,

5    especially during wartime, are they a rather close-knit

6    bunch?

7    A.  They can be, yes.

8    Q.  Would you be surprised if some of Pierre's army buddies

9    would have taken care of him, so to speak, when he was in the

10   army when it came to having to read or write anything?

11   A.  No, I wouldn't be surprised.

12   Q.  In other words, that's something that army buddies might

13   do?

14             THE COURT:  Only if you know whether this occurs.

15   A.  I'm an ex-marine, and I did, yes.

16             MR. BETHEL:  No Further questions, Your Honor.

17             THE COURT:  Go ahead.

18             MR. BRUNSON:  No questions.

19             MR. BETHEL:  Your Honor, may this witness be

20   excused?

21             THE COURT:  Yes.

22             (Whereupon the witness, Devereau Racossi, stepped

23   down from the stand.)

24             THE COURT:  Next witness.

25                    P R I S C I L L A    B U T L E R,

```
 1        the witness herein, having first been duly sworn or
 2   affirmed to tell the truth, was examined and testified as
 3   follows:
 4                         DIRECT EXAMINATION
 5                  BY MS. MASON OF PRISCILLA BUTLER:
 6   Q.   Good afternoon, Ms. Butler.
 7   A.   Good afternoon.
 8   Q.   Ms. Butler, where do you live?
 9   A.   I live on -- My address?
10   Q.   No, not your street address, just the city and state.
11   A.   Auburn, Alabama.
12   Q.   And how long have you lived in Auburn, Alabama?
13   A.   Practically all my life.
14   Q.   And, Ms. Butler, what is your relationship to Pierre
15   Gunnings?
16   A.   I'm his grandmother.  Stepgrandmother.
17   Q.   And has Pierre ever lived with you?
18   A.   Sure.  He has.
19   Q.   What were the circumstances, the reason why Mr. Gunnings
20   lived with you?
21   A.   Well, my husband, his mother -- my husband and his mother
22   -- well, she was having some problems and my husband and I
23   received custody of Pierre.
24   Q.   When was it that you got custody of Mr. Gunnings and his
25   brother?
```

1    A.   I'm not sure of the year, but Pierre was thirteen.

2    Q.   Thirteen years old?

3    A.   Mm-hmm.

4    Q.   And ever since he was thirteen years old he lived with

5    you?

6    A.   Until he was nineteen.

7    Q.   Until he was nineteen.

8    A.   Yes.

9    Q.   Now what is your knowledge of Mr. Gunnings' ability to

10   read?

11   A.   Well, I know he had problems reading.  He couldn't.

12   Q.   When did you first discover that he was having problems

13   reading?

14   A.   Right after he moved in with us.  I used to help him with

15   his homework, and he had problems reading and I would help

16   him with it.

17   Q.   Could you give an example of the kinds of problems he

18   would have with his homework?

19   A.   Well, reading.  And if he wanted to spell a word,

20   sometimes he could ask me how to spell it.  And he struggled

21   in trying to read.

22   Q.   Did you ever have him tested or evaluated for his reading

23   problems?

24   A.   No.  But my husband, actually he went to the school to

25   have conferences with his teachers, and at that time he was

1    told that he had problems reading and that they wanted to

2    test him.  I don't know the outcome of the tests or anything

3    like that, but he was tested at school.

4    Q.  Do you know if Mr. Gunnings has ever been diagnosed with

5    a learning the disability?

6    A.  No, I don't know.

7    Q.  Now to your knowledge, was Mr. Gunnings ever in the

8    army?

9    A.  Yes.

10   Q.  To your knowledge did he ever serve in Iraq?

11   A.  Yes.

12   Q.  Do you know how it was that Mr. Gunnings was able to

13   enlist in the army?

14   A.  Not really, no.

15   Q.  Based on your knowledge of Mr. Gunnings' ability to read,

16   do you know if he's made any progress from the time he was

17   thirteen until now?

18   A.  I don't think so.

19            MS. MASON:  I don't have any further questions.

20                        CROSS EXAMINATION

21            BY MR. BRUNSON OF PRISCILLA BUTLER:

22   Q.  In your last answer, what are you basing that on, you

23   "don't think so"?

24   A.  You mean how did he get into the army?

25   Q.  No, ma'am.  The last question you were asked, I believe,

1    was has he made any progress, and you said, "I don't think

2    so."

3    A.   He didn't before he left my home.

4    Q.   But that was when he was nineteen.

5    A.   Right.

6    Q.   And how old is he now?

7    A.   Twenty-six right now.

8    Q.   So that's seven years.  He could have made progress.

9    A.   Yes, but I have talked to Pierre, and Pierre, like giving

10   him addresses when he was in the service, I had to spell

11   everything that I -- you know, if I was giving him my

12   daughter's address in Atlanta or something, my home address

13   or something, I would have to spell each word to him.  Each

14   letter I would have to spell out.

15   Q.   And was this for him to write letters to other people?

16   A.   Yeah.  To me or my daughter.

17   Q.   And he could do that after you helped him?

18   A.   No.  I never received a letter, although I gave him the

19   address.

20   Q.   Did you ever send him any letters?

21   A.   No.  He preferred calling me and talking to him because

22   he had trouble reading the letters.

23   Q.   But your knowledge of this is from when he was thirteen

24   and nineteen, which is seven years ago?

25   A.   Yes.  But like I say, when he calls me he would request

```
 1   the address or something.  I would have to spell it.
 2   Q.  How long ago was that?
 3   A.  That was while he was serving in the army.
 4   Q.  And how long ago was that?
 5   A.  It was probably four or five years ago.
 6              MR. BRUNSON:  No further questions.
 7              MS. MASON:  No further questions.
 8              THE COURT:  You may step down.
 9              (Whereupon the witness, Priscilla Butler, stepped
10   down from the stand.)
11              MS. MASON:  Your Honor, may she be excused?
12              THE COURT:  Unless you want to keep her.
13              MS. MASON:  No.
14              THE COURT:  Next witness.
15              MS. MASON:  Anthony Davis.
16                        A N T H O N Y    D A V I S,
17      the witness herein, having first been duly sworn or
18   affirmed to tell the truth, was examined and testified as
19   follows:
20                        DIRECT EXAMINATION
21                   BY MS. MASON OF ANTHONY DAVIS:
22   Q.  Good afternoon, Mr. Davis.
23          Mr. Davis, where do you live?
24   A.  I live in Auburn.
25   Q.  How long have you lived in Auburn?
```

1  A.  I lived off and on back and forth California to Auburn,

2  but like recently I've lived here about six years.

3  Q.  What is your relationship to Pierre Gunnings?

4  A.  First cousin.

5  Q.  Now, Mr. Davis, what is your knowledge about Mr.

6  Gunnings' ability to read?

7  A.  He cannot.

8  Q.  When did you first learn that he could not read?

9  A.  I was about ten years old.

10  Q.  What were the circumstances around that time that let you

11  know that Mr. Gunnings could not read?

12  A.  Just watching him struggle with his homework.

13  Q.  Could you give an example of the struggle that he had?

14  A.  Sometimes he would ask me how to spell words.

15  Q.  And you were ten years old at the time?

16  A.  Yes.

17  Q.  How would was he?

18  A.  He might have been about sixteen.

19  Q.  Do you have any other examples of circumstances that you

20  found out that Mr. Gunnings could not read?

21  A.  One time recently, about two years ago, he flat out told

22  me that he could not read.

23  Q.  Was that common knowledge within your family?

24  A.  I'm really not sure, because I know he tried to keep it a

25  secret.

```
 1   Q.   And when you say "he tried to keep it a secret," Who did
 2   he try to keep it a secret from?
 3   A.   Really, from everybody.
 4   Q.   Do you know why?
 5   A.   I don't know why.
 6   Q.   But you do know that he cannot read?
 7   A.   I do know that.
 8   Q.   And you've known that ever since you were ten years
 9   old?
10   A.   Yes.
11   Q.   And how old are you now?
12   A.   I'm nineteen.
13   Q.   I have no further questions.
14             THE COURT:  Cross?
15                         CROSS EXAMINATION
16             BY MR. BRUNSON OF ANTHONY DAVIS:
17   Q.   Mr. Davis, what do you do now, are you in school?
18   A.   Not right now.
19   Q.   How often do you have contact with your cousin Pierre?
20   A.   Used to be every day.
21   Q.   What is "used to be"?
22   A.   Before he got locked up.
23   Q.   Okay.  Do you know when that was?
24   A.   Actually, I just got back from a vacation, and he had
25   gotten locked up then.  But when I was here, we saw each
```

1    other every day.

2    Q.  And you say it was about two years ago that he told you

3    he couldn't read?

4    A.  Yes.

5    Q.  And was that roughly in two thousand six?

6    A.  I'm really not sure.

7    Q.  Is that about the time he got in trouble for this

8    firearms offense?

9    A.  I'm not sure.

10   Q.  But it could have been?

11   A.  I'm really not sure.

12   Q.  Did he tell you that he was in trouble?

13   A.  No.

14   Q.  You didn't even know it?

15   A.  No.

16           MR. BRUNSON:  No further questions.

17                   REDIRECT EXAMINATION

18              BY MS. MASON OF ANTHONY DAVIS:

19   Q.  Mr. Davis, have you ever had an opportunity to help Mr.

20   Gunnings in his problems not being able to read?

21   A.  Yeah, I have.  Me and him, he tried to register for

22   Southern Union, and --

23   Q.  I'm sorry.  Would you tell us what Southern Union is?

24   A.  It's a community college in Opelika, Alabama.  It's like

25   a two year community college.  And he tried to register, and

1  there were papers that he had to fill out.  And I pretty much

2  sat with him right, next to him, I sat there and listened to

3  him tell the lady like, "I'm not even going to play around

4  with you, I cannot read."  And so even still, it was

5  something he had to do so we had to fill those papers out and

6  I sat with him, step by step read out everything, read his

7  information, read what I needed to know and, you know, helped

8  him like that.

9  Q.  When was that?

10 A.  It was a while back.  Maybe almost two or three years

11 ago.  It was a while back.

12 Q.  Have you done anything like that for him at any other

13 time, helped him to fill out forms?

14 A.  Not recently.

15 Q.  Have you ever sent text messages to him?

16 A.  I have not.

17          MS. MASON:  I have no further questions.

18          MR. BRUNSON:  Nothing further, Your Honor.

19          THE COURT:  Thank you.  You may step down.

20          (Whereupon the witness, Anthony Davis, stepped down

21 from the stand.)

22          THE COURT:  Next witness.

23          MS. MASON:  William Gunnings.

24          THE COURT:  How many more witnesses do you have?

25          MR. BETHEL:  We have five more witnesses, Your

1    Honor.

2            THE COURT:  I'm just trying to get an idea of how

3    the schedule will work out today.

4                    W I L L I A M S    G U N N I N G S,

5        the witness herein, having first been duly sworn or

6    affirmed to tell the truth, was examined and testified as

7    follows:

8                        DIRECT EXAMINATION

9                    BY MS. MASON OF WILLIAM GUNNINGS:

10   Q.   Mr. Gunnings, where do you live?

11   A.   Right now I live in Bonaire, Georgia.

12   Q.   Could you spell the name of that city for us?

13   A.   B-o-n-a-i-r-e, Georgia.  Three one zero zero five.

14   Q.   What do you do for a living?

15   A.   I right now I work with Perdue Farms.  It's a poultry

16   company.  I'm a production supervisor.

17   Q.   Have you ever been in the military?

18   A.   Yes, ma'am.

19   Q.   What branch?

20   A.   I was in the armed forces, the army.  I went right after

21   high school.

22   Q.   So you're familiar with the procedures that one must

23   undertake to enlist in the military?

24   A.   Yes, ma'am.

25   Q.   And what type of test do you have to take to enlist in

1    the military?

2    A.   You have to take a A. S. B. A. B. test.

3    Q.   And you've taken this A. S. B. A. B. test?

4    A.   Yes, ma'am.

5    Q.   What is your relationship to Pierre Gunnings?

6    A.   I'm his next oldest brother.  I'm the brother that's the

7    oldest.  We had one more that passed away last year in April

8    that was actually older than me.  But I'm his oldest living

9    brother.

10   Q.   Can you describe to us, please, your circumstances

11   growing up, you and your brother?

12   A.   Me and Pierre, we're the only two siblings that had the

13   same Mom and Dad.  We grew up in Brooklyn, New York.  We grew

14   up basically poor, so to speak.  We lived in shelters and low

15   income housing with our parents.  Both our parents were on

16   drugs.  And they both died at a very young age in their lower

17   forties.

18   Q.   Now, Mr. Gunnings, after your parents died what role did

19   you play in Pierre's upbringing?

20   A.   My father died in ninety-five.  I want to say February.

21   I can't remember exactly the date.  My mother died about a

22   week and-a-half after I graduated from high school, which is

23   nineteen ninety-six.  I'm four years older than Pierre, and

24   all along when my parents were alive, I kind of looked over

25   him.  I remember working at Burger King in high school,

1   feeding him, other family members taking care of him.

2          I was like a father figure to Pierre.  I always

3   looked over him.  Even in New York I would fight for him or

4   whatever.

5   Q.  Mr. Gunnings, can your brother read?

6   A.  No.  He's always had a problem with literacy.  We

7   basically been knowing that for a long time with Pierre.

8   Q.  You said we've known that for a long time, who are you

9   referring to?

10  A.  My parents that were living.  My oldest brother that

11  died.  It's kind of something we hear from a lot of people,

12  because it was his personal problem but the people close

13  enough to him knew.

14  Q.  Now was your brother ever in the military?

15  A.  Yes, ma'am.

16  Q.  Did you suggest to him to enlist in the military?

17  A.  Yes.  Actually, when I was in the military, because when

18  I got out of high school I looked over him, when I was in the

19  military I would send stuff to him, shoes, things like that

20  because both of our parents were deceased and he was living

21  with our grandparents.  So I would, you know, try to look

22  over him as much as I can even though I was far away.

23         Once I got stationed in Georgia, it was about four

24  and-a-half hours away, some weekends I would pick him up and

25  let him stay with me to see what I go through.

1   Q.   Did you suggest that he enlist in the military?

2   A.   Yes, ma'am.  Actually, after I got out of the military I

3   went to California in ninety-nine.  I spent about two years

4   in California.  I came back to Alabama in two thousand and

5   two and enrolled in Tuskegee University.

6             At the time Pierre was living with a high school

7   girlfriend.  He was unemployed at the time.  He was

8   unemployed at the time.

9   Q.   Okay, Mr. Gunnings.  I'm sorry, but I'm going to have to

10  ask you to lean up again closer to the mic so everyone can

11  hear you.

12  A.   Sorry.

13            At that time when I was headed back to California,

14  Pierre was actually living with his girlfriend.  She was

15  going to school and working.  And at that time with me going

16  to school and trying to do something productive, I'd say,

17  "What are your plans now that you're out of school?"

18            And one day him and the girlfriend broke up.  I

19  would look after him, take them out to eat at sometime and

20  ask, "Why don't you go into the army?  You can get a trade

21  that you could use."  So I talked to him a lot about the

22  armed forces.

23  Q.   To your knowledge, did your brother Pierre Gunnings

24  attempt to take the A. S. B. A. B. test himself?

25  A.   To my knowledge, to my knowledge he took that twice.

1  Q.  And what were the results?  Without knowing specifically

2  what the number result was, do you know how well he did on

3  those tests?

4  A.  I know that he didn't do well enough for his scores to

5  get him in.  I think the minimum score on the A. S. B. A. B.

6  would be would like a thirty-three or something, and he was

7  somewhere in the teens.

8  Q.  So how was it that Mr. Gunnings ended up in the military

9  if he had failed the A. S. B. A. B. himself twice?

10  A.  Well, as can you see, me and my brother favor a lot, so I

11  took the A. S. B. A. B. for him.  I actually took his

12  driver's license and memorized his Social Security number and

13  went in and took the test for him.

14  Q.  To your knowledge, did the recruiter know about this?

15  A.  I think so.  I'm pretty sure he knew because his

16  recruiter had mentioned that the score that Pierre received

17  of his last A. S. B. A. B. score to the score that I gave him

18  when I took the test was drastically higher.  At that time I

19  think he was trying to say that the original score was

20  sixteen and your second score is like a sixty-five.  But I

21  wanted him to get in.

22          MS. MASON:  I have no further questions.

23          THE COURT:  Cross?

24                      CROSS EXAMINATION

25              BY MR. BRUNSON OF WILLIAM GUNNINGS:

1    Q.   When did you take the test for your brother?

2    A.   Sir, actually I don't know the actual date and time, but

3    I believe he enrolled right after Thanksgiving.  So I would

4    say three months prior to Thanksgiving.

5    Q.   Of what year?

6    A.   I want to say two thousand two because I got to Alabama

7    in two thousand two.

8    Q.   Two thousand two?

9    A.   I think so, sir.  I believe it's two thousand two.

10   Q.   Did you ever talk to your brother about what he would be

11   doing in the army?  I know you said you invited him to go to

12   Georgia with you when you were stationed there.  Did you ever

13   talk to him and tell him what he would be doing?

14   A.   Yes.  I explained to him a lot.  Because when you have a

15   brother that you're very close with, actually what you're

16   doing is we work out in the morning.  You know, I, myself,

17   was a nineteen kilo, which was a tanker.  I worked around

18   tanks, so I explained to him what my life was like.  And I

19   also tried to share with him some of my knowledge of the

20   military so when he joined he -- I didn't like my job so I

21   tried to explain to him when you go, don't take this job, do

22   this.  I actually tried to talk him into doing some kind of

23   truck driving position.

24   Q.   Did you talk to him about basic training?

25   A.   Yes, sir.  Pierre was a student athlete in high school,

1    so I knew that the physical aspect of basic training would be

2    easy for him.  He played a little football.  Me and him

3    played a lot of pickup basketball.

4    Q.  What did you tell him about the written test when was

5    going into the army and taking other courses that were

6    necessary for advancement?

7    A.  Well I didn't tell him much about that because to my

8    knowledge the written test aren't taken until you go further

9    up in rank.  Our initial goal was for him to go in and do

10   three years and come out with some technical skills.  So I

11   didn't talk to him much about the non-commissioned test you

12   have to take to be a sergeant or above.

13   Q.  How many years did he serve?

14   A.  He served three years.

15   Q.  He served three full years.  And went to Iraq?

16   A.  Yes.

17   Q.  Isn't there an army code book or handbook they assign to

18   everybody who enters the army?

19   A.  Yes, they do assign that book, and that book basically a

20   lot of the things in the book you learn through experience.

21   Just like it's a lot of repetitive things.  You can refer

22   back to the book if you need to, but to be honest I didn't

23   read the book much, I learned through generally following

24   orders.

25   Q.  And Pierre Gunnings served three successful years in the

1   army?

2   A.  Yes, sir, to my knowledge.

3          MR. BRUNSON:  No further questions.

4                    REDIRECT EXAMINATION

5              BY MS. MASON OF WILLIAM GUNNINGS:

6   Q.  Mr. Gunnings, what did your brother do in the army?

7   A.  He was infantry.  I'm not sure what the code was.  I want

8   to say eleven bravo, or something like that.  I'm not sure.

9   You know, I was nineteen kilo.

10  Q.  Can you explain what "infantry" is?

11  A.  Infantry is a lot of the grunt work.  It's not like

12  secretary or something like that.  Infantry is what you would

13  consider basically an M-sixteen was basically what they were

14  responsible for, shooting an M-sixteen.  They were soldiers.

15  Infantry, it really doesn't have -- what's the word I'm

16  looking for -- It really didn't transfer over to civilian

17  life. You learn how to fight.

18  Q.  Do you know what his discharge was?

19  A.  No, ma'am.  I do not know his discharge, what it was.

20          MS. MASON:  No further questions.

21          MR. BRUNSON:  Nothing further, Your Honor.

22          THE COURT:  Thank you.  You may step down.

23          (Whereupon the witness, William Gunnings, stepped

24  down from the stand.)

25          MR. BETHEL:  Your Honor, we call Tequila Griffin to

```
 1   the stand.
 2                    T E Q U I L A    G R I F F I N,
 3        the witness herein, having first been duly sworn or
 4   affirmed to tell the truth, was examined and testified as
 5   follows:
 6                         DIRECT EXAMINATION
 7                 BY MR. BETHEL OF TEQUILA GRIFFIN:
 8   Q.  Good afternoon, Ms. Griffin.
 9   A.  Hi, good afternoon.
10   Q.  Please lean forward and speak into the microphone so the
11   court reporter can record everything you say.
12             Ms. Griffin, in what city and state do you live?
13   A.  I live in Auburn, Alabama.
14   Q.  How long have you been a resident of Auburn?
15   A.  Since two thousand and six.
16   Q.  Do you remember what month it was when you moved to
17   Auburn?
18   A.  It was in May.
19   Q.  So just about two years ago?
20             Do you know Pierre Gunnings?
21   A.  I do.
22   Q.  How do you know Mr. Gunnings?
23   A.  Me and Pierre dated.  We were in a relationship together.
24   Q.  When did you first meet him?
25   A.  Two thousand and six at Auburn University.
```

```
 1   Q.  Do you remember how long it was after you moved to Auburn
 2   that you first met Mr. Gunnings?
 3   A.  I do not.
 4   Q.  Was it a week?  A month?  A year?
 5   A.  A couple of months.
 6   Q.  So sometime during the summer of two thousand and six?
 7   A.  Yes, sir.
 8   Q.  And how soon after you met him did you begin dating
 9   him?
10   A.  Maybe a week or two.
11   Q.  How did you all meet?
12   A.  We had met on campus at Auburn University.
13   Q.  And where on the campus?
14   A.  It was by the Pharmacy School.
15   Q.  How did you meet him?
16   A.  He just spoke to me every time I went to class.
17   Q.  How long did you date Mr. Gunnings?
18   A.  We dated for a year.
19   Q.  During the time that you dated Mr. Gunnings, during the
20   year that you dated Mr. Gunnings were you ever able to
21   determine whether Pierre Gunnings can read?
22   A.  Yes.
23   Q.  And can Pierre Gunnings read?
24   A.  No.
25   Q.  Could he read during the time that you dated from two
```

1  thousand and six until two thousand and seven?

2  A.   No.

3  Q.   Would that include the time period of December, two

4  thousand and six?

5  A.   Yes.

6  Q.   How did you learn that Pierre cannot read?

7  A.   Because I would go with Pierre to the V. A. Hospital in

8  Montgomery, and I would fill out the paperwork for him.  And

9  I also did his lease at the realty place.

10  Q.   When you say you "did his lease," what do you mean by

11  that?

12  A.   I filled it out for him.

13  Q.   Did you ever have to read anything to him?

14  A.   Yes.

15  Q.   Now you had you said you went with him to the V. A.

16  center?

17  A.   Mm-hmm.

18  Q.   And you helped him fill out forms there?

19  A.   I actually filled them out.

20  Q.   Do you know what those forms were for?  What the forms

21  were for?  What was the reason that he was there and you were

22  helping him fill out this?

23  A.   It was checking him medically for his back.

24  Q.   And that was related to what?

25  A.   The military.

1   Q.  Do you have any idea what his -- what kind of a discharge

2   he received from the army?

3   A.  I do not.

4   Q.  But you know that he was there seeking V. A. benefits?

5   A.  Yes.

6   Q.  Is there any doubt in your mind whether or not Pierre can

7   read?

8   A.  No.

9           MR. BETHEL:  No further questions, Your Honor.

10                          CROSS EXAMINATION

11              BY MR. BRUNSON OF TEQUILA GRIFFIN:

12  Q.  Ms. Griffin, Let me ask you to look at this form that has

13  been introduced as Government's exhibit one A.

14          You're a college student, is that correct?

15  A.  Yes.

16  Q.  Can you read?

17  A.  I can.

18  Q.  Can you read that clearly?

19  A.  I can.

20  Q.  Is that the typed form that you would help Mr. Gunnings

21  fill out at the V. A.?

22  A.  Yes.

23  Q.  If you knew that those answers were provided by Pierre

24  Gunnings, would you believe that?

25          MR. BETHEL:  Your Honor, I'm sorry.  I find that

1    question confusing.  And apparently from the raised brow, so

2    does the witness.

3            THE COURT:  I'll allow it.

4    A.  By himself?

5    Q.  Yes.

6    A.  No, he could not have filled this out.

7    Q.  The fact that it is -- Is his name on that form?

8    A.  It is.

9    Q.  The fact that his name is on that form and is filled out

10   and testimony here has been that it was by him, is that

11   something that you would not believe could happen?

12   A.  I don't understand the question.

13   Q.  You're saying you don't believe he could have filled that

14   form out, is that correct?

15   A.  Correct.

16           MR. BRUNSON:  No further questions, Your Honor.

17           THE COURT:  Anything else?

18                      REDIRECT EXAMINATION

19                 BY MR. BETHEL OF TEQUILA GRIFFIN:

20   Q.  Ms. Griffin, you were not working at the pawnshop when

21   that form was filled out?

22   A.  No, I wasn't.

23   Q.  So you didn't fill it out?

24   A.  Right, I wasn't there.

25   Q.  So you don't have any knowledge about how that form got

1   filled out?

2   A.   Exactly.

3            MR. BETHEL:  No further questions, Your Honor.

4            THE COURT:  Anything else?

5            MR. BRUNSON:  No, Your Honor.

6            THE COURT:  You may step down.

7            (Whereupon the witness, Tequila Griffin, stepped

8   down from the stand.)

9            MR. BETHEL:  I would request a short recess.

10           THE COURT:  Why?

11           MR. BETHEL:  Well, I would need a comfort break,

12  number one; number two, there is a brief matter concerning

13  our other witnesses I would like to discuss with the Court

14  outside the hearing of the jury.

15           THE COURT:  Okay.  I'll excuse the jury.  We'll

16  make it a five minute recess.

17           How many more witnesses do you have?

18           MR. BETHEL:  I have three, Your Honor.

19           THE COURT:  Let's just take a five minute recess.

20  I want to get as much evidence in as we can today so we can

21  get the case to you tomorrow.

22           Don't forget to turn your notes over in your

23  chairs, and do not discuss the case.

24           (Whereupon the jury was escorted out of the

25  courtroom, and the following colloquy ensued):

1          MR. BETHEL:  Your Honor, I have an issue concerning

2     one of my witnesses.  We have a witness who is supposed to be

3     here from Bozeman, Montana.  He served in the army with Mr.

4     Gunnings.  He is what I think is best described, and a number

5     of people from my office have spoken with him, he's what I

6     would describe as a little flaky or squirrelly.  It was very

7     difficult to the get his cooperation in traveling from that

8     distance.  He is a farmer, he calls himself, an organic

9     farmer.  He has animals to take care of.  He has a number of

10    excuses.

11         We finally got him to get on an airplane even

12    though this morning we were still coaxing him to do that, but

13    I did not realize we would go this quickly.  He flatly

14    refused to come yesterday.  He is going to travel today and

15    is due to arrive at the Montgomery airport at five-fifteen.

16         I apologize to the Court for not having him here

17    earlier than this, and I beg the Court's indulgence.  At this

18    point he is the person that I would like to call next if at

19    all possible.  I have -- He will be relatively short as will

20    another witness.

21         THE COURT:  Let's go ahead and do your other

22    witnesses.  We'll take him in the morning.

23         MR. BETHEL:  Very well, Your Honor.

24         The last witness that we would call today is Ms.

25    Patsy Thomas.

```
1              THE COURT:  Is she your last witness?

2              MR. BETHEL:  We have one other, Jamaal Byrd, and

3   then the gentleman from Montana.

4              THE COURT:  Let's do those two, and then we'll do

5   your quirky witness in the morning.

6              MR. BETHEL:  We'll call Ms. Thomas when we return.

7              THE COURT:  So the only one we should take is the

8   farmer, is that correct?

9              MR. BETHEL:  That's correct.

10             THE COURT:  We'll take a five minute recess, and

11  when we come back we'll hear all of your witnesses except the

12  farmer.

13             (Whereupon, a recess was taken.)

14             THE COURT:  Proceed.

15                       P A T S Y    T H O M A S,

16      the witness herein, having first been duly sworn or

17  affirmed to tell the truth, was examined and testified as

18  follows:

19                       DIRECT EXAMINATION

20                  BY MS. MASON OF PATSY THOMAS:

21  Q.  Good afternoon, Ms. Thomas.

22  A.  Good afternoon.

23  Q.  Ms. Thomas, where do you live?

24  A.  In Auburn, Alabama.

25  Q.  How long have you been a resident of Auburn, Alabama?
```

1    A.  My family and I moved to Auburn in nineteen fifty, but I

2    married and moved away for a lot of years.  I have been back

3    for ten years.  Well, about twelve years, actually.

4    Q.  When you moved away, where did you go?

5    A.  I lived all over.  I married a military person and we

6    lived all over the world.

7    Q.  What do you do for a living?

8    A.  I have been in education all my life.  When I finished

9    Auburn University in sixty-six, I taught school, various

10   junior highs all over, and I worked two summers in the

11   military with G. E. D. and found out that working with adults

12   was something that I really loved to do.

13          And then when I came back to Auburn, I was teaching

14   G. E. D., and then I started working at the university in an

15   outreach program.  And then I became director in two thousand

16   one of the Lee County Literacy Coalition from two thousand

17   one to two thousand five.

18          I'm now retired and spend my time as president of

19   the board of the Lee County Literacy Coalition.

20   Q.  Before we talk about the Lee County Literacy Coalition I

21   want to talk to you about your educational background.  You

22   said you went to Auburn; what degrees do you hold from Auburn

23   University?

24   A.  I hold a B. S. in secondary science education, and a

25   Master's in secondary education.

1    Q.   Is Auburn University the only institution you attended?

2    A.   No.   I actually went to various schools.   I thought about

3    getting my Doctorate.   I went to school in -- you know what?

4    I can't even remember some of them being in the military, but

5    I went to Troy State in Heidelberg, Germany, taking adult ed

6    classes.   I took some in Louisiana, and I think some from

7    Arizona but since I'm sitting in this seat I'm not going to

8    swear to that.

9    Q.   You said that you were the president of the board of the

10   Lee County Literacy Coalition.   What is that?

11   A.   In the Lee County we have a very strong United Way, and

12   the coalition is one of about thirty agencies that work from

13   a non-profit way.   We have one paid employee, the director,

14   and the rest of the people involved are volunteer tutors,

15   which I am myself now.   And we help people in the county who

16   are in need of basic literacy skills, be it math or learning

17   to fill out forms for a job, or reading, or preparing for the

18   graduation exam if they're already out of high school and

19   haven't passed that, or studying to get into a G. E. D.

20   classroom.

21   Q.   How long have you been a volunteer tutor?

22   A.   I started volunteering when I first came back to Auburn,

23   and that was in ninety-five.

24   Q.   And is this program for adults only?

25   A.   Not really.   We are mostly for adults, but we do have two

 1  outreach programs in Opelika and one in Auburn.  But

 2  primarily it's for adults because they are the ones that the

 3  County feels might have slipped through the cracks.

 4  Q.  Now what are your duties as a volunteer tutor?  What kind

 5  of things do you do?

 6  A.  Really we try to meet the needs of the individual that

 7  we're tutoring, be it math skills or reading skills or just

 8  life skills.

 9  Q.  Ms. Thomas, do you know Pierre Gunnings?

10  A.  I sure do.

11  Q.  How do you know him?

12  A.  I met Pierre, I don't know if it was -- it was January,

13  February or March of two thousand six.  And I had just

14  retired from being director, and I had told the new director

15  that if anyone came along that needed help, especially if

16  they had a military background, that I would like to be

17  involved because with my military background I just thought I

18  could help there.

19  Q.  So was Mr. Gunnings assigned to you?

20  A.  Yes, he was.  He had called the Literacy Coalition and

21  said that he needed reading help, and the director knew what

22  I had said to her and she called me about doing that and I

23  said that I would.

24  Q.  So you said that Mr. Gunnings called; he voluntarily

25  sought help to read?

1    A.   Oh, yes.  That was not the first time he had sought help

2    with the Coalition.  He had done so, I think he was fourteen

3    or so still in Auburn High School when he called the

4    Coalition for help.  Because he knew the program, even as a

5    high school student because one of his best friends' father

6    was a tutor with us and he knew even at that early age that

7    he needed reading help.

8    Q.   Were you a volunteer tutor at the time when he was

9    fourteen years old and first came to the center?

10   A.   No.

11   Q.   So you have been working with Mr. Gunnings since either

12   somewhere in January, February or March of two thousand

13   six?

14   A.   Right.  It's on the intake form, I've just forgotten what

15   it was.

16   Q.   Now, when you were working with Mr. Gunnings, what kind

17   of problems did you see that he had?

18   A.   Well, when we first started working together I didn't

19   realize that he had quite as bad a reading problem as he

20   does.  We started out -- because as a volunteer you don't

21   quite know.  We don't do any real testing because we just

22   take somebody where they are and they are adults so they can

23   usually tell what you they need.

24            But I had started with Pierre at probably -- well,

25   I'm sure at a much higher level than I needed, but it was

1    insightful to me when I realized one day I had some really

2    basic reading books on putting sounds together.  And he saw

3    them and said, "Let me see those books."  He said, "I think

4    we should start working in these books."  And these was a

5    Laubauch one book.  So we started working with those, really

6    with many new words, a few new words and lots of sight

7    words.

8    Q.  And what kind of words were in this book that he wanted

9    to read from?

10   A.  This first one started with something like, I think one

11   of the books that went along with the series was called

12   *Indian River*.  And it was like, "This is Indian River."  And

13   so "this is" would be the two sight words in that sentence,

14   and then we would be studying Indian River and we would be

15   paying attention to the sound of the I in the "Indian" and

16   the different sounds that make up "River".

17          So it was very short sentences that could be broken

18   down into sounds.

19   Q.  Now what would a typical tutoring session consist of?

20   A.  Well, normally we only meet once a week for an hour.  And

21   that's the way I start off with people that I'm helping,

22   because first I want to see if they're going to be punctual

23   and if they are motivated, and if they are courteous.

24   Q.  Was Mr. Gunnings punctual?

25   A.  Absolutely.  And so when that happens, then I will say if

1    I have time, you know, well I'll meet with them twice a week

2    because you really need more than that.  So the way it stood

3    with Pierre and I, I don't live far from the place that we

4    tutor, so I had told him that I could pretty much meet him

5    any time he had an hour.  So we worked it that way.  Instead

6    of regular times, we would meet whenever we could.

7            And our typical session, it's at a public library,

8    we would spend a few minutes talking about just small talk,

9    and then we would -- usually he would say, "Let's get on into

10   reading."  Because I would always ask him to read something,

11   the sports page in the newspaper, look it over, look at words

12   that he might know or doesn't know and bring those back to

13   me.  Just read something.

14           Then we would spend our time reading, or we would

15   go over part of the sight words that we were working on, and

16   he would write those down in his tiny, tiny handwriting and

17   we'd go over those.

18           Sometimes we did some math.

19   Q.  What would you say the most advanced word that he would

20   work on would be?

21   A.  On the sight word list?

22   Q.  Yes.

23   A.  That's a good question.

24   Q.  Or maybe something like an example of something like the

25   most advanced word.

1  A.  Okay.  Well, "where" might be a good one.  W-h-e-r-e,

2  where.

3  Q.  Now, Ms. Thomas, is there a relation between not being

4  able to read and being able to write?

5  A.  A lot of people that are nonreaders or reading just a

6  little bit know how to write a lot of basic things because of

7  coping skills.

8         You know, people that don't read well don't want

9  the world to know that, so they have learned to write the

10  kinds of things they know that we're all going to be asked to

11  write on forms and such as that.  So I don't think there is

12  any correlation in that.

13  Q.  Did you and Mr. Gunnings work on things like writing his

14  name and filling out forms?

15  A.  No.  We didn't.  All the writing I ever really saw Pierre

16  do, because he knew how -- Pierre knew how to cope.  He could

17  do that.  But I would have him write or actually he would say

18  when we would come to a new word he would start a list.  And

19  like I said, he'd write so tiny that I would say, you know,

20  "Can't you write larger than that?"  But that's the way he

21  writes.  But I always felt -- I think writing tells a lot

22  about a person.  And so I always thought that he was just

23  being very inward about himself by writing so small.  And

24  probably because he didn't feel confident about the way he

25  read.

1  Q.  Would it be safe to say that he could copy a word that he

2  sees in front of him?

3  A.  Yes.

4  Q.  And he can write a word if he's directed to write it or

5  if it's spelled for him?

6  A.  Absolutely.

7  Q.  But he cannot read advanced words.

8  A.  Absolutely not.

9  Q.  Ms. Thomas, I want to show to you what we've entered as

10  defendant's exhibit one.  And this is the form that Mr.

11  Gunnings filled out.  Can you see this?

12  A.  Yes.

13  Q.  Now based on what you know about Mr. Gunnings, would he

14  be able to fill in the basic information, his name and

15  address?

16  A.  Yes.

17  Q.  Now starting down here where these questions begin, could

18  he read and understand these questions?

19  A.  I'm already seeing words that there is no way that Pierre

20  would know.

21  Q.  For example --

22  A.  For example in A I'm seeing "firearms".  Maybe "actual".

23  "Warning".  "Acquiring".  "Behalf". "Another".

24          THE COURT:  Are you saying he would or would not?

25          THE WITNESS:  He would not know those words.

1  Q.  And most specifically "indictment"?

2  A.  Oh, no.

3  Q.  What about "information"?

4  A.  No.

5  Q.  "Felony"?

6  A.  No.  Like on something like "information", if we were

7  studying together, he was getting so that he could sound that

8  out.  But "felony"?  No.

9  Q.  However he could write "yes" and "no" if he were directed

10 to write those words.

11 A.  Absolutely.

12 Q.  Ms. Thomas, based on your experience with people who

13 cannot read, is it your opinion that they are typically

14 embarrassed or ashamed of that fact?

15 A.  Oh, yes.

16 Q.  And that they wouldn't normally tell other people that

17 they could not read?

18 A.  Absolutely.  I've seen people go to great measures to

19 have people not know that they cannot read.

20 Q.  Do you know whether Mr. Gunnings was embarrassed about

21 the fact that he couldn't read?

22 A.  Oh, yes, I know he was.

23 Q.  Did he tell you that?

24 A.  Yes.  He not only told me with words, but his demeanor

25 told me.

1   Q.   Now I just want to make sure.  Were you his tutor in

2   December of two thousand six?

3   A.   Yes.

4   Q.   And based on the form that I showed you and the words

5   that were in that form, as of December two thousand six could

6   he read those words?

7   A.   No.

8   Q.   Could he understand those words?

9   A.   If we talked about it and somebody told him what the word

10  was, he would understand.

11  Q.   But if he were left to read it on his own, he would not

12  be able to?

13  A.   No, because he couldn't read the word.  He wouldn't know

14  what we were dealing with.

15  Q.   Thank you.  No further questions.

16                          CROSS EXAMINATION

17                  BY MR. BRUNSON OF PATSY THOMAS:

18  Q.   Ms. Thomas, the best you can remember is you started

19  working with Mr. Gunnings in approximately March of oh six.

20  A.   Right.  It was about March of oh six, yes.

21  Q.   And he had help from your facility as early as when he

22  was fourteen?

23  A.   Yes.

24  Q.   What progress had he made over the years?

25  A.   He was still needing a lot of help when I was working

1    with him.

2    Q.   But what progress had he made?

3    A.   Well, I can't actually answer that because we don't

4    document progress per se.

5    Q.   "Indictment" is one of the words that you specifically

6    said he couldn't understand.

7    A.   Correct, or read.

8    Q.   Or read.  I misspoke.  Thank you.

9             He could understand it?

10   A.   I don't know if he could understand that particular word

11   or not.  I would doubt that he could.

12   Q.   Suppose that had been explained to him in a prior

13   criminal proceeding.

14   A.   It would probably depend on how much time had elapsed.

15   Q.   Were you aware that he was indicted in Georgia in

16   September, specifically on September the twenty-first two

17   thousand six in Georgia?

18   A.   No, I wouldn't.

19   Q.   You didn't know that?

20   A.   You mean at that time?

21   Q.   That on that date, September twenty-first, two thousand

22   six, that he was indicted in Georgia.

23   A.   I do know that now, but I did not know that prior to this

24   trial.

25   Q.   And do you know that during this trial there has been

```
 1   testimony that he made appearances in court on November the
 2   sixth, two thousand and six and December the fourth of two
 3   thousand and six when the indictment was explained to him?
 4   A.  I was not aware of that.
 5   Q.  Would that make a difference in his understanding of the
 6   word "indictment"?
 7   A.  Not really to me.  Not with what I know of Pierre.  I
 8   would think he might still misunderstand it.
 9   Q.  Would he be able to recognize that word since he had seen
10   it?
11   A.  I don't know.
12   Q.  But he could have?
13   A.  I guess it's possible, but I wouldn't think so.
14   Q.  Thank you.
15                        REDIRECT EXAMINATION
16                   BY MS. MASON OF PATSY THOMAS:
17   Q.  Ms. Thomas, would Pierre hearing the word "indictment"
18   translate to his ability to see it on a piece of paper and
19   know that was the word that was verbalized to him?
20   A.  No.
21   Q.  Thank you.  No further questions.
22             THE COURT:  Anything else?
23             MR. BRUNSON:  No, Your Honor.
24             THE COURT:  Thank you.  You may step down.
25             (Whereupon the witness, Patsy Thomas, stepped down
```

 1  from the stand.)

 2          THE COURT:  Next witness.

 3          MR. BETHEL:  No more witnesses, Your Honor, other

 4  than the witness we spoke about for tomorrow.

 5          THE COURT:  Do you anticipate any rebuttal, Mr.

 6  Brunson?  Or do you want to take up that other matter?

 7          MR. BRUNSON:  Yes, Your Honor.

 8          THE COURT:  So we may be down to one witness, then.

 9          How long is that witness going to take?

10          MR. BETHEL:  It will be very short, Your Honor.

11          THE COURT:  All right, then.  We'll start back at

12  nine o'clock tomorrow.

13          Does that pose a problem for anyone?

14          (Whereupon, there was no response.

15          THE COURT:  If you can be here promptly by fifteen

16  of nine so we can start at nine o'clock, we'll have that

17  witness.

18          How long do you need for your closing arguments?

19          MR. BRUNSON:  Thirty minutes, Your Honor.

20          MR. BETHEL:  That's plenty, Your Honor.

21          THE COURT:  Thirty minutes as to each side.  We can

22  finish the evidence by nine-thirty.  Closing arguments by

23  ten-thirty.  My charge will take maybe twenty minutes.

24  Eleven clock you should have the case to begin your

25  deliberations.  So let's start promptly at nine.

1           Turn your notes over in your chairs.  Leave your

2    notes in your chairs.

3           Don't forget to discuss the case among yourselves

4    or with anyone else.  And that includes family and friends.

5           And I'll see you back here at eight forty-five

6    tomorrow.

7              (Whereupon, the proceedings were concluded.)

8                        * * * * * * * *

9                 <u>COURT REPORTER'S CERTIFICATE</u>

10

11       I certify that the foregoing is a correct

12    transcript from the record of proceedings in the

13    above-entitled matter as prepared by me to the best of

14    my ability.

15

16       I further certify that I am not related to any of

17    the parties hereto, nor their counsel, and I have no

18    interest in the outcome of said cause.

19

20       Dated this 2nd day of June 2008.

21

22

23                    \s\ Mitchell P. Reisner, CM, CRR
                      **MITCHELL  P.  REISNER,  CM,  CRR**
                      Official US Dist. Court Reporter
24                    Registered Professional Reporter
                      Certified  Real-Time  Reporter
25