1        **IN THE UNITED STATES DISTRICT COURT**
                          **FOR**
2          **THE MIDDLE DISTRICT OF ALABAMA**

3

4

5

6    THE UNITED STATES
        OF AMERICA

7                                    CRIMINAL ACTION NO.
            vs.                      3:07-cr-313-MHT

8    PIERRE MARCELLO GUNNINGS

9

10

11

12

13                       VOLUME II OF II
                         2ND DAY OF
14                  JURY TRIAL PROCEEDINGS

15

16

17

18              *  *  *  *  *  *  *  *  *  *

19

20

21   HEARD BEFORE:      The Hon. Myron H. Thompson

22   HEARD AT:          Opelika, Alabama

23   HEARD ON:          May 13, 2008

24   APPEARANCES:       Kent Brunson, Esq.
                        Donnie W. Bethel, Esq.
25                      Danielle Mason, Esq.

MITCHELL P. REISNER, CM, CRR
Official U. S. Court Reporter
Middle District of Alabama
(334) 265-2500

# T A B L E   O F   C O N T E N T S

**ITEM DESCRIPTION**                              **PAGE NO.**

Table of Contents ...........................    1

Title Page ..................................    2

Eric Gowdy - Direct Examination
      by Mr. Bethel ..........................    3

Eric Gowdy - Cross Examination
      by Mr. Brunson .........................    7

Jamal Byrd - Direct Examination
      by Mr. Bethel ..........................   14

Jamal Byrd - Cross Examination
      by Mr. Brunson .........................   17

Jamal Byrd - Redirect Examination
      by Mr. Bethel ..........................   20

Closing Arguments
      by Mr. Brunson .........................   25

Closing Arguments
      by Mr. Bethel ..........................   34

Rebuttal Closing Arguments
      by Mr. Brunson .........................   51

Charge to the Jury
      by the Court ...........................   54

Verdict of the Jury .........................   71

Court Reporter's Certificate ................   73

-o0o-

**MITCHELL P. REISNER, CM, CRR**
Official U. S. Court Reporter
Middle District of Alabama
(334) 265-2500

| | |
|---|---|
| 1 | WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE THE HON. MYRON H. THOMPSON ON MAY 13, 2008 AT THE UNITED STATES |
| 2 | COURTHOUSE IN OPELIKA, ALABAMA: |
| 3 | |
| 4 | THE BAILIFF:  The jury is now the entering the |
| 5 | courtroom. |
| 6 | THE COURT:  Ready to proceed? |
| 7 | MR. BETHEL:  Yes, Your Honor. |
| 8 | THE COURT:  Call your last witness. |
| 9 | MR. BETHEL:  Your Honor, we have one additional |
| 10 | witness.  I let Mr. Green know that this morning.  Someone |
| 11 | who wasn't under subpoena that we just spoke with. |
| 12 | THE COURT:  Okay.  Go ahead. |
| 13 | MR. BETHEL:  We have Mr. Eric Gowdy is the first |
| 14 | witness this morning, Your Honor.  Mr. Gowdy and Mr. Byrd |
| 15 | have not been sworn. |
| 16 | E R I C    G O W D Y, |
| 17 | the witness herein, having first been duly sworn or |
| 18 | affirmed to tell the truth, was examined and testified as |
| 19 | follows: |
| 20 | DIRECT EXAMINATION |
| 21 | BY MR. BETHEL OF ERIC GOWDY: |
| 22 | Q.  Good morning, Mr. Gowdy. |
| 23 | A.  Good morning. |
| 24 | Q.  Sir, please tell the Court where you're from, the city |
| 25 | and state. |

1    A.   I don't live in a city, but I live in the mountains in

2    Nevada right now, but most of the time I spend my time in

3    Montana.

4    Q.   Sir, where are you from originally?

5    A.   Dearborn River.

6    Q.   Sir, where are you from originally?

7    A.   Nevada, Montazooma (sic.)

8    Q.   Have you ever served in the army?

9    A.   Yes, sir.

10   Q.   How long did you serve in the Army?

11   A.   Three and-a-half years.

12   Q.   And what was the period of your army service?

13   A.   From February twentieth, two thousand two to June

14   twentieth two thousand five.

15   Q.   Do you know Pierre Gunnings?

16   A.   I do.

17   Q.   And how do you know Mr. Gunnings?

18   A.   He was my in my company.

19   Q.   Mr. Gunnings -- It's a little tough to hear in here.  So

20   if you wouldn't mind leaning into the mic.

21   A.   He was in my company.

22   Q.   And where was that company?

23   A.   In Germany, the First Infantry Division.

24   Q.   Were you actually stationed in Germany?

25   A.   Yes, sir.

1    Q.   And was Mr. Gunnings stationed in your unit as well?

2    A.   Yes, sir.

3    Q.   You said he was in your company.  How big is a company?

4    A.   It's about a hundred and twenty men.

5    Q.   Is that broken down into any other divisions?

6    A.   Yes.  It's broken up into four platoons, usually a

7    headquarters platoon and three other platoons.

8    Q.   Were you in the same platoon as Mr. Gunnings?

9    A.   No, I was not.

10   Q.   Despite the fact that you weren't in the same platoon yet

11   you were in the same company, did you spend a fair amount of

12   time with him?

13   A.   Just about every day when we got off work.

14   Q.   Now could you describe for the members of the jury what

15   kind of duties do you have in the infantry?

16   A.   Well, when we're in the rear or not deployed, we clean

17   weapons and maybe go over some training outside and we go

18   play video games or watch movies.

19   Q.   Do you do a lot of reading?

20   A.   No.

21   Q.   Do you have to fill out a lot of paperwork when you're in

22   the infantry?

23   A.   No.  You just sign off for your weapon.

24   Q.   What is your primary responsibility?  What is it you're

25   trained to do in the infantry?

```
1   A.   Finding and fixing the enemy.
2   Q.   What do you mean by find and fix the enemy?
3   A.   Kill them.
4   Q.   Now you served with Mr. Gunnings in Germany.  Do you
5   remember when he arrived in Germany?
6   A.   Not exactly.  I met Gunnings after I got back from
7   Kosovo.  He was hanging out with my friend, and from there we
8   became best friends for about two and-a-half years.
9   Q.   How long after he arrived at your unit did you get to
10  know him?
11  A.   I'm not sure exactly when he arrived, but I knew him from
12  when -- I had known him for two and-a-half years.
13  Q.   Did you get to know him pretty well?
14  A.   Yes.
15  Q.   Did you serve with him in Iraq?
16  A.   Yes, I did.
17  Q.   Did y'all see any combat while you were in Iraq?
18  A.   Yes, we did.
19  Q.   Now you said when you were in the rear or not deployed
20  you said that you would clean your weapons and play video
21  games.  What was life like when you were deployed to Iraq?
22  A.   Get out and get shot at and play video games.
23  Q.   Now during the time that you knew Mr. Gunnings, did you
24  ever become aware that he could not read?
25  A.   Yes, he told me.  He was quite embarrassed about it, but
```

1    he told me he couldn't read.

2    Q.   Was this something he told you when you first met him?

3    A.   No.

4    Q.   How long had you known him before you found out that he

5    couldn't read?

6    A.   Almost a year.  You don't really need to read, really.  I

7    mean if you don't ask someone to read, you don't know it.

8    But he told me later on that he couldn't read.

9    Q.   So, if I may, would you say it was only after you got to

10   know him very well and became very good friends that he'd

11   admitted that to you?

12   A.   Yes, sir.

13   Q.   Is there any doubt in your mind that while the time you

14   two served in the army that Pierre could not read?

15   A.   He couldn't read.  He would ask me sometimes, "Tim could

16   read something" for him.  He wasn't a reader, that's for

17   sure.

18           MR. BETHEL:  No further questions, Your Honor.

19           THE COURT:  Cross.

20           MR. BRUNSON:  Thank you, Your Honor.

21                        CROSS EXAMINATION

22                BY MR. BRUNSON OF ERIC GOWDY:

23   Q.   Mr. Gowdy, someone can read but not as you just got

24   through saying be a reader, isn't that correct?

25   A.   Well, it depends.  I mean --

1    Q.  They could not read books or magazines but they could

2    read comic books and they could read directions on how to

3    play video games and they could read but not be a, quote,

4    reader?

5          MR. BETHEL:  Your Honor, I object.  This is clearly

6    outside the scope.

7          THE COURT:  Well, he's asking him to define what he

8    means.

9    A.  He never read in front of me ever, so there was no comic

10   books.  I don't know if you play video games, but it's all

11   played through your thumbs, so there is no reading

12   required.

13   Q.  Did you ever go out to the eat with him other than on

14   base?

15   A.  I mean yes and no.  But since we were in Germany, I can't

16   even read the menu myself.

17   Q.  And you didn't serve with him other than in Germany?

18   A.  Germany and Iraq.

19   Q.  That's all you served with him?

20   A.  Yes, sir.

21   Q.  So you were never around a place where you would have a

22   menu that you would read?

23   A.  No, sir.

24   Q.  And you didn't have any periodicals or magazines or comic

25   books to read?

```
1   A.  Me personally, or him?

2   Q.  Him, specifically.

3   A.  I never saw any in his room, no.

4   Q.  Do you know any of his family?

5   A.  I just met his brother today.

6   Q.  How did you learn about this case?

7   A.  His nephew called me and told me, and then his lawyer

8   called me and told me.

9   Q.  Do you own any firearms?

10  A.  Is that a relevant question?

11          MR. BETHEL:  Your Honor, again, I object for the

12  same reason that the witness just stated.  It's completely

13  irrelevant whether Mr. Gowdy owns any firearm.

14          THE COURT:  Why are you asking him this?

15          MR. BRUNSON:  Your Honor, I want to know why he's

16  familiar with them, because if he doesn't own any it could be

17  a lie.

18          THE COURT:  You want to know if he owns any

19  firearms?

20          MR. BRUNSON:  Yes, Your Honor.

21          THE COURT:  I'll sustain the objection.

22  Q.  Do you know what is required for a person to buy a

23  firearm?

24  A.  Second Amendment.

25  Q.  No, do you know what is required, a procedure?  If you
```

1  don't know, that's a good answer.

2          MR. BETHEL:  Your Honor, again, I object to this

3  line of questioning.

4          THE COURT:  I'll allow him to answer this question.

5          Do you know what the regulations are to get a

6  firearm?  Federal regulations?

7          THE WITNESS:  Federal regulations in the

8  Constitution, the Second Amendment.

9  Q.  Is it your testimony, then, that you don't recognize any

10  limitations on the Second Amendment for a person to purchase

11  or own a firearm?

12          MR. BETHEL:  Your Honor --

13          THE COURT:  Overruled.

14  A.  My personal feelings are if you can read the Second

15  Amendment you can interpret it yourself.  It's pretty plain

16  and simple.

17  Q.  Do you think it is legal for a person who has been

18  convicted of a felony to own a firearm?

19          MR. BETHEL:  Your Honor, now I object to this

20  question because that is not what is at issue in this case.

21  There is absolutely no evidence --

22          THE COURT:  He can show his bias.  Overruled.

23          MR. BETHEL:  Your Honor, if I may?  What

24  Mr. Brunson is asking do you think it's legal for someone who

25  committed a felony to own a firearm.  Number one, what he

1   thinks doesn't matter.  Number two, that's not what this case

2   is about.  Mr. Gunnings hasn't been charged with possessing a

3   firearm after being convicted of a felony.

4           THE COURT:  Overruled.

5   A.  No, I don't think a felony -- a felon should not own a

6   firearm, no.

7   Q.  How about a person who has been indicted for a felony

8   offense?

9   A.  I don't know.  I have no opinion on that.

10  Q.  How about a person who is an alien that is not a citizen

11  of the United States?

12          MR. BETHEL:  Your Honor --

13          THE COURT:  I'll sustain that.  We've gone too far.

14  Q.  When you served two and-a-half years with Mr. Gunnings,

15  were there any tests that had to be taken?  Is that a period

16  of time where --

17  A.  No.

18  Q.  There is no promotion within the --

19  A.  Not until you go into an N. C. O.  But neither of us were

20  N. C. O.s.

21  Q.  Were there any pay records that had to be filled out?

22  A.  No.

23  Q.  Any medical records?

24  A.  No.

25  Q.  How about leave records?

1  A.  No.

2  Q.  How would you classify Mr. Gunnings as being very bright,

3  smart, stupid, retarded, how would you classify him?

4  A.  Well I'm not a psychologist, but --

5  Q.  But you have knowledge of him.  You have an opinion of

6  him?

7  A.  Gunnings is fairly bright.  I mean he can talk.  He

8  survived Iraq.  There are different degrees of intelligence.

9  You and I both know that.  Some people have verbal skills,

10  some people have writing skills, some people have eyesight

11  skills.  Some people are good at basketball, football,

12  whatever.  We can't all be a genius.

13  Q.  But he's not stupid, is he?

14  A.  I wouldn't say he's stupid, no.

15  Q.  And you would say and did say that he is smart?

16  A.  I didn't say smart, I said he's bright.

17  Q.  You said he's bright.  Would you say that with comparison

18  to other people you served with, that he's brighter than

19  most?

20  A.  You're asking me to go way back, but --

21  Q.  You're the one that came here, and I'm asking you what

22  you know about him.

23  A.  I'm not going to compare him with other people.

24  Q.  Would you say that he's street smart?

25  A.  Again, I don't know.  I don't know what "street smart"

1    is.  I'm from the country.

2    Q.  How many times have you talked with anyone about this

3    case?

4    A.  I got to talk to the lawyer yesterday, and that's it.

5    Q.  Yesterday for the first time?

6    A.  Mm-hmm.

7    Q.  How about any investigators in preparation for your

8    testimony?

9    A.  The man that picked me up at the airport yesterday, I

10   asked him what's going on, and he said he didn't know what

11   the heck was going on.

12   Q.  And you talked to the nephew?

13   A.  He just told me Pierre is in trouble, and I asked him to

14   give me the lawyer's phone number.  That's about it.

15   Q.  Thank you.

16            THE COURT:  Anything else?

17            MR. BETHEL:  No, Your Honor.

18            THE COURT:  Thank you.  You may step down.

19            (Whereupon the witness, Eric Gowdy, stepped down

20   from the stand.)

21            MR. BETHEL:  We call Jamal Byrd.

22                         J A M A L    B Y R D,

23       the witness herein, having first been duly sworn or

24   affirmed to tell the truth, was examined and testified as

25   follows.

1                          DIRECT EXAMINATION

2                    BY MR. BETHEL OF JAMAL BYRD:

3  Q.  Good morning, Mr. Byrd.

4          It's difficult for the court reporter to hear in

5  here, so please lean forward and speak into the microphone

6  when you answer the questions this morning.

7          Please state your full name.

8  A.  Jamal Isaiah Byrd.

9  Q.  Sir, in what city and state do you live?

10  A.  Auburn, Alabama.

11  Q.  How long have you been a resident in Auburn?

12  A.  Sixteen years.

13  Q.  So going back to nineteen ninety-two?

14  A.  Yes, sir.

15  Q.  Do you know Pierre Gunnings?

16  A.  Yes, sir.

17  Q.  And how long have you known him?

18  A.  Out of those sixteen years I would say thirteen or

19  fourteen years.

20  Q.  So you've known him since at least nineteen

21  ninety-four?

22  A.  Yes, sir.

23  Q.  How do you know Mr. Gunnings?

24  A.  I met him at church, actually.  He was coming to church

25  with -- Fellow members of that church at the time brought

```
 1   Pierre to church and that's where I met him.
 2   Q.  And that would have been back in ninety-four?
 3   A.  Yes, sir.
 4   Q.  How well have you gotten to know Pierre over the fourteen
 5   years or so since then?
 6   A.  Very well.  He's like a brother to me.
 7   Q.  Has he ever spent any time living with your family?
 8   A.  Yes, sir.  Approximately two years.
 9   Q.  When was that?
10   A.  When he came home from the Service.
11   Q.  During the course of those fourteen years, did you ever
12   come to learn that Pierre Gunnings cannot read?
13   A.  Yes.
14   Q.  How long did it take you to find that out?  From the time
15   you met him in nineteen ninety-four, how long did it take you
16   to actually discover or confirm that Pierre Gunnings can't
17   read?
18   A.  It had to be a matter of at least five to six years after
19   I met him.
20   Q.  How did you finally know for certain that Mr. Gunnings
21   couldn't read?
22   A.  He told me.
23   Q.  So it took him five or six years before he even admitted
24   to you that he could not read?
25   A.  Yes, sir.
```

```
 1  Q.  How did he seem to feel about the fact that he could not
 2  read?
 3  A.  Like anyone would, embarrassed.  Like I say, for him to
 4  read a document and it took him five or six years to tell me,
 5  but you don't want to pry into someone's business so I never
 6  asked what was going on as far as that was concerned.  I knew
 7  he was in Special Ed classes.
 8  Q.  You said you knew he was in Special Ed classes when he
 9  was in school?
10  A.  Yes, sir.
11  Q.  After he admitted to you that he couldn't read, did that
12  make sense to you then?
13  A.  I put two and two together.  Exactly.
14  Q.  Is there anything else that you've experienced that would
15  confirm for you that Pierre cannot read?
16  A.  Yes, sir.  He's asked me to fill out various
17  applications.
18  Q.  What kind of applications?
19  A.  Job applications when he come back from the Service.  I
20  also filled out his car loan applications, and just various
21  reading material that he's asked me to help him to do because
22  he couldn't understand them.
23  Q.  Is there any doubt in your mind that the Pierre Gunnings
24  can't read?
25  A.  No, sir.
```

1    Q.   Thank you.   No further questions.

2                    CROSS EXAMINATION

3                BY MR. BRUNSON OF JAMAL BYRD:

4    Q.   Mr. Byrd, in the five or six years that you knew Mr.

5    Gunnings before you learned he couldn't read, were you ever

6    in any situations where he did things that would make you

7    think that he was able to read what he was doing?   Such as

8    reading a menu, or filling out job applications, or looking

9    at magazines or books?   Anything?

10   A.   No, sir.   Because before that time, like I say, I knew

11   him but it wasn't a situation to where it was later on to

12   where he was living with us and whatnot.   So we basically saw

13   each other at school and church and things like that, but

14   there weren't any really situations where I would have

15   noticed that.

16   Q.   Did you ever see him read the Bible?

17   A.   No, sir.

18   Q.   Did you ever see him read a hymnal?

19   A.   No, sir.

20   Q.   When -- If you can determine a year, when did he tell you

21   that he could not read?

22   A.   It had to be two thousand, two thousand one, somewhere

23   around that time.

24   Q.   So is it correct that in two thousand one that he would

25   have been a senior in high school?

1   A.   That's correct.

2   Q.   Do you know -- or have you maintained contact with him

3   since two thousand one up through two thousand six?

4   A.   Yes, sir.

5   Q.   Did he take any reading tutorials or remedial courses to

6   learn how to read even after he got out of high school?

7   A.   Yes, sir.

8   Q.   Would you say that Mr. Gunnings is a smart young man?

9   A.   Yes, sir.

10  Q.   Able to learn?

11  A.   Yes, sir.

12  Q.   So is it possible, then, that from two thousand one when

13  he was a senior in high school and Special Ed that he could

14  have developed reading skills up and through two thousand

15  six?

16  A.   That for sure I can't say.

17  Q.   But he could have?

18  A.   Possibly.

19  Q.   You don't know that he didn't.

20  A.   No, sir.

21  Q.   When is the last time you were real close with Mr.

22  Gunnings?

23  A.   Up to the present.

24  Q.   Is he street smart?

25  A.   I'm not really sure what that entails.

1    Q.   Okay.  But he is a bright young man?

2    A.   Yes, sir.

3    Q.   He is capable of learning?

4    A.   Yes, sir.

5    Q.   Can you read?

6    A.   Yes, sir.

7    Q.   Do you have any difficulty reading?

8    A.   No, sir.

9    Q.   And you've already testified that you helped him fill out

10   forms such as job applications?

11   A.   Yes, sir.

12   Q.   When did that happen?

13   A.   In high school, and also when he moved in the with me and

14   my family.

15   Q.   And I believe your testimony was that that was when he

16   got out of the Army.

17   A.   Yes, sir.

18   Q.   Did he tell you anything about his army service?

19   A.   As far as?

20   Q.   Anything.

21   A.   Yes, sir.  He told me about his experience in the Service

22   and what it was like.

23   Q.   Did he say anything about that he got it over on the Army

24   that he couldn't read, they never knew it?

25   A.   As far as I know they didn't know it.

1    Q.   They didn't know he couldn't read?

2    A.   Exactly.

3              MR. BRUNSON:   No further questions, Your Honor.

4                      REDIRECT EXAMINATION

5                  BY MR. BETHEL OF JAMAL BYRD:

6    Q.   Mr. Byrd, so Mr. Gunnings did tell you about his service

7    in Iraq?

8    A.   Yes, sir.

9    Q.   Did he tell you what that was like?

10   A.   Yes, sir.

11   Q.   What did he tell you?

12   A.   He basically told me about an experience he'd never

13   forget, and just about all the bad things that he witnessed.

14   Just pretty much things I couldn't even imagine, even with

15   him telling me.  It's still hard to fathom what he went

16   through when he was over there.

17   Q.   Would he have moved in with your family sometime in two

18   thousand and five when he returned from Iraq?

19   A.   Yes, I was one of the people who picked him up from the

20   airport.

21   Q.   So how long did you say he lived with your family when he

22   returned from the Service?

23   A.   Approximately two years.

24   Q.   So that would have been from about two thousand five to

25   two thousand seven?

1    A.   That's correct.

2    Q.   Is that the time period when you filled out job

3    applications for him?

4    A.   And also car loan applications, et cetera.

5    Q.   All right.  So it was during that two year period in two

6    thousand five to the year two thousand seven when you were

7    filling out applicants for him of various kinds?

8    A.   Exactly.

9    Q.   Now based on what you've seen of his ability or his lack

10   of ability to read back when you were in high school, did you

11   see any improvement from then until the time he lived with

12   you and you were filling out those application for him?

13   A.   No, sir.

14         MR. BETHEL:  No further questions, Your Honor.

15         MR. BRUNSON:  No questions, Your Honor.

16         THE COURT:  Thank you.  You may step down.

17         (Whereupon the witness, Jamal Byrd, stepped down

18   from the stand.)

19         THE COURT:  Do you rest?

20         MR. BETHEL:  The Defense rests, Your Honor.

21         THE COURT:  Any rebuttal?

22         MR. BRUNSON:  No, Your Honor.

23         THE COURT:  Members of the jury, we finished the

24   evidence portion of the trial.  We're going to take a recess

25   for about fifteen minutes while we try to get the rest of the

1    trial ready for you.

2          When you come back we'll hear closing arguments

3    from the lawyers which take about thirty minutes to a side,

4    then I will charge you as to the law, that will take about

5    twenty minutes.  So, again, we're hoping that you can begin

6    your deliberations sometime around eleven-twenty.

7          I'll excuse you, as I said, for about fifteen

8    minutes.  Don't forget to turn your notes over in your chairs

9    so no one can see even if you've written nothing.  Again, the

10   do not discuss the case among yourselves.

11          Counsel, please remain in the courtroom.

12      (Whereupon, the jury was escorted out of the courtroom,

13   and the following colloquy ensued):

14          THE COURT:  Yes, Mr. Bethel?

15          MR. BETHEL:  We'd renew our motion for judgment of

16   acquittal, Your Honor.

17          THE COURT:  The motion is denied.

18          Again, Mr. Gunnings, is it still your desire not to

19   testify in light of the representations you made to the Court

20   earlier?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  And, again, you conferred with your

23   lawyer about this?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Very good, then.  I will have the

1   Court's charge ready in about the three or four minutes, and

2   then we'll go over that after you've had a chance to review

3   it.

4              Very good.  Court's in recess.

5              Oh, Counsel, I have the stipulation, and I'll file

6   it and it will be marked as court's exhibit one and it will

7   go to the jury.

8              MR. BETHEL:  Thank you, Your Honor.

9              (Whereupon, a recess was taken.)

10             THE COURT:  Counsel, I think Mr. Brunson picked up

11  the word "knowingly" in the charge twice, so I'll delete the

12  first one so that it will appear only the second time.  So

13  the first definition on page eleven will be deleted, and I

14  will then retain the definition on page thirteen, which is

15  the same definition.

16             Any other objections?

17             MR. BETHEL:  Actually, Your Honor, I would request

18  that it be given both times.  And this is why --

19             THE COURT:  Well, the only thing is that the way it

20  is now, it's given as a part of count one, whereas the second

21  time it says "throughout the charge."

22             It's given as a part of count one.  Whereas the

23  second time it's given to apply everywhere throughout the

24  charge.

25             MR. BETHEL:  And, Your Honor, the only reason I

```
 1   would ask that it be given in both locations is because it
 2   had been given on both of those locations on page ten and
 3   then also on page thirteen.  We have a definition first of a
 4   statement being false or fictitious.  And then we have --
 5            THE COURT:  Well go I did it twice.  It should be
 6   given at the end of count two.
 7            MR. BETHEL:  That would be fine, Your Honor.  The
 8   only reason I say that is because it goes hand and glove with
 9   the definition of first, a false or fictitious statement, and
10   then a false entry.
11            THE COURT:  I have no problems with that.  I just
12   think that the second time it's given generically as applying
13   to the charge where the other time it's given is for count
14   one.  I don't want it to be applying only to count one.
15            MR. BETHEL:  And that's why I would like it to be
16   given twice; to make it clear as to that.
17            THE COURT:  Anything else, Mr. Brunson?
18            MR. BRUNSON:  No, Your Honor.
19            THE COURT:  With that change, the charge will be
20   given.
21            Bring in the jury, and we'll have closing
22   arguments.
23            (Whereupon, the jury was escorted into the
24   courtroom.)
25            THE COURT:  Proceed, Mr. Brunson.
```

```
 1                      CLOSING ARGUMENTS:
 2              MR. BRUNSON:  May it please the Court, ladies and
 3    of the jury.
 4              It was yesterday afternoon, well about this time
 5    yesterday when the jury selection process began.  We took up
 6    the jury selection process for the balance of the morning,
 7    and then about one-fifteen or one-thirty was when you heard
 8    the first witness.  So this case has not taken a real long
 9    time to try.  But as I stated in opening statement, this is
10    an important case for both parties in this case.
11              This case started out with an indictment.  I've
12    explained that to you in opening.  You've heard testimony
13    about it.  The judge is going to give you further information
14    and read the indictment to you and tell what you has to be
15    proved to reach a verdict in this case.  The elements in
16    this, and the judge will go over it in detail and listen to
17    him because what I say is not what you are being charged,
18    that will come from the bench, but first that the defendant
19    -- and this is in violation of nine twenty-two A six which is
20    count one -- that the defendant acquired or attempted to
21    acquire a firearm from a federally firearm licensed dealer.
22              You heard Doug Johnson say that Pawn Central is a
23    federal firearm licensee.  So you know that has been proved.
24    And it really, quite frankly, hasn't been in dispute.  That's
25    something that has to be proved and it has been.
```

1          Second is the defendant knowingly made a false or

2    fictitious statement in writing which was intended to and

3    likely to deceive the dealer.  And certainly this statement

4    was likely to and was intended to deceive the dealer; that

5    statement being, "Are you under indictment for a felony

6    offense?"

7          You know from Bonnie Derrer that prior to December

8    the sixteenth, two thousand and six when this form was filled

9    out, that Mr. Gunnings was under indictment for a felony

10   offense in Georgia.  Not only did she come and testify to you

11   about that, ladies and gentlemen, the parties have agreed to

12   that.  It's a stipulation that has been agreed to.  It is

13   admitted by the Court, and he'll instruct you on how the

14   weight and how to consider a stipulation.

15         I certainly don't want to overlook, because this is

16   the important part of this case, was that statement made by

17   the defendant in writing made knowingly.  Did he know what he

18   was doing when he made that statement.  I'll come back to

19   that, but that is the critical issue of this count.

20         The third element is the defendant -- that the

21   subject matter of a false statement was material to the

22   lawfulness of the sale.  Remember in opening statement I

23   believe I said that materiality was an element, that it

24   didn't have to be proved, that it would be determined by the

25   Court?  He's going to instruct you on that.  And he's going

1  to instruct you that this statement was material.  It was a

2  material statement to determine whether or not Mr. Gunnings

3  could lawfully purchase a firearm.  That's the first count.

4       And count two, and this is the violation of Title

5  Eighteen, Section nine twenty-four A one A, the elements of

6  this offense are that the person named in the indictment was

7  a federal licensee -- that the person named as such in the

8  indictment was a federally licensed firearms dealer at the

9  time the alleged offense occurred.  And that is Pawn Central.

10  And again, Doug Johnson told you that they were.

11       Second, that the defendant made a false statement

12  or representation in the firearms records, the licensed

13  firearms dealer are required by federal law to maintain.

14  Again, Doug Johnson and Agent Panoke told you that federal

15  firearm licensees are required to keep that form forty-four

16  seventy-three.  So that's been proved.

17       Third, that the defendant made the false statement

18  or representation with knowledge of the falsity.  There,

19  again, knowledge is the critical part of this case, both in

20  count one and in count two.  What I'm telling you to combine

21  that is, again, not in dispute because I remember in opening

22  statement by Mr. Bethel, he said that it would be illogical

23  for you to find Mr. Gunnings guilty on one and not guilty on

24  the other, whichever way you twist them.  The issue is the

25  same, did he knowingly make a false statement.

1           Did he make a false statement with knowledge that
2    the statement was false.  When you weigh the evidence,
3    certainly the stipulation, the exhibits, the testimony --
4    some of you have made notes and some of you may not have made
5    notes.  But as the Judge instructed you when he told about
6    making notes, consider your memory of the case and not just
7    any note that was to be taken.  Some didn't take notes.
8    Those who didn't, your input in this case is no less than
9    somebody who took copious notes; that is, full notes of
10   everything.

11          In my observation of the jury, you have been very
12   attentive to the witness and not been busy note-taking.  You
13   have been attentive to what was being said.  But consider
14   that a consideration with care.

15          In the Government's presentation in this case Will
16   Panoke testified he investigated this case.  That he got the
17   form four-forty seventy-three.  He made a copy and you're
18   going to have both of those when you go to deliberate.
19   Government's exhibit one and Government's exhibit one A, and
20   they're actually the same.  You can just read what is on one
21   A whereas you can't on Government's exhibit one.

22          We've already talked about that form four-forty
23   seventy-three.  It is required to be kept, and we got that
24   from Pawn Central, which is a federal firearms licensee.

25          This case came about because Mr. Gunnings had been

1  indicted in Georgia on September the 21st, two thousand and

2  six.  Bonnie Derrer told you that.  Her testimony, as I wrote

3  it down, was that he didn't make one but two court

4  appearances prior to his filling out the form.  Specifically,

5  on November the sixth, two thousand six, and again on

6  December the fourth of two thousand and six he appeared in

7  court and was processed by the Court.

8          After that, on December the sixteenth, two thousand

9  and six he went to Pawn Central, filled out this form in

10  question, and answered the questions just perfectly to

11  acquire a firearm.  But in this case, the system worked.  And

12  because of information received at F. B. I. headquarters, he

13  was denied the purchase.  That doesn't mean he didn't commit

14  the offense, because it includes attempted to purchase as

15  you'll see and you'll be instructed by the judge.  So he had

16  been in court.

17          Now he could come in and argue that if all he was

18  was indicted on September twenty-first, that I didn't know I

19  was indicted, but he made appearances on November the sixth

20  and on December the fourth, both prior to his attempted

21  purchase of his firearm and his filling out that form on

22  December the sixteenth when he said that he was not under

23  indictment.

24          How did he know what he was doing?  Remember in

25  opening statement, and as the judge will tell you, apply your

1    common sense to your deliberations.  The defense is in every

2    witness, I wrote down I believe nine or maybe ten witnesses

3    who testified.  And the gist of every witness was that Mr.

4    Gunnings couldn't read.  Now that goes back from when he was

5    sixteen.  It go goes back to Mr. Fowler.  Scott Fowler had

6    him in the school year nineteen ninety-nine, two thousand.

7         When you look at defendant's exhibit number two,

8    you'll see that school year, nineteen ninety-nine two

9    thousand, was when he was in the eleventh grade.  He had

10   twelfth grade, and at least five more years of learning

11   before he filled out this form in two thousand and six.  He

12   knew what he was doing.  He filled out that form accurately

13   to purchase a firearm.  What direct evidence -- and that's

14   where you can use your common sense, to apply that.  It's

15   circumstantial evidence.  As the judge will instruct you,

16   circumstantial evidence is just as valuable in your

17   deliberations as direct evidence.

18        What direct evidence do you have that Mr. Gunnings

19   knowingly filled out that false statement?  That he knew what

20   he was doing when he answered questions.

21        Bonnie Derrer came as a Government witness.  And

22   she testified about the indictment and about the date of

23   appearances, as I've already described.  And I didn't ask her

24   a lot of questions of her because that had already been

25   stipulated, that he admitted to his felony offense -- excuse

1    me, felony indictment.

2         Mr. Bethel then asked, "You don't know if he can

3    read or write or not, do you?"  Do you remember that

4    question?  That's the first question he asked.  Yes, he can

5    read or write, he filled out the forms.  Mr. Bethel is a

6    great attorney.  He continued to question.  And I'm not sure

7    that I understand her testimony on this because I've tried to

8    correlate the dates as I've listened to witnesses.  Some have

9    had clear understandings of the dates.

10        The aunt, I don't believe knew how long he served

11   in the military, and when he got out.  But we heard a good

12   bit of testimony about his service in the military and I

13   wrote down that when he appeared on at least one of those

14   occasions in Georgia, he was in military uniform.  Remember

15   these the two dates, November the sixth, two thousand six and

16   December the fourth, two thousand and six.

17        Mr. Bethel followed that up with another question

18   about her observing Mr. Gunnings, and she said, "He is

19   obviously literate."  Remember her testimony?  "He is

20   obviously literate."  That is direct evidence in support of

21   the fact that Mr. Gunnings knowingly completed the form which

22   is charged in count one and count two?  One.

23        Of the instructions to listen to pertains to

24   witnesses.  And when you hear the evidence -- or when you go

25   back and hear the instructions and you go back to consider

1    the evidence, the judge is going to instruct you don't weigh

2    your judgment on the number of witnesses.  The weight of the

3    witnesses is not how you're to reach your verdict, and you'll

4    be instructed by the judge.  It's the credibility of the

5    witnesses that you need to hinge your verdict on.

6            Analyze the witnesses.  Put your memory to how they

7    appeared on the stand.  Were their answers direct and

8    succinct?  Did they answer the questions?  Did they know what

9    they were talking about?  Did the witness that you're

10   considering have something to gain or lose by their

11   testimony?  Who had the most to the gain by the testimony,

12   and who had the most to lose.

13           There certainly is a dispute, there is a big

14   dispute, and I'll submit the evidence is clear that Mr.

15   Gunnings could read sufficiently to completely fill out this

16   form, and that he answered one of the questions untruthfully,

17   which is a violation of the law, and your sworn obligation is

18   to hold him accountable for that.

19           I urge you to look over, and I'm sure you will,

20   this form.  It's been handled.  It's been talked about.  It's

21   been shown to witnesses.  A blowup has been made of this

22   exhibit so you know firsthand most of what's on here.  But

23   what not a lot has been said about, other than Steve Wingo

24   who was the employee of the Pawn Central who went over the

25   form in Pawn Central, Is that their portion, portions of page

1    two that he completed with Mr. Gunnings standing before him,

2    having just presented his driver's license.

3           Alabama driver's license, number seven one eight

4    four two three five.  Expiration month oh five.  Date, oh

5    four.  Year, two thousand eight.  He did that with Mr.

6    Gunnings right before having presented his driver's

7    license.

8           I ask you to look also on page two, or on page four

9    is the name is printed.  But on page two of this form where

10   Mr. Gunnings' signature appears, how Ms. Thomas said he wrote

11   small?  See how small this handwriting is where he wrote his

12   signature and the date, certification date, twelve sixteen oh

13   six.  Pass it out.  Look over this form very carefully.

14   Determine yourself if the Government has proved beyond a

15   reasonable doubt, and that's your measure.  Not all doubt,

16   not all possible doubt, but a reasonable doubt that Mr.

17   Gunnings knew what he was doing when he went into Pawn

18   Central in Opelika, Alabama and filled out this form.

19          Another circumstance to consider.  Mr. Johnson gave

20   this testimony.  On the form that you'll examine, that you'll

21   see what he was purchasing a "handgun" is checked.  The

22   options are "handgun," "long gun," "bow".  And there is a

23   square to be checked and the "handgun" is checked.

24          Getting back to Mr. Johnson's testimony, he said

25   that Mr. Gunnings on the day that he made this application

1    purchased a clip for a twenty-two Beretta handgun.  He

2    intended to purchase that firearm.  He knew what he was

3    doing, and in anticipation of every receiving that firearm

4    three days later, he got a clip for it.  That is another

5    indication that he knew what he was doing that you can

6    consider.

7            I have used up part of my time.  And again I thank

8    you for your attention.  I'm going to sit down.  Mr. Bethel

9    will sum up his evidence for you and I will come and make a

10   final summation before the judge instructs you, and then you

11   can go to the deliberate.

12           I thank you for your attention.

13           THE COURT:  Mr. Bethel?

14                      CLOSING ARGUMENTS:

15           MR. BETHEL:  May it please the Court, Your Honor,

16   ladies and gentlemen of the jury.

17           John Cochran graduated from college and taught high

18   school for seventeen years without being able to read, write

19   or spell.  Cochran's life of secrecy started at a young age.

20   He said his teachers moved him up from grade to grade and

21   often placed him in what he calls "the dumb row".  I can

22   remember when I was eight years old saying my prayers at

23   night saying, "Please, God, tomorrow, when it's my turn to

24   read, please let me read."  Cochran later attended Polavary

25   (ph.) High School in Carlsbad, California.

1       He cheated his way through high school, receiving

2   his diploma in June of nineteen fifty-six.  He asked stole

3   tests and persuaded friends to complete his assignments.

4   Cochran earned an athletic scholarship at Texas Western

5   College.  He said his cheating intensified, claiming he

6   cheated in every class.  In nineteen sixty-one Cochran

7   graduated with a Bachelor's degree in education while still

8   illiterate.

9       He then went on to become a teacher during a

10  teaching shortage.  For seventeen years the Cochran taught

11  high school for the Oceanside School relying on teachers'

12  assistance for help and oral lesson plans.  He said he did a

13  great job at teaching his students.

14      It wasn't until he was forty-eight years old that

15  he gave reading and writing another chance.  He drove to an

16  inconspicuous office with a sign he couldn't read.  He

17  studied and worked with a tutor at The Literacy Center in

18  Carlsbad.  Carlsbad City literacy coordinator Terry Scott

19  said that people of all walks of life go through the reading

20  program, including teachers.  That story was in the news back

21  in February of this year.  It was in the actual news.

22  Headlines.

23      Forty-eight years old, seventeen years as a high

24  school teacher could not read, write and spell.  Yet Mr.

25  Brunson would have you believe that because Pierre Gunnings

1    managed to graduate from Auburn High School with an

2    occupational diploma, and because he somehow got in the army

3    and served three years, he must be a genius when it comes to

4    reading.  Pierre Gunnings can't read.  If we know one thing

5    for certain at the conclusion of all the evidence, we know

6    that.

7            Mr. Brunson talked about the witnesses.  Who came

8    up to this witness stand and testified and told you one thing

9    about Pierre Gunnings and his ability to read?  Well, we

10   heard from first of all Mr. Scott Fowler.  His high school

11   teacher.  And he explained what it means to get an

12   occupational diploma.  That's what a Special Ed gets.

13           Mr. Fowler told you that he had a Master's degree

14   in Special Education.  Taught Special Education in Auburn

15   High School for seven years.  He taught Pierre for an entire

16   year.  An hour and-a-half every single day for five years.

17   He told you there was no doubt in his mind that Pierre

18   Gunnings cannot read and couldn't possibly have read those

19   big words on that form that we talked about.

20           Words like "firearm".  "Indictment".

21   "Information".  He told you he couldn't read those words.

22   And  what Mr. Brunson tried to argue to you, he said well, he

23   had a lot of time to learn.  He had a lot of time to figure

24   out how to read those words between nineteen ninety-nine and

25   two thousand, two thousand six.  December of two thousand six

1   when Mr. Gunnings filled out that form at Pawn Central.

2          But what did the other witnesses in this case tell

3   you?  Well, who else did we hear from?  We heard from his

4   aunt, Devereau Racossi.  And she told you that Pierre can't

5   read.  That it was well known in the family that he couldn't

6   read.  She told you that she knew how Pierre got in the army,

7   that his brother William took the test for him to get in.

8          We also heard from Anthony Davis, his cousin, who

9   also told you that everybody in the family knows that Pierre

10  can't read.  We heard from Ms. Butler, his grandmother, the

11  woman who really raised Pierre.  She said she recognized as

12  soon as he came to live with them that he had reading

13  problems.

14         We heard from Tequila Griffin.  She was his

15  girlfriend when?  Beginning about two years ago in the summer

16  of two thousand six, and was his girlfriend for a year.  That

17  would be the summer of two thousand seven.  What's right in

18  the middle of the summer of two thousand six and the summer

19  of two thousand seven?  Well that would be December two

20  thousand six, the time when Mr. Gunnings went to Pawn Central

21  and filled out that form.

22         What did she tell you?  She had absolutely no doubt

23  that Pierre Gunnings can't read.  She filled out a lease for

24  him.  She read to him.  There was no doubt in her mind that

25  he couldn't read.

1           We heard from Eric Gowdy.  He testified you don't

2    have to read to be an infantry troop.

3           First of all, we heard from William Gunnings, his

4    brother, who testified that Pierre can't read.  That he tried

5    to take a test twice, failed miserably both times, and that

6    he shouldn't have done it, it's not proper, no dispute about

7    that, but what's done is done.  That he took his brother's

8    driver's license, memorized his Social Security number, went

9    down and took the test for him, and that's how he got into

10   the army.  And you know what?  I'll guaranty you that's not

11   the first or the last time that something like that has

12   happened in army recruiting.

13          Mr. Brunson hinted that oh, how could he possibly

14   survive three years in the army if he can't read?  How come

15   they didn't throw him out?  Well, let's see.  He got in in

16   late two thousand two.  What was going on?  Well, there was

17   already talk of war in October, November, December of two

18   thousand two because he went to Iraq in two thousand and

19   three.  And when did he serve?  He served during that war.

20   Where did he serve?  He served in Iraq.

21          Does anybody in this room really believe that the

22   army is going to throw someone out because they can't read in

23   the middle of a war?  We got troops in Afghanistan, troops in

24   Iraq.  There are a hundred forty thousand plus there right

25   now.  I just heard a story on National Public Radio this week

1    about an army specialist, not even a sergeant, he's an

2    enlisted troop, because he had prior service they let him

3    back in at the age of fifty-six.  The army needs every man

4    they can get.

5          Now his brother said he wanted to get into the army

6    so he could get a skill.  But where did the army put him?

7    Did they make him a truck driver?  Did they make him a medic?

8    Did they put him in communications?  No.  Where did put him?

9    They made him an infantryman.  What do you need to know to be

10   an infantryman?  You need to know how to shoot a weapon and

11   kill the enemy.  That's what you need to know.  So he didn't

12   get the skills, the technical skills that he hoped to get by

13   joining the army.  And why did the army put him in that

14   career field?  Well, you have to be able to read to do

15   anything else.  That's how he got in the army.

16          So we finally heard from Miss Patsy Thomas.  Again,

17   Master's degree in education.  Been working with literacy

18   programs as a volunteer for thirty years.  Herself an army

19   wife, traveled all over the world working with people who

20   can't read.  What does she tell you?  That two years ago,

21   sometime between January and March of two thousand and six

22   Pierre Gunnings, like Mr. Cochran in the story I told you,

23   found his way to the Lee County Literacy Program because he

24   wanted to learn how to read.

25          Now I tell you what.  If that was some sort of

1    rouse, he is one clever guy.  I know what I'll do, I'll show

2    up in January, get started with this literacy program, fill

3    out a form in December fraudulently, and then later claim I

4    can't tell read.  How about that?  Now does anybody in this

5    courtroom believe that for a minute?  Of course not.  Ms.

6    Thomas said she's tutored him from two thousand six, at the

7    latest March, and until the present.  And she told you in

8    December of two thousand six there was no way he could read

9    and understand the words on this form.  It is simply not

10   possible.  There's no doubt.

11        What was the biggest word that she could think of

12   that Pierre Gunnings could possibly read and maybe understand

13   on his own?  Clear.  Five letters, one syllable.  Mr. Fowler

14   said Pierre could read some small one syllable words.  He

15   can't multisyllabic or polysyllabic words.

16        So one thing we know for sure.  There is one thing

17   we know for absolutely certain, and that is that Pierre

18   Gunnings could not possibly have read and understood these

19   questions and filled this form in based on his own ability to

20   understand those questions.  It's simply not possible.  We

21   know that.

22        They didn't offer any, any evidence to dispute the

23   fact that Pierre Gunnings can't read.  So the only question

24   is, then, how did that get filled out?  Well obviously

25   somebody had to tell Mr. Gunnings how to full it out

1    ultimate.

2           Now let's look at some of the things on this form.

3    What do we have under "county"?  Lee.  What do we have under

4    "foreign country"?  "Lee".  Now if you can't read, there is

5    only one letter difference between county and country.  Do

6    you see any squiggly lines that look very much like those

7    squiggly lines with one very minor difference.  If you can't

8    read, and you know if you put Lee in here you'll put Lee

9    right in there.  That's what happens if you can't read.

10           How many people in this room, how many members of

11   the jury, the judge, the members of the court personnel, the

12   members of the defense team, the prosecutor, the witnesses,

13   how many of us would have made that mistake on this form?

14   How many?  Not one.  Not one single person.  There is only

15   one person in this courtroom who would have made that

16   mistake, and it's the one man in the courtroom who cannot

17   read, and that would be Pierre Gunnings.

18           How about this.  A-l-b-a-m-a crossed out and the

19   correct spelling written in.  How many members of the jury,

20   or the judge, or the courtroom personnel, or the prosecutor

21   would have made that mistake, would have misspelled the state

22   in which they live?  Not one.  Only one person in this

23   courtroom that would have made that mistake, and that's the

24   man who cannot read and that's Pierre Gunnings.

25           And how about these questions.  How do they get

1  filled out?  Well we really don't know.  We know he didn't

2  understand those questions.  I'll tell you what's likely to

3  have happened.  When was it?  Sixteen December two thousand

4  six.  That's right in the middle of what season?  The

5  Christmas shopping season.  We know that the Mr. Wingo said

6  the pawnshop is very busy.  It gets a lot of customers.  It's

7  right in the middle of the Christmas shopping season.  What's

8  likely to have happened?

9         Mr. Gunnings hesitates, doesn't know what to do, he

10  can't fill out the form because he can't read it.  What's Mr.

11  Wingo say?  Look, yes, the rest are no, done.  That's it.

12  It's that simple.  Now he's never going to admit it.

13         What did Agent Panoke testify?  He said it's

14  against the law to him tell him what to put down on it.  He's

15  not going to admit that.  He's not going to get up on the

16  witness stand and admit that he broke the law by simply

17  telling him what to fill out.  But he's working at a busy

18  pawnshop during the Christmas season.  Look, yes, no, done.

19         But what's the problem with that?  One problem.

20  That last question is not supposed to be no.  What does that

21  question read?  If you answered yes to question eleven point

22  L, this one right here, do you fall within any of the

23  exceptions set forth in four, exception two.  What?  Well, if

24  you can read one those questions you know you're not going to

25  put anything in there.

1          But if you can't read, you put no, just like you
2     did for the previous question.  What's the previous question?
3     "Are you a nonimmigrant alien?"  First of all, he can't read
4     a work like "nonimmigrant."  He can't read a word like
5     "alien".  He didn't know.  He just filled it out the way the
6     pawnshop employee told him to fill it out.  And that's what
7     he did.  Cross that out, write in N A and put your initials
8     right there.

9          Now that had to happen.  There is no other way that
10    that could have been crossed out in a written and P. G.
11    written in.  He wouldn't have known to do that.  I wouldn't
12    have known to do that.  You wouldn't have known to do that.
13    None of us would.  Only somebody who works in that industry
14    and fills out those kinds of forms all the time would know
15    that's wrong, here's what you have to do.  So the pawnshop
16    employee had to tell him that.

17         Now imagine what it must be like to be Pierre
18    Gunnings and have to sit here in this courtroom and listen to
19    this parade of witnesses come in and tell you he can't read.
20    What did Ms. Thomas and Mr. Fowler tell you?  That's
21    something people don't readily admit.  They try to hide it.
22    They try to keep it a secret.  Mr. Fowler told you especially
23    for males.  They especially are embarrassed, humiliated and
24    don't want people to know they can't read.

25         Mr. Gowdy was an army buddy.  A good army buddy.

1    It took him a year to find out before Mr. Gunnings confided

2    in him.  Jamal Byrd.  What did Jamal Byrd tell you?  I forgot

3    to mention him earlier.  Mr. Gunnings lived with him for two

4    years and his family.  He told you about how he filled out

5    all those forms for him, for job applications, for a credit

6    application.  He had no doubt that Pierre Gunnings can't

7    read.  It took him five or six years to find out that Pierre

8    can't read before Pierre admitted it to him.

9           So is it any surprise, ladies and gentlemen of the

10   jury, that on that day, that Agent Panoke called him on the

11   phone and wanted to question him about this form?

12          Mr. Brunson asked well, did he tell you that he

13   couldn't read?  No.  Aha, he must be lying about the fact he

14   can't read.  What do you expect Pierre Gunnings to do?  This

15   man calls him he's never met, tells him he's a federal agent,

16   tells him he wants to talk to him about filling out this

17   form, this question, you answered no, that's false.  Do you

18   really expect Pierre Gunnings to say I'm sorry, I'm an idiot.

19   I'm be a moron, I can't read.  I'm twenty-six years old and

20   I?  Can't read a lick.  That's absurd.  It's absolutely

21   ridiculous.

22          So what did he say according to Agent Panoke?

23   Well, I didn't know I was under indictment.  Agent Panoke

24   said he was driving, sounded preoccupied.  He's going to say

25   anything other than the truth, which is he can't read.  And,

1    you know, if all you're relying on is the facts and the

2    evidence, how can you twist things around like what Agent

3    Panoke did?  How can you have to throw something out there

4    where the Court has to give an admonishment to the jury that

5    he never should have said that?  How come when I asked him a

6    simple question I couldn't get a simple answer?

7    How come when I asked him didn't Mr. Gunnings sound

8    preoccupied on the phone?  What was his answer?  Well, what

9    did he say?  "Well, that's possible."  Then I asked him now

10   wait a minute, when you testified earlier in front of the

11   judge, isn't that the word you used?  "Well yes, it is."

12   That's his word.  It came right out of his mouth.  I just

13   asked him to admit that he said it and he tries to hedge.

14   "Well, that's possible."  Why?  Why?  If all you're relying

15   on is the facts and truth, why are you trying to do that.

16          What did Agent Panoke really add to the case?  Not

17   much.  He wasn't there when that form got filled out.  He

18   didn't even bother the pawnshop employees for three months.

19   Ninety days.  That's why Mr. Wingo couldn't pick him up out

20   of a lineup.  He didn't remember the transaction.  The only

21   reason he knew that he was involved was because he recognized

22   his handwriting and his name on the form.  He couldn't tell

23   us anything about how it actually transpired.  They have to

24   prove that.

25          Proof beyond a reasonable doubt, not only that the

1    letters N O are written in this case, but Pierre Gunnings at

2    the time that he wrote that in there not only knew what that

3    question was, but understood it.  Because he has to knowingly

4    make a false or fictitious statement.  That's in the

5    instructions the judge is going to give you.

6         Mr. Wingo can't even tell you how that transaction

7    transpired.  He doesn't remember.

8         What did Mr. Johnson add to the case?  Well, he

9    said that Pawn Central is a federally licensed firearm

10   dealer.  Okay.  No dispute.  That's it.  He didn't remember

11   Pierre Gunnings.  He specifically said he couldn't pick him

12   out of a lineup.  He had nothing to do with this transaction.

13   That's it.

14        How about the rest of the Government's case?  How

15   about the fourth witness?  The assistant district attorney

16   who said oh I've got the forms.  He can read and write.  He's

17   literate.  Gave you a specific conclusion.

18        And the one thing I do agree with Mr. Brunson that

19   he said during his closing statement, he said that Mr. Bethel

20   is a very good attorney.  I heard him say that and I'll

21   concur with that.  And because I'm a good attorney I didn't

22   stop there.  What did I ask her?  Now wait a minute, did you

23   see him fill out that form?  Well, no.  Did you see him read

24   it?  No.  Did you hear him read it out loud?  No.  So

25   actually you don't know whether he filled out that form,

1    right?  Well, that's right.  She admitted it.

2         How presumptuous and arrogant on her part to simply

3    say that because she's got a form that somebody filled out

4    and that he signed it, that she can therefore conclude that

5    he's literate, that he can read and write when she wasn't

6    there and didn't see who filled out the form?  But what do

7    you expect her to say?  She's a prosecutor.  Just like

8    Mr. Brunson, her job is to prosecute people and throw them in

9    prison.  That's what she does for a living.

10        Now I wouldn't have been a very good attorney if I

11   hadn't asked those follow-up questions and had her admit that

12   she didn't see him fill out that form.  She didn't see him

13   read it.  She was basing that conclusion on the fact that it

14   was filled out and had his signature on it.

15        How many people testified that they have helped

16   Pierre Gunnings fill out forms?  Jamal Byrd did.  His

17   girlfriend, Tequila Griffin, did.  Job applications, credit

18   applications, leases.  That's their says.  That is their

19   whole case.  Those four witnesses.  And here's what they want

20   you to do.  They want you to give them the benefit of a

21   doubt.  They have not proven, not even close to beyond a

22   reasonable doubt whether the Pierre Gunnings wrote the

23   letters N O on that form, that he could read and understand

24   or somebody explain to him what's on that form.  Not even

25   close.

1          But you know what?  In this courtroom, in our

2    system of justice, prosecutors don't get the benefit of the

3    doubt.  The benefit of the doubt goes to one person and one

4    person only and that is the person who is accused.  The

5    person who walks into this courtroom with a presumption of

6    innocence.  That's why they have to prove their case beyond a

7    reasonable doubt.  Because this isn't communist China, this

8    isn't North Korea, this isn't Cuba.

9          We don't have governments that run around and lock

10   people up because they don't like what they say, because they

11   think they might be a criminal.  Don't give them a trial,

12   let's throw away the key.  This isn't a communist country.

13   This is a country where the rule of law applies.  And because

14   we value freedom and liberty so highly, we have decreed as a

15   nation, it's not enough if you think somebody might have

16   committed a crime, it's not enough if you think that it's

17   more than likely than not that they committed a crime, it's

18   not even enough if you think they probably committed a crime.

19   You can't throw someone in prison in this country unless you

20   can prove beyond a reasonable doubt that they're guilty of a

21   crime.  And the Government hasn't done that.

22          Mr. Brunson just threw it out there.  Oh, he filled

23   this form out perfectly.  Country, Lee; misspelled Alabama;

24   cross that out and then fix that.  That doesn't look

25   perfectly to me.  Does that look perfectly to you?

1          He also said there is intent to deceive.  There is

2   no intent to deceive in filling out that form the way it's

3   filled out unless you can conclude beyond a reasonable doubt

4   that Pierre Gunnings knowingly put a false statement on

5   there.  That's the key.  And this case is all about

6   knowingly.  That's what this case is about.  And the simple

7   fact of the matter is that they haven't come close to proving

8   beyond a reasonable doubt that Pierre Gunnings knowingly

9   falsified the information.

10         As I said in my opening statement, count one, count

11  two, there is very little difference between the two.  They

12  both are all about whether that form was knowingly and

13  intentionally falsified with the intent to deceive.  That's

14  the question.  They haven't proved it.  What we know for sure

15  -- The only thing we really know beyond a reasonable doubt is

16  that Pierre Gunnings can't read.

17         So beyond that, they would have to prove just

18  exactly how that got to him.  What did the pawnshop owner

19  tell him?  How much help did he give him in filling out that

20  form?  Did he explain it thoroughly, or did he just tell him,

21  as is certainly possible, hey, this is yes, the rest are no.

22  Date the form.  It's the middle of the Christmas season.  Let

23  me know and write a check.  It's a pawnshop.  It's not the F.

24  B. I.  It's not the A. T. F.  It's a pawnshop. Anybody that's

25  ever been in a pawn shot knows it is not exactly a federal

1    government agency.

2           So is that a possibility?  Absolutely.  And they

3    have done nothing to remove that possibility.

4           Forty eight years old.  School teacher.  Seventeen

5    years as a high school teacher, and couldn't read, write or

6    spell.

7           Finally walked into that literacy office because he

8    wanted to learn how to read.  Just like Pierre Gunnings did,

9    a disabled, Iraqi war veteran and he wanted to learn to read.

10   You know what?  If he could read and write, if he could

11   understand, well certainly he knew he was under indictment.

12   We don't dispute that.  It's not an issue.  If he could read

13   and understand, you know what that said?  The minute he read

14   that he either would have put yes or he just walked out of

15   there.  He could have said, thanks, never mind.  And you know

16   what.

17          Anybody in this courtroom, it wouldn't take you

18   more than fifteen minutes on the street to talk to a few

19   people and find out where you could buy a piece from some guy

20   for fifty bucks without having to do it legally and lawfully

21   from a federal firearms licensed dealer.  It just doesn't

22   make any sense.  He didn't want to go on the street and just

23   buy a piece.  Saturday night special fifty bucks?

24          The simple matter of the fact is, ladies and

25   gentlemen of the jury, that the Government hasn't proved

1    their case beyond a reasonable doubt.

2            Now Mr. Brunson gets to get up here and talk to you

3    again.  This is my only chance.  Why does he get to talk to

4    you twice?  Why does he get to start the closing argument and

5    end the closing argument?  Because the burden of proof rests

6    with the Prosecution.  Pierre Gunnings has no burden to

7    present any evidence whatsoever in this courtroom.  And I

8    submit to you if we didn't put on one single witness, not one

9    single witness to explain that Pierre Gunnings doesn't read,

10   they still haven't proved that he could read or understand,

11   or somebody explained that question to him.  Even without

12   that.

13           But with the witnesses that we put on, again, the

14   testimony that's undisputed.  Truth beyond a reasonable doubt

15   is proof of sufficient that we're going to convict someone

16   and we're going to deprive them of their liberty and throw

17   them behind bars?  Not even close.  Not even close, ladies

18   and gentlemen of the jury.

19           Very simple.  When you deliberate, you should find

20   Pierre Gunnings not guilty.

21           THE COURT:  Mr. Brunson?

22           MR. BRUNSON:  Thank you, Your Honor.

23                    REBUTTAL CLOSING ARGUMENT:

24           MR. BRUNSON:  Thank you, Your Honor.

25           Ladies and gentlemen, we're close to the end of the

1    attorneys and the witnesses' part of this case.  Then the

2    judge will instruct you, and you'll decide the case as the

3    finder of facts.

4           As I get started in this final summation, the first

5    thing I wanted to point out, I wrote down during Mr. Bethel's

6    closing to you, I wish that when he quoted me, or attempted

7    to, he would do so accurately.  The first thing I wrote down,

8    he said, I would have you believe that Mr. Gunnings was a

9    genius when it comes to reading.  Did I ever say or imply, or

10   try to elicit from any witness that Mr. Gunnings was a genius

11   when it comes to reading?  It's obvious he has some reading

12   difficulties.  He has for years.

13          I'll submit to you that when he filled out that

14   forty-four seventy-three, he knew what he was doing.

15          Mr. Bethel said Doug Johnson didn't have much to

16   say, but he said it was a federal firearm licensee.  Well,

17   ladies and gentlemen, I assure you of one thing, if I hadn't

18   gotten that out of his testimony, that would have been a

19   major thrust of Mr. Bethel's argument that we didn't prove

20   that it was a federal firearm licensee, because that's an

21   element of the offense, as you've heard me describe time and

22   time again.  He was an important part of this case.

23          I also told you in opening that no one witness

24   would put together all of the puzzle pieces.  The other

25   witnesses you could infer he considered to give important

1    testimony because he attacked them.  He attacked their

2    credibility.

3          First Steve Wingo, he said that it was apparent

4    that Steve Wingo told him to write down yes, then no no no no

5    no.  How do you know he didn't do it?  Because he told you he

6    didn't.  That's a figment of Mr. Bethel's imagination.  He

7    was an important witness.  He did not, as he told you, tell

8    Mr. Gunnings how to fill out that form.

9          Assistant District Attorney Bonnie Derrer.  Mr.

10   Bethel attacked her for saying that Mr. Gunnings is obviously

11   literate and he knew how to fill out the form because he

12   filled them out.  That's credible evidence.  He couldn't

13   overlook that credible evidence, so he has to attack the

14   witness.

15         Then he attacks Agent Panoke.  He's trying a law

16   enforcement officer's order.  You should not, and you'll be

17   instructed, any more faith and credit to a law enforcement

18   officer than you should to any other witness.  I'm sure

19   that's common sense to you and you wouldn't anyway.  But you

20   should consider what he has to say, weigh his demeanor on the

21   stand, measure what he had to say with other being facts that

22   came out, and while it may be inappropriate in my opinion,

23   it's often the case that defense attorneys when they don't

24   have any other defense attack law enforcement.

25         You have heard a number of witnesses.  But it boils

1    down to this:  As the triers of the facts, the judges of the

2    facts, did Pierre Gunnings know what he was doing when he

3    filled out the question eleven B on form forty-four

4    seventy-three when he stated, "Are you under indictment or

5    information in any court for a felony or any other crime for

6    which the judge could imprison you for more than one year?"

7    And he answered, "No."

8           He knew that he was under indictment in Georgia.

9    He had made two court appearances.

10          Are you going to weigh the testimony of Steve Wingo

11   that he didn't fill out or assist in filling out that form?

12   That's in consideration of Mr. Bethel's argument to you that

13   that's the only thing that could have happened.  I submit to

14   you, ladies and gentlemen, that's not correct argument.  Mr.

15   Gunnings knew what he was doing.  You've got a sworn

16   obligation to find a fair and impartial verdict without

17   regard to bias or prejudice or sympathy.  And I'll submit

18   that verdict is going to be guilty for counts one and count

19   two.

20          Thank you.

21                    CHARGE TO THE JURY:

22          THE COURT:  Members of the jury, why don't we take

23   about a five minute recess.  When we come back I will charge

24   you as to the law.

25          (Whereupon, a recess was taken.)

1          THE COURT:  Members of the jury, the clerk is now

2     passing out copies of my instructions on the law.  I'm going

3     to ask that you read these instructions along with me.  These

4     are your copies, so you can mark on them.

5          Again, as I said before, I'm going to ask that you

6     read these instructions along with me.

7          It is now my duty to instruct you on the rules of

8     law that you must follow and apply in deciding this case.

9     When I have finished you will go to the jury room and begin

10    your discussions, what we call your "deliberations".  It will

11    be your duty to decide whether the Government has proved

12    beyond a reasonable doubt the specific facts necessary to

13    find the defendant guilty of the crime charged in the

14    indictment.

15         You must make your decision only on the basis of

16    the testimony and other evidence presented here during the

17    trial.  And you must not be influenced in any way by public

18    opinion, or by either sympathy, or prejudice for or against

19    the defendant or the Government.  Both the defendant and the

20    Government expect a fair trial at your hands, and that you

21    will carefully and impartially consider this case without

22    prejudice or sympathy.

23         You must also follow the law as I explain it to

24    you, whether you agree with that law or not.  You must follow

25    all of my instructions as a whole.  You may not single out or

```
 1   disregard any of the Court's instructions on the law.

 2              Now the from time to time --

 3              Yes?

 4              JUROR:  It's missing some pages, I think.

 5              THE COURT:  You're missing a page?

 6              JUROR:  Yes, sir.

 7              THE COURT:  Okay.  Are you missing page two?

 8              JUROR:  It starts out, and then it goes to page

 9   four here.

10              THE COURT:  Is everyone missing page two?

11              JUROR:  No, I'm not.

12              THE COURT:  Will you check and make sure you have

13   all of the pages?  Look at the bottom.  If there is anyone

14   who is missing a page, let me know and we'll make sure you

15   get a copy.  The whole document is seventeen pages.

16              I'm going to start at the top of page two, because

17   some you have are missing the page two.

18              And you must not be influenced in any way by public

19   opinion or by either sympathy or prejudice for or against the

20   defendant or the Government.  Both the defendant and the

21   Government expect a fair trial at your hands, and that you

22   will carefully and impartially consider this case without

23   prejudice or sympathy.

24              You must also follow the law as I explain it to

25   you, whether you agree with that law or not.  And you must
```

1    follow all of my instructions as a whole.  You may not single

2    out or disregard any of the Court's instructions on the law.

3            Now the indictment, or formal charge, against any

4    defendant is not evidence of guilt.  Indeed, every defendant

5    is presumed by the law to be innocent.  The law does not

6    require a defendant to prove innocence or to produce any

7    evidence at all.  And if a defendant elects not to testify,

8    you should not consider that in any way during your

9    deliberations.  The Government has the burden of proving a

10   defendant's guilt beyond a reasonable doubt, and if it fails

11   to do so you must find that defendant not guilty.

12           Now while the Government's burden of proof is a

13   strict or heavy burden, it is not necessary that a

14   defendant's guilt be proved all possible doubt.  It is only

15   required that the Government's proof exclude any reasonable

16   doubt concerning the defendant's guilt.  A reasonable doubt

17   is a real doubt based upon reason and common sense after

18   careful and impartial consideration of all the evidence in

19   the case.  Proof beyond a reasonable doubt, therefore, is

20   proof of such a convincing character that you would be

21   willing to rely and act upon it without hesitation in the

22   most important of usual own affairs.

23           If you are convinced that the defendant has been

24   proved guilty beyond a reasonable doubt, say so.  If you are

25   not so convinced, say so.

1          As stated earlier you must consider only the
2    evidence that I have admitted in the case.  The term
3    "evidence" includes the testimony of the witnesses and the
4    exhibits admitted in the record.  Remember that the opening
5    statements and closing statements are not evidence in the
6    case.  It is your own recollection and interpretation of the
7    evidence that controls.  What is said during the opening
8    statements and closing statements is not binding upon you.

9          Also, you should not assume anything I may have
10   said that I have any opinion concerning any of the issues in
11   the case.  Except for my instructions to you on the law, you
12   should disregard anything I may have said during the trial in
13   arriving at your own decisions concerning the facts.

14         Now when considering the evidence you may make
15   deductions and reach conclusions which reason and common
16   sense lead you to make.  And you should not necessarily be
17   concerned about whether the evidence is direct or
18   circumstantial.  "Direct evidence" is the testimony of one
19   who asserts actual knowledge of a fact, such as an
20   eyewitness.  "Circumstantial evidence" is proof of a chain of
21   facts and circumstances tending to prove or disprove any fact
22   in dispute.  The law makes no distinction between the weight
23   you may give to either direct or circumstantial evidence.

24         Now in saying that you must consider all of the
25   evidence I do not mean that you must accept all of the

1    evidence as true or accurate.  You should decide whether you

2    believe what each witness had to say and how important that

3    testimony was.  In making that decision you may believe or

4    disbelieve any witness in whole or in part.  Also the number

5    of witnesses testifying concerning any particular dispute is

6    not necessarily controlling.

7              In deciding whether you believe or do not believe

8    any witness I suggest you ask yourself a few questions.

9              Did the witness impress you as one who was telling

10   the truth?

11             Did the witness have any particular reason not to

12   tell the truth?

13             Did the witness have a personal in the outcome of

14   the case?

15             Did the witness seem to have a good memory?

16             Did the witness have the opportunity and ability to

17   observe accurately the things he or she testified about?

18             Did the witness appear to understand the questions

19   clearly and answer them directly?

20             Did the witness's testimony differ from other

21   testimony or other evidence?

22             You should also ask yourself whether there was

23   evidence tending to proving that a witness testified falsely

24   concerning some important fact, or whether there was evidence

25   that at some other time a witness said or did something, or

1    failed to do or say something which was different from the

2    testimony the witness gave before you during that trial.

3    That was splayed before you during the trial.

4          You should keep in mind, of course, a simple

5    mistake by a witness does not necessarily mean that the

6    witness was not telling the truth as he or she remembers it

7    because people naturally tend to forget some things or

8    remember other things inaccurately.  So if a witness has made

9    a misstatement, you need to consider whether that

10   misstatement was simply an innocent lapse of memory or an

11   intentional falsehood, and that may depend upon whether it

12   has to do with an important fact or only an unimportant

13   detail.

14         Now you've heard the testimony of several law

15   enforcement officials.  The fact that a witness may be

16   employed by the Government as a law enforcement official does

17   not mean that his or her testimony is necessarily deserving

18   of more or less consideration, or greater or lesser weight

19   than that of an ordinary witness.

20         At the same time, it is quite legitimate for the

21   defense counsel to try to attack the credibility of a law

22   enforcement witness on the grounds that he or she, or that

23   his or her testimony may be colored by a personal or

24   professional interest in the outcome of the case.  It is your

25   own decision after reviewing all of the evidence whether to

1  accept the testimony of the law enforcement witnesses, and to

2  give that testimony whatever weight, if any, you decide it

3  deserves.

4         Now when the Government offers testimony or

5  evidence that a defendant made a statement to someone, the

6  jury should consider the evidence concerning such a statement

7  with caution and great care.  It is for you to decide first,

8  whether the defendant made the statement; and, second, if so,

9  how much weight to give to it.  In making these decisions you

10 should consider all of the evidence about the statement,

11 including the circumstances under which the defendant may

12 have made the statement.

13        Now the jury the defendant is Pierre Marcello

14 Gunnings.  The defendant is charged in a two count

15 indictment.  I will now read count one of the indictment to

16 you.

17        Count one.  "On or about December sixteen, two

18 thousand and six in Lee County within the Middle District of

19 Alabama Pierre Marcello Gunnings, defendant herein, had

20 attempted the acquisition of a firearm, a better description

21 of which is otherwise unknown to the grand jury, from Pawn

22 Central, Incorporated, a licensed dealer of firearms, did

23 knowingly make a false and fictitious statement to Pawn

24 Central Incorporated which statement was intended and likely

25 to deceive Pawn Central, Incorporated as to a fact material

1    to the lawfulness of such sale and other disposition of the

2    said firearm in that the defendant represented that he was

3    not under indictment or in information in any court for a

4    felony, or any other crime for which the judge could imprison

5    him for more than one year, even if he received a shorter

6    sentence through probation.

7         "The fact that the defendant was indicted under

8    case number zero six four six nine three in the Cobb Superior

9    Court in the state of Georgia on September twenty-one, two

10   thousand and six and arraigned on October thirteen, two

11   thousand and six, all in violation Title Eighteen, united

12   States Code, Section nine two two A six."

13        Title Eighteen, United States Code, Section nine

14   two two A six makes it a federal crime or offense for anyone

15   in the process of buying firearms of making a false statement

16   to a licensed firearms dealer.  The defendant can be found

17   guilty of that offense only if all of the following facts are

18   proved beyond a reasonable doubt.

19        First, that the defendant acquired, or attempted to

20   acquire, a firearm from a federally licensed firearms dealer

21   as charged.

22        Second, that in doing so the defendant knowingly

23   made a false or fictitious statement in writing which was

24   intended to likely to deceive such dealer.

25        And, third, that the subject matter of the false

1    statement was material to the lawfulness of the sale.

2            The term "firearm" means any weapon which is

3    designed to, or may be readily converted to dispel a

4    projectile by the action of an explosive.  And the term

5    includes the frame or receiver of any such weapon, or any

6    firearm muffler or firearm silencer.

7            A federally licensed firearms dealer is one who is

8    organized or licensed by the federal government to legally

9    sell and purchase firearms.

10            And statement is false or fictitious if it was

11    untrue when made.  And that it had been known to be untrue by

12    the person making it.

13            A false statement is likely to deceive if the

14    nature of the statement, considering all of the surrounding

15    circumstances at the time, would probably mislead or deceive

16    a reasonable person of ordinarily prudence.

17            The materiality of the alleged false statement is

18    not a matter with which you are concerned, but rather is a

19    question for the Court to decide.  You are instructed that

20    the alleged false statement is fraud in the indictment if

21    proved it related to a material fact.

22            The word "knowingly" as that term has been used

23    from time to time in these instructions means that the act

24    was done voluntarily and intentionally, and not because of

25    mistake or accident.

1              I will now read count two of the indictment.    "On

2    or about December sixteen, two thousand six in Lee County

3    within the Middle District of Alabama, Pierre Marcello

4    Gunnings, the defendant herein, knowingly made a false

5    statement and representation to Pawn Central, Incorporated, a

6    person licensed under the provisions of Chapter forty-four of

7    Title Eighteen, united States Code, with respect to the

8    information required by the provisions of Chapter forty-four

9    of Title Eighteen, United States Code to be kept in the

10   record of Pawn Central, Incorporated in that the defendant

11   responded "No" to the question eleven B, which asks, "Are you

12   under indictment or information in any court for a felony or

13   any other crime in which the judge can imprison you for more

14   than one year, even if you receive a shorter sentence

15   including probation?"

16             The fact that the defendant was indicted in case

17   number zero six four six nine three in the Cobb Superior

18   Court in the state of Georgia on September twenty-one, two

19   thousand and six and arraigned on October thirteen, two

20   thousand and six, all in violate of Title Eighteen, United

21   States Code, Section nine to four A one A." Title Eighteen,

22   United States Code, Section nine two four A one A R. makes it

23   a federal crime or offense for any person to make a false

24   statement or representation with respect to information

25   required to be kept in any record a licensed firearm dealer

1    is required by federal law to keep.

2            An A. T. F. form forty-four seventy-three is a

3    record which a federally licensed firearms dealer is required

4    by federal law to keep or maintain.

5            The defendant can be found guilty of that offense

6    only if all of the following facts are proved.

7            First, that the person named as such in the

8    indictment was a federally licensed firearms dealer at the

9    time the alleged offense occurred.

10           Second, that the defendant made a false statement

11   or representation in the firearm records the licensed

12   firearms dealer was required by federal law to maintain.

13           And, third, that the defendant made the false

14   statement or representation with knowledge of the falsity.

15           An entry in a record is false if it was untrue at

16   the time it was made and was then known to be untrue by the

17   person who made it.

18           The word "knowingly" as that term has been used

19   form time to time in these instructions means the act was

20   done voluntarily and intentionally, and not because of

21   mistake or accident.

22           Now you will note that the indictment charges that

23   these offenses occurred on or about a certain day.  The

24   Government does not have to prove with certainty the exact

25   date of the alleged offense.  If the Government proves beyond

1  a reasonable doubt that the offense was committed on a date

2  reasonably near the date alleged.

3      A separate crime is charged with each count of the

4  indictment.  Each count, and the evidence pertaining to it,

5  should be considered separately.  The fact that you may find

6  the defendant guilty or not guilty in one of the crimes

7  charged should not control your verdict as to the other.  I

8  caution you, members of the jury, that you are here to

9  determine from the evidence in this case whether the

10  defendant is guilty or not guilty.  The defendant is on trial

11  only for the specific offenses alleged in the indictment.

12      Also, in the question of punishment should never be

13  considered by the jury in any way in deciding the case.  If

14  the defendant is to be convicted, the matter of punishment is

15  for the judge alone to determined.

16      Any verdict you reach in the jury room, whether

17  guilty or not guilty, must be unanimous.  In other words, to

18  return a verdict you must all agree.  Your deliberations will

19  be secret.  You will never have to explain your verdict to

20  anyone.

21      It is your duty as jurors to discuss the case with

22  one another in an effort to reach agreement if you can do so.

23  Each of you must decide the case for yourself, but only after

24  full consideration of the evidence with the other members of

25  the jury.  While you are discussing the case do not hesitate

1    to reexamine your opinion and change your mind if you become

2    convinced that you were wrong.  But do not give up your

3    honest beliefs solely because the others think differently,

4    or merely to get the case over with.  Remember that in a very

5    real way you are judges, judges of the fact.  Your only

6    interest is to seek the truth from the evidence in the case.

7           Now when you go to the jury room you should first

8    select one of your members to act as your foreperson.  The

9    foreperson will preside over your deliberations and will

10   speak for you here in court.

11          If you should desire to communicate with me at any

12   time, please write down your message or question and pass the

13   note to the security officer who will bring it to my

14   attention.  I will then respond as promptly as possible

15   either in writing or by having you return to the courtroom so

16   I can address you orally.  I caution you, however, with

17   regard to any message or question you might send, that you

18   should not tell me your numerical division at that time.

19          Now a verdict form has been prepared for your

20   convenience.  You will take the verdict form to the jury

21   room, and when you have reached unanimous agreement you will

22   have your foreperson fill in the verdict form, date it and

23   sign it, and then you'll return to the courtroom.

24          Now I'm going to ask that you step out at this

25   time.  Take all of your personal belongings with you,

1    including your coats and so forth.  When you come back in,

2    you're going to stand right across here.  You won't go back

3    to the jury box.  That's why you should take everything with

4    you.  That includes your notes as well as my instructions on

5    the law.

6            Please step out for just a minute.

7            Do not discuss the case.

8            (Whereupon, the jury was escorted out of the

9    courtroom, and the following colloquy ensued):

10            THE COURT:  Counsel, for some reason the definition

11    of "knowingly" popped up on the last page of my charge.  Was

12    it on the last page on yours?

13            MR. BETHEL:  No, Your Honor.

14            THE COURT:  I don't think it was on the jury's

15    charge.  But anyway, it's just a redefinition.

16            Anything else?

17            MR. BRUNSON:  The United States is satisfied, Your

18    Honor.

19            MR. BETHEL:  Satisfied, Your Honor.

20            THE COURT:  Very good.

21            Who are the alternates?  I will tell them, since it

22    is now eleven-thirty, that they can go to lunch from twelve

23    until one, and I will give them my standard instructions

24    about lunch.  I won't bring them back in here, however, if

25    they desire to go to lunch.  If they go to lunch, then you

```
 1   will go to lunch at that time and I will go to lunch.  If
 2   they don't go to lunch, then we will wait.
 3              Bring the jury back in.
 4              (Whereupon, the jury was escorted into the
 5   courtroom.)
 6              THE COURT:  Right across here is fine.  Face me,
 7   please.
 8              Members of the jury, my instruction has another
 9   definition of "knowingly," but apparently it's not on your
10   copies.  The computers are sort of doing their own thing
11   today.  I think you have the correct instructions now.
12              Now I have Ms. Davenport and Mr. Jordan.  You are
13   our two alternates.  You would have served in case one of the
14   other twelve could not have served.
15              Thank you very much for your service, and you're
16   free to go at this time.  You may leave your notes here.  I
17   know it's been an imposition to appear, but, again, thank you
18   very much.
19              MR. BETHEL:  Your Honor, should they be instructed
20   not to discuss the case until after a verdict has been
21   returned in the event something should happen to one of the
22   jurors and they would have to replace that juror?
23              THE COURT:  That is true.  So the two of you,
24   please don't discuss the case in case we have to replace a
25   juror later.
```

1          Members of the jury you may now begin your
2    deliberations.

3          It's now eleven-thirty.  If you don't have a
4    verdict by noon, you may go to lunch from twelve until one.
5    I will leave that up to you as to whether you want to or not.
6    If you decide to go to lunch, notify the security officer and
7    he will let you go to lunch from twelve until one.  We won't
8    go to lunch until you go to lunch.

9          Now if you decide to go to lunch, you're under
10   these instructions.  While at lunch you may not discuss the
11   case.  You may not resume your deliberations until one
12   o'clock, and you may resume them only when that twelfth juror
13   is present.  So when you come back from lunch, if eleven of
14   you come back and one of you is late, you can't talk about
15   the case.  Only when that twelfth juror is in the jury room
16   may you resume your deliberations after lunch.

17         Also we're in tight quarters again.  I want to
18   remind you that if you go to lunch, should it end up that you
19   might see one of the lawyers or one of the parties or one of
20   the witnesses at one of the restaurants around here, it's
21   very important, particularly now since you're in your
22   deliberations, not to say anything to them because we don't
23   anyone to think that someone has said something improper to
24   you.  So that's really to maintain your confidentiality.  Not
25   even giving the appearance of saying something to someone

1    else inappropriate.

2             You may now begin your deliberations.

3             Court will be in recess until we have a verdict

4    from the jury.

5             (Whereupon, the jury was escorted out of the

6    courtroom to enter into its deliberations at eleven

7    thirty-two a.m.).

8                          VERDICT OF THE JURY:

9                          (TWO FORTY-SEVEN P.M.)

10            THE COURT:  Counsel, I understand the jury has

11    reached a verdict.

12            (Whereupon, the jury was escorted into the

13    courtroom at two forty-seven p.m.)

14            THE COURT:  I understand you've reached a verdict,

15    is that correct?

16            THE FOREPERSON:  Yes, sir.

17            THE COURT:  Will you hand the verdict to the clerk

18    of the court.

19            (Whereupon, the court examined said document.)

20            THE COURT:  The clerk of the court is directed to

21    file the verdict and read it.

22            COURTROOM DEPUTY CLERK:  "As to the charge in count

23    one of the indictment we, the jury, find the defendant,

24    Pierre Marcello Gunnings, guilty.

25            "As to the charge in count two of the indictment

1  we, the jury, find the defendant, Pierre Marcello Gunnings,

2  guilty.

3           "Done this thirteenth day of May two thousand

4  eight, Tracy Yocal (sic.), foreperson."

5           THE COURT:  Anything else from this jury, Mr.

6  Brunson?

7           MR. BRUNSON:  Not from the United States, Your

8  Honor.

9           THE COURT:  Mr. Bethel, would you like the jury

10  polled?

11           MR. BETHEL:  Yes, Your Honor.

12           THE COURT:  Members of the jury, I'm going to have

13  you polled this time.  What that means is that the clerk will

14  call out your last name.  Answer yes if the verdict is yours,

15  answer no if the verdict is not.  So as your name is called,

16  answer yes if the verdict is yours, and answer no if the

17  verdict is not yours.

18           (Whereupon, the jury was polled and each and every

19  juror confirmed the verdict as read.)

20           THE COURT:  Members of the jury, I'd like to thank

21  you very much for your service.  The genius of this country

22  is that this is the way we resolve matters.  And you have

23  been a conscientious jury.  I'd like to thank you very much.

24  You are excused at this time.

25           (Whereupon, the jury was escorted out of the

```
 1    courtroom.)

 2              THE COURT:  Would you bring the defendant forward.

 3              Based on the verdict of the jury, it is the order,

 4    judgment and decree of the Court that the defendant is guilty

 5    of both counts of the indictment.  Sentencing will be set at

 6    July thirty-one at ten o'clock.

 7              The defendant is in the custody of the marshal.

 8              (Whereupon, the proceedings were concluded at three

 9    forty-eight p.m.)

10                        * * * * * * * *

11                  COURT REPORTER'S CERTIFICATE

12        I certify that the foregoing is a correct

13    transcript from the record of proceedings in the

14    above-entitled matter as prepared by me to the best of

15    my ability.

16        I further certify that I am not related to any of

17    the parties hereto, nor their counsel, and I have no

18    interest in the outcome of said cause.

19        Dated this 3rd day of June 2008.

20

21

22              \s\ Mitchell P. Reisner, CM, CRR
                MITCHELL P. REISNER, CM, CRR
23              Official US Dist. Court Reporter
                Registered Professional Reporter
                Certified   Real-Time   Reporter
24

25
```